FILED
12/6/2022 3:11 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Belinda Hernandez DEPUTY

CAUSE NO. DC-22-16847
_____

| | | |
|---|---|---|
| CHRISTINA AGUAYO | § | IN THE DISTRICT COURT OF |
| | § | |
| v. | § | |
| | § | 191st _____ JUDICIAL DISTRICT |
| CONGRESSWOMAN VERONICA | § | |
| ESCOBAR | § | |
| | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION AND
## ALTERNATIVE MOTION TO COMPEL ARBITRATION

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff, Christina Aguayo ("Plaintiff"), complaining of Defendant Congresswoman Veronica Escobar ("Defendant"), would show the Court as follows:

I.

### CASE LEVEL

1.      Discovery is intended to be conducted under Level 3 pursuant to Tex. R. Civ. P. 190. Plaintiff requests the Court enter a docket control order.

2.      Pursuant to Tex. R. Civ. P 47, Plaintiff states that the damages sought are within the jurisdictional limit of the court. Plaintiff seeks monetary relief exceeding $1,000,000.

3.      The Court has jurisdiction over the parties and the subject matter. Plaintiff is a resident of Texas and Defendant is a resident of Texas.

II.

### PARTIES

4.      Plaintiff Christina Aguayo is an individual who is appearing in court through her attorneys of record, Robert E. Goodman, Jr. and John S. Morgan, Kilgore & Kilgore, PLLC, 3141 Hood Street, Suite 500, Dallas, Texas 75219.

5.      Defendant Honorable Congresswoman Escobar is an individual who can be served with process by certified mail at 221 N. Kansas Street, Suite 1500, El Paso, Texas 79901.

III.

JURISDICTION AND VENUE

6.      The Court has subject matter jurisdiction because the amount in controversy exceeds the minimum jurisdictional amount of this Court.

7.      The Court has personal jurisdiction over Defendant, a resident of Texas.

8.      Venue is proper in Dallas County, Texas. This lawsuit is based on a pattern of tortious interference and defamation committed by Defendant specifically intended to tortiously interfere with, and cause the termination of, the existing contractual employment relationship between Plaintiff and her former employer, Nexstar Media, LLC ("Nexstar"). Such employment relationship was governed by a written contract between Plaintiff and Nexstar entitled Performer Employer Agreement (the "PEA") dated July 28, 2021, in Dallas County, Texas. The PEA is attached as Exhibit "A." The PEA provides in paragraph 8 that Nexstar is located in the Dallas, Texas metropolitan area, with a corporate address of 545 E. John Carpenter Freeway, Suite 700, Irving, Texas 75062. Further, the PEA provides in paragraph 13 "that exclusive venue for any court proceeding will be in Dallas County, Texas." The PEA, in paragraph 16, contains a broad arbitration provision that covers all issues stemming from the employment of Plaintiff with Nexstar. Paragraph 16 provides that arbitration must occur pursuant to the Federal Arbitration Act before the American Arbitration Association ("AAA") and can occur in the AAA's office located at 13455 Noel Road, Suite 1750, Dallas, Texas 75240. Plaintiff has filed an arbitration proceeding against Nexstar in the AAA's Dallas office. Nexstar wrongfully terminated Plaintiff's employment under the PEA due to Defendant's torts that tortiously interfered with Plaintiff's

employment relationship with Nexstar pursuant to the PEA. But for Defendant's acts of tortious interference (which included Defendant's tort of defamation in the forms of both libel and slander), Plaintiff would still be employed by Nexstar under the terms of the Dallas-based PEA.

9.      Nexstar's termination of Plaintiff was ostensibly justified by a letter to Plaintiff dated February 8, 2022, signed by Mr. David Candelaria, General Manager of Nexstar's television network affiliate KTSM-TV9. The letter is attached as Exhibit "B". It claimed that Nexstar fired Plaintiff based on paragraph 3(b)(xii) of the PEA, for alleged conduct "that tends to bring you [Plaintiff], the company [Nexstar], the station and the station's sponsors into a negative public light, jeopardizes the reputation or success of the company [Nexstar], or otherwise reflects unfavorably on the company [Nexstar]."

10.      Defendant's torts of defamation and tortious interference with Plaintiff's employment relationship with Nexstar, governed by the PEA, consisted of: (1) sending repetitive emails and making repetitive phone calls to Nexstar's management complaining about and libeling and slandering Plaintiff and her news reporting; (2) repetitively demanding through emails and phone calls that Nexstar terminate Plaintiff's employment; (3) encouraging or demanding that other persons who were either employed by Defendant or who supported Defendant libel or slander Plaintiff in order to pressure Nexstar to fire Plaintiff from her job; and (4) taking other acts intended by Defendant to tortiously interfere with Plaintiff's employment with Nexstar, to be demonstrated at trial.

11.      Defendant's torts occurred while Defendant was located either in her Congressional office in Washington, D.C., or in her local district office in El Paso, Texas. Plaintiff believes in good faith that Defendant perpetrated most if not all her torts against Plaintiff while located in Washington, D.C. To the extent Defendant's torts were perpetrated in

Washington, D.C., any motion to transfer venue out of Dallas County to El Paso County, Texas would be baseless. Similarly, even if some of acts and omissions underlying Defendant's torts occurred in El Paso, Texas, that fact would not defeat venue in Dallas County, because Dallas is a proper venue for this case, and Plaintiff has the right to choose any proper venue in which to bring suit.

12.    Texas law is well-settled that when a plaintiff has selected a county of proper venue, it would be reversible error for a court to transfer this case to another venue that may also have been a proper venue. Moveforfree.com v. Hetrick, Inc., 288 S.W. 3d 539, 541-42 (Tex. App. – Houston [14th Dist.] 2009, no pet.) ("In Texas, the plaintiff has the right to choose venue in the first instance. … If … the plaintiff has chosen a proper venue, the trial court must maintain venue in the plaintiff's chosen county unless a mandatory venue provision applies or the defendant brings forth 'conclusive evidence' that destroys the plaintiff's prima facie proof."), citing Tex. R. Civ. P. 87(3)(c). Accord In re Henry, 274 S.W. 2d 185, 190 (Tex. App. – Houston [1st Dist.] 2008, orig. proceeding) ("plaintiffs are allowed to choose venue first, and the plaintiff's choice of venue cannot be disturbed as long as the suit in initially filed in a county of proper venue"); see also GeoChem Tech Corp. v. Verseckes, 962 S.W. 2d 541, 544 (Tex. 1988) (venue may be proper in more than one county under the venue rules), citing Tex. Civ. Prac. & Rem. Code Section 15.002 (a) (1). In this case, there is no mandatory venue provision that requires a change of venue.

13.     Since Dallas County is a county of proper venue for this case, any attempt by Defendant to move this case to another county, such as El Paso County, "is improper as a matter of law." Moveforfree, 288 S.W. 3d at 541, citing Lynn-Smith Chevrolet-GEO, Inc. v. Tidwell, 161 S.W. 3d 738, 742 (Tex. App. – Fort Worth 2005, no pet.).

14.     If Defendant files a motion to transfer venue, Plaintiff invokes her right to conduct venue discovery to enable Plaintiff to present a full record of pertinent facts, and particularly the location in which Defendant committed torts against Plaintiff, to the Court. It is well settled that a party opposing a motion to transfer venue is entitled to conduct venue discovery prior to the trial court's hearing on a motion to transfer venue. Tex. R. Civ. P. 88, entitled "Discovery and Venue" ("Deposition transcripts, responses to requests for admission, answers to interrogatories and other discovery products containing information relevant to a determination of proper venue may be considered by the court in making the venue determination … ."); Montalvo v. Fourth Court of Appeals, 917 S.W. 2d 1 (Tex. 1995).

IV.

FACTUAL BACKGROUND

15.     Plaintiff signed the PEA with Nexstar on September 7, 2021 at Nexstar's television network affiliate KTSM-TV9 ("KTSM") as an on-screen news reporter. The PEA defined Plaintiff's role as a "performer," with "such duties as [were] assigned to [her] from time to time by the Company" [Nexstar]. Exhibit "A", page 1, para. 1. While employed, Plaintiff diligently performed her assigned duties consisting of preparing and broadcasting various news stories. Plaintiff received prior approval from KTSM's management, who were all Nexstar employees, for all the news stories she reported on television, including stories she developed during her personal time off.

PLAINTIFF'S ORIGINAL PETITION AND
ALTERNATIVE MOTION TO COMPEL ARBITRATION — Page 5

16.    Due to the tortious interference of Defendant with Plaintiff's employment agreement with Nexstar governed by the PEA, Nexstar terminated Plaintiff's employment on February 8, 2022 in breach of the PEA, falsely claiming Plaintiff had engaged in conduct detrimental to Nexstar, citing two news stories Plaintiff broadcasted at KTSM, both of which KTSM's management had actually approved prior to airing. Nexstar's termination of Plaintiff's employment was preceded by and accompanied by libelous and slanderous statements published by Defendant and by Nexstar's KTSM employees, and by other non-employees at the request of Defendant.

17.    The events leading to Plaintiff's wrongful termination began with complaints by Defendant regarding Plaintiff's reporting of certain news stories which KTSM had approved prior to the broadcast of such stories. Such complaints by Defendant did not constitute a valid reason for Nexstar's termination of the PEA under paragraph 3 of the PEA entitled "Termination," subsection (b)(xii), and did not justify the defamatory statements made about her by Defendant or at Defendant's behest.

18.    From the beginning of Plaintiff's employment at KTSM until October 20, 2021, its management and employees held Plaintiff in high regard, providing her positive feedback for her excellent job performance. This changed after October 21, 2021, when Plaintiff interviewed Texas Attorney General Ken Paxton. When Plaintiff arrived at KTSM's office to meet with her photographer to proceed with the interview, KTSM's assignments manager, Andra Litton, the assistant to the station's news director, and Tim Gutierrez, KTSM's news director, approached Plaintiff and instructed her to ask Attorney General Paxton a list of questions prepared by Ms. Litton which had not been either submitted to or approved by Mr. Paxton in advance. Ms. Litton and Mr. Gutierrez provided this instruction to Plaintiff at the insistence of Defendant. Pre-

approval of questions by political figures such as Attorney General Paxton is normal and customary in the television reporting industry. Ms. Litton and Mr. Gutierrez instructed Plaintiff to "blindside" Mr. Paxton and apologize for asking unapproved questions afterwards. Plaintiff refused this unethical instruction because complying with their demand would not only be detrimental to Plaintiff's reputation as a journalist, but, also, Attorney General Paxton had never previously agreed to an interview with a local station in El Paso and "blindsiding" Mr. Paxton could deter him from conducting any other news interviews in El Paso. Of course, Plaintiff did not want to repudiate her commitment regarding questions she provided to Mr. Paxton prior to the interview. Plaintiff reasonably suspects Ms. Litton prepared the list of unapproved questions because Ms. Litton worked on one more election campaigns for Defendant and is a close friend of Defendant's Communications and Special Projects Director, Elizabeth Lopez-Sandoval, and both Defendant and Ms. Lopez-Sandoval had political differences with Attorney General Paxton.

19.    On October 28, 2021, KTSM aired Plaintiff's interview with Attorney General Paxton on its Sunday night news show. The next day, October 29, 2021, Ms. Litton and Chris Babcock, KTSM's website director, removed Plaintiff's interview with Mr. Paxton from its website at the insistence of Defendant. Ms. Litton and Mr. Babcock told Plaintiff that KTSM's news director, Mr. Gutierrez, and general manager, Mr. Candelaria, instructed Ms. Litton and Mr. Babcock to remove the Ken Paxton interview. Since Mr. Candelaria had approved airing the Ken Paxton interview in advance, Plaintiff went to his office to verify the truth of their claim that he had approved the removal of the story from KTSM's website. Plaintiff determined Mr. Candelaria did not find anything objectionable either about Plaintiff's interview of Attorney

General Paxton or KTSM's decision to air that story and did not approve of the removal from KTSM's website. Mr. Candelaria then instructed Ms. Litton and Mr. Babcock to put the story back on the station's website.

20.    Subsequently, Mr. Candelaria told Plaintiff by telephone that Defendant called Mr. Candelaria about the Ken Paxton story and complained about Plaintiff and the story based on views contrary to those of Attorney General Paxton. Defendant told Mr. Candelaria that she was very angry that Plaintiff's interview and subsequent news story did not contain information regarding legal troubles of Mr. Paxton. Defendant requested that Mr. Candelaria remove Plaintiff from news broadcasting on the air through KTSM, meaning that Defendant demanded KTSM no longer permit Plaintiff to report any news stories. After Mr. Candelaria received the complaining phone call from Defendant about Mr. Paxton's interview, Mr. Candelaria informed Plaintiff that her news reporting needed to be "more balanced," which under the circumstances, necessarily meant that Plaintiff should only report stories which satisfied Defendant's views.

21.    The interview of Mr. Paxton was the starting point of Defendant's campaign of complaining repeatedly to Mr. Candelaria about Plaintiff and repeatedly demanding KTSM remove Plaintiff from her news reporting duties. Mr. Candelaria read to Plaintiff texts and emails from Defendant received numerous times per week, all containing complaints about Plaintiff and seeking her termination from employment by KTSM.

22.    Subsequently, Plaintiff learned that multiple false and defamatory stories about her were published on various social media platforms. One false and defamatory story was instigated by an employee of Defendant's office, who Plaintiff reasonably believes was Ms. Lopez-Sandoval, who provided false information to the Democratic Party of El Paso, which itself then published false defamatory statements about Plaintiff on its own Facebook social

media site. The same or similar false defamatory statements were also made by Ms. Lopez-Sandoval to others who published them on the websites of KissFM 93.1, a so-called Lionstar Blog, the website for the Democratic Party of El Paso, and FTVLive.com. These social media sites published false defamatory stories regarding Plaintiff's interview of Attorney General Paxton and her employment at KTSM beginning on October 28, 2021, continuing until the termination of Plaintiff's employment on February 8, 2022, and even continuing thereafter. These false defamatory publications stated Plaintiff's reporting of her interview of Ken Paxton was "unbalanced," "inaccurate," "right leaning," "did not question [Attorney General] Paxton's facts," and was a "five minute campaign ad [for Mr. Paxton]." The same publications also falsely and defamatorily referred to numerous KTSM news staff complaining of biased and inaccurate reporting by Plaintiff.

23.    Mr. Gutierrez subsequently admitted to Plaintiff that Defendant, Ms. Lopez-Sandoval and the Chairwoman of the El Paso Democratic Party, Dora Oaxaca, actively encouraged and assisted in the publication of the false defamatory statements about Plaintiff by the three entities, KISSFM 93.1, Lionstar Blog and FTVLive.com, noted above, in order to convince KTSM to fire Plaintiff in violation of the PEA, notwithstanding that Plaintiff's news report about Mr. Paxton was honest, unbiased and approved in advance by KTSM. Defendant herself told Mr. Candelaria that she had provided false defamatory information regarding Plaintiff to Ms. Lopez-Sandoval, and that Ms. Lopez-Sandoval subsequently provided this information to the Democratic Party of El Paso, which published a post defaming Plaintiff on Facebook. Plaintiff's reporting of her interview of Attorney General Paxton created an untenable

situation for Plaintiff at KTSM from October 28, 2021 through the date of her wrongful termination of employment by Nexstar on February 8, 2022 due to Defendant's escalating tortious interference.

24.     On or about November 9, 2021, Plaintiff interviewed Congressman Tony Gonzales, representing a Congressional district adjacent to that represented by Defendant. After this interview, Plaintiff reached out to Defendant by email, asking to interview Defendant if she wanted to respond to statements made by Congressman Gonzales. Defendant did not respond to Plaintiff's email inquiry. When KTSM reported Plaintiff's interview of Congressman Gonzales on television, Plaintiff accurately stated she had reached out to Defendant but that Defendant had not responded to Plaintiff's email by the time of the broadcast.

25.     After the broadcast of Plaintiff's interview of Congressman Gonzales Defendant called Mr. Candelaria and stated that she was very upset about Plaintiff's reporting of the interview of Congressman Gonzales. Defendant demanded that KTSM force Plaintiff to apologize for reporting that Defendant did not respond to Plaintiff's email even though Defendant knew Plaintiff had contacted her and Defendant did not respond. In order to appease Defendant, Mr. Candelaria responded by reprimanding Plaintiff by text message and demanded that Plaintiff prove that she had emailed Defendant for a comment. Plaintiff then provided to Mr. Candelaria her email to Defendant. Even though Mr. Candelaria received proof of Plaintiff's email to Defendant, Mr. Candelaria and Mr. Gutierrez wrote an apology for Plaintiff and forced Plaintiff to read this apology on television regarding her prior statement that Defendant did not respond to Plaintiff's request for response to her email. His forcing Plaintiff to lie on television was outrageous and was done to appease Defendant.

26.    On or about November 19, 2021, Plaintiff came to KTSM on her day off to conduct an exclusive interview with Texas Governor Greg Abbott. Prior to this interview, Governor Abbott had not consented to any local interviews in El Paso. Mr. Gutierrez was in the control booth during Plaintiff's interview of Governor Abbott. After this interview, Mr. Gutierrez praised Plaintiff for her interview of the Governor.

27.    On or about November 20, 2021, KTSM broadcast Plaintiff's interview of Governor Abbott. Mr. Candelaria again praised Plaintiff's work after KTSM aired the interview. Defendant demanded that KTSM remove Plaintiff from her job as an on-screen news reporter and also demanded that KTSM remove the story about Governor Abbott from the KTSM website. Defendant complained to Mr. Candelaria about Plaintiff and her news story about Governor Abbott in both emails and text messages. Mr. Candelaria called Plaintiff into his office and informed Plaintiff that Defendant was "blowing up" his phone and email with her anger regarding the news story. Due to Defendant's vociferous complaints, Mr. Candelaria began himself criticizing Plaintiff again and again told Plaintiff that her news reporting had to be "more balanced" in order to appease Defendant.

28.    Plaintiff's employment under the PEA was further subjected to additional interference by Defendant after Plaintiff interviewed Irene Armendariz–Jackson, Defendant's political opponent in her last election to Congress, which Defendant won. KTSM approved in writing Plaintiff's interview for on-screen news broadcast. After KTSM aired the interview, Defendant became infuriated and she complained about Plaintiff again to Mr. Candelaria, who again told Plaintiff that Defendant had been continually complaining about Plaintiff and continually demanding that KTSM terminate Plaintiff's employment. Approximately one week later, Mr. Gutierrez told Plaintiff that he was exhausted with constantly dealing with Defendant's

complaints regarding Plaintiff and the news stories which Plaintiff presented on-screen notwithstanding all had received prior approval from KTSM management. Mr. Gutierrez reprimanded Plaintiff and told her KTSM would extend Plaintiff's 90-day probation another thirty days solely based on the constant angry communications by Defendant in response to the interview of Ms. Armendariz–Jackson and other news stories presented by Plaintiff, all approved in advance by KTSM. Neither Mr. Gutierrez nor Mr. Candelaria, however, accused Plaintiff of providing either improper or biased content in her interview of Ms. Armendariz-Jackson.

29.     During her additional 30 days of probationary employment, Plaintiff refrained from reporting any news stories addressing current events. This caused Plaintiff to lose followers on social media and to lose her popularity and respect in the local El Paso community.

30.     On or about February 1, 2022, Plaintiff interviewed a former U.S. Border Patrol agent named Bill Jackson regarding the morale of the Border Patrol and what was occurring behind the scenes regarding the situation at the U.S.-Mexican border. Mr. Jackson is the husband of Ms. Armendariz–Jackson. Plaintiff's story was approved for a KTSM television broadcast in advance by Mr. Gutierrez. After the story aired, Mr. Gutierrez praised the story and Plaintiff's handling of the interview of Mr. Jackson. Defendant was upset about the story and she sent numerous emails and text messages complaining about Plaintiff to Mr. Candelaria about the story, including again asking Mr. Candelaria to terminate Plaintiff's employment.

31.     On February 2, 2022, Plaintiff sent an email to Defendant requesting an interview. Defendant refused Plaintiff's request for an interview. Ms. Lopez-Sandoval replied to Plaintiff's request to interview Defendant by an email to Plaintiff, dated February 3, 2022 at 2:50 PM, with a copy to Timothy Gutierrez, David Candelaria and others. Ms. Lopez Sandoval wrote: "Good afternoon, Christina. Thank you for reaching out. I'm so sorry if KTSM didn't inform you, but

months ago your supervisors and my office agreed that given your track record of dishonest reporting, Congresswoman Escobar will not be granting you any interviews. My best, Elizabeth."

32.   On or about February 5, 2022 or February 6, 2022, Plaintiff ran a twenty-second story about a Trump rally in Texas. Due to Plaintiff's concerns regarding Defendant's hostile criticism of Plaintiff, Plaintiff limited the story to inform the public that the Trump rally occurred in Texas, that Governor Abbott was present at the rally and the Governor appeared on the stage and made some public statements. Plaintiff ran a five second sound bite from Governor Abbott while he was speaking on the stage. This story was also approved in writing by Mr. Gutierrez prior to KTSM airing it. After KTSM aired the story, Defendant and her staff sent several emails and made several phone calls again complaining about Plaintiff generally and the Trump rally story specifically, to Mr. Candelaria. Both Mr. Candelaria and Mr. Gutierrez informed Plaintiff that they were spending an inordinate amount of time dealing with Defendant's complaints regarding Plaintiff and pre-approved news stories which she reported on air.

33.   On February 8, 2022, Nexstar terminated Plaintiff's employment with Nexstar, claiming the reason for her termination was Plaintiff's broadcasting of the two news stories regarding Mr. Jackson and the Trump rally. Nexstar falsely claimed, illogically and without explanation, that the publication of these news stories, although approved in advance by KTSM management, was "conduct detrimental" to Nexstar and its affiliate KTSM. Nexstar's termination of Plaintiff's employment would not have occurred but for Defendant's repetitive acts of tortious interference and libel and slander and aiding and abetting libel and slander by others intended to force Nexstar to fire Plaintiff.

V.

PLAINTIFF'S CAUSES OF ACTION

34.     Defendant repeatedly committed the torts of tortious interference in Plaintiff's existing employment relationship with Nexstar as well as libel and slander, and aiding and abetting libel and slander by others against Plaintiff. Defendant's torts of tortious interference, libel and slander and aiding and abetting libel and slander by others and defamation were specifically intended to disrupt and cause the termination of the employment relationship between Plaintiff and Nexstar governed by the PEA. Defendant perpetrated tortious interference against Plaintiff and made repeated false defamatory statements about Plaintiff with actual knowledge that such false defamatory statements made against Plaintiff by Defendants and by others at the request of Defendant could be effective to disrupt or bring about the termination of Plaintiff's employment relationship Nexstar. Defendant also knew that her pattern of tortious interference and libel and slander, and aiding and abetting of libel and slander, through her repetitive phone calls, emails and texts continually defaming Plaintiff and encouraging defamation of Plaintiff by others, all of which Defendant orchestrated, would severely damage, if not destroy, Plaintiff's career as a journalist and a television reporter under the PEA and in the future and also cause Plaintiff substantial psychological distress. At Defendant's request, multiple others publicly falsely defamed Plaintiff by accusing her of dishonesty in her reporting, political bias, publishing intentionally false information, being a "fake journalist," carrying out a "far-right agenda," as well as other similar false criticisms. These false defamatory statements were, in addition to being made by non-employees of KTSM, made by some employees of KTSM in order to appease Defendant, and were also published by non-employees on various public and social media platforms based on requests made by Defendant or on Defendant's

behalf. Defendant's torts of tortious interference, libel and slander and aiding and abetting of liable and slander, proximately caused Plaintiff to sustain actual damages.

VI.

PLAINTIFF'S DAMAGES

35.     Plaintiff's claim for actual damages against Defendant includes her past pecuniary losses consisting of her past lost wages and benefits from the date of her wrongful termination to the date of the conclusion of this case. These damages can be calculated based on her weekly salary set forth in the PEA, plus the value of her dental and vision insurance coverage and her cell phone allowance in the approximate amount of $580 per month paid by Nexstar, as well as her loss of rental income in the amount of $1,500 per month, because Plaintiff remains unemployed and cannot afford to rent an apartment and therefore Plaintiff is residing in a home that she had previously rented to tenants and from which had previously derived income.

36.     Plaintiff has been unable to obtain new employment as a journalist or a news reporter due to the negative job reference from Nexstar and the false defamatory social media posts, blogs and statements other publicly available about her, all of which occurred due to Defendant's tortious interference with Plaintiff's employment relationship with Nexstar and libel and slander of Plaintiff and aiding and abetting of libel and slander of Plaintiff by others. Plaintiff has a claim for pecuniary or monetary losses against Defendant for a substantial loss of earning capacity and lost wages and benefits in the future and in all reasonable probability for the remainder of Plaintiff's work life, which even on a present value basis, is very substantial. Plaintiff has also suffered damage to her personal and professional reputation in substantial amounts to be decided by the fact-finder in this case.

37.     Plaintiff has also sustained substantial non-pecuniary damages for her mental anguish with physical and bodily manifestations in the past, present and into the future and probably for the remainder of her life. These damages include Plaintiff suffering from depression, self-doubt, feelings of hopelessness, persistent crying, loss of self-esteem, constant anxiety, stress and fear over her finances, loss of sleep, worries about her reputation and career, flashbacks, nightmares, heartbreak and social isolation due to fear of facing more unjustified defamation and accusations of impropriety. These damages were all proximately caused by Defendant's tortious interference and defamation, and these damages severely and adversely impact Plaintiff's daily life and activities.

38.     Plaintiff also seeks to recover from Defendant punitive or exemplary damages, in an amount in the discretion of the fact-finder, to punish Defendant for her intentional and malicious tortious misconduct, and to deter Defendant from engaging in similar misconduct in the future. Plaintiff shall demonstrate by clear and convincing evidence the tortious misconduct of Defendant occurred deliberately, with malice, and with specific knowledge by Defendant that her misconduct would harm Plaintiff and posed a severe risk of serious harm or damage to Plaintiff.

39.     Plaintiff seeks to recover from Defendant all of Plaintiff's actual and punitive or exemplary damages which Defendant proximately caused.

40.     Plaintiff has satisfied all conditions precedent to asserting all of her claims.

VII.

ALTERNATIVE MOTION TO COMPEL ARBITRATION

41.     Plaintiff requests the Court order Defendant to participate as a party in the AAA arbitration proceeding which Plaintiff initiated against Nexstar in Dallas, Texas, on October 25, 2022. Plaintiff's Arbitration Demand and related Claim in Arbitration are attached as Exhibits "C-1" and "C-2." Plaintiff sent a letter to Defendant on October 26, 2022, inviting Defendant to participate in this arbitration. Defendant refused the invitation by email, a copy of which is attached as Exhibit "D." For the reasons set forth below, this Court should not sustain Defendant's refusal, but order Defendant to participate as a party in this arbitration.

42.     The PEA required arbitration pursuant to the Federal Arbitration Act ("FAA") of disputes relating to Plaintiff's employment under the PEA. Paragraph 16 of the PEA states: "Company and Performer [Plaintiff] agree to resolve any and all disputes or claims related in any manner whatsoever to this Agreement and/or to Performer's employment, including but not limited to, all claims beginning from the period of Performer's application for employment with the Company through termination of employment at Company, by binding arbitration … ." The FAA provides that written arbitration agreements concerning transactions in interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 111-12 (2001). The FAA embodies a "liberal federal policy favoring arbitration." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). That policy requires "ambiguities as to the scope of the arbitration clause itself [to be] resolved in favor of arbitration." Volt Information Sciences, Inc. v. Board Of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 476 (1989). A party seeking to compel arbitration "must show (1) that a

valid agreement to arbitrate exists, (2) that the movant is entitled to invoke the arbitration clause, (3) that the other party is bound by that clause, and (4) that the claim asserted comes within the clause's scope." InterGen N.V. v. Grina, 344 F.3d 134, 142 (1st Cir. 2003). Plaintiff has invoked the agreement to arbitration within the PEA by filing an arbitration proceeding against Nexstar in Dallas, Texas. Under applicable law, Defendant is properly bound by the PEA's arbitration clause and Plaintiff's claims against Defendant are within the scope of the agreement's arbitration clause, mandating joinder of Defendant in the arbitration proceeding against Nexstar.

43.    It is well-settled that a court can order a non-signatory to participate in an arbitration even though the non-signatory did not sign a contract containing an arbitration clause. Crawford Professional Drugs, Inc. v. CVS Caremark Corp., 748 F. 3d 249 (5th Cir. 2014). Federal courts have recognized six theories under the FAA to bind non-signatories to arbitration proceedings: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; (5) estoppel, and (6) third-party beneficiary. See J.E. Grenig, Alternative Dispute Resolution § 7:4 (3d ed. 2005); 1 LNPG: MA Alternative Dispute Resolution § 4.20 (2018); Bridas S.A.P.I.C. v. Gov't of Turkmenistan, 345 F.3d 347, 356 (5th Cir. 2003), cert. denied, 541 U.S. 937 (2004). Because arbitration is governed by a contract, the legal grounds for compelling a non-signatory to arbitrate are governed by state law. Arthur Anderson LLP v. Carlisle, 556 U.S. 624, 630 (2009); Lawson v. Life of the S. Ins. Co., 648 F.3d 1166, 1170 (11th Cir. 2011).

44.    Under a theory of estoppel, a non-signatory to an arbitration agreement can either compel another party to attend arbitration, or can be compelled to arbitration, if the claims involving the non-signatory are inextricably intertwined with claims identified in a contract containing an arbitration clause mandating an arbitration. V3 Construction Company, LLC v. Butler, No. 02-20-00214-CV, 2021 WL 51991 (Tex. App.—Fort Worth 2021, pet. denied). In

Hayes v. HCA Holdings, Inc, 838 F.3d 605 (5th Cir. 2016), the Fifth Circuit applied Texas law and ruled intertwined claims can require the arbitration of claims against a non-signatory to an arbitration agreement when the claims are intimately founded upon and intertwined with the underlying contractual obligations that contain an arbitration clause. The Hays court affirmed the federal district court's order which applied intertwined claims estoppel to compel arbitration of claims against a non-signatory in a dispute involving an employee's wrongful termination claim. Similarly, the Fifth Circuit ruled, in U.S. Health Group, Inc. v. South, 656 Fed. Appx. 194 (5th Cir. 2015) (applying Texas law), that arbitration under the FAA for a non-signatory is appropriate if the arbitrable claims and the claims involving the non-signatory are inherently inseparable even beyond being inextricably intertwined. Id. at 199-200. Although the Fifth Circuit affirmed the district court's denial of arbitration under the facts of that case, the Court held that claims involving a non-signatory to a contract directly related to the terms of the contract at issue requires a non-signatory to participate as a party in arbitration. Id., citing Carr v. Main Development, LLC, 337 S.W. 3d 489, 497-99 (Tex. App. – Dallas 2011, pet. denied).

45.     In Natgasoline, LLC v. Refractory Construction Services, Co., LLC, 566 S.W. 3d 871 (Tex. App. – Houston [14th Dist.] 2019, pet. denied), the court explained that the doctrine of intertwined claims estoppel compels a non-signatory's participation in arbitration when the non-signatory has a close relationship with the signatory to a contract with an arbitration agreement, or the claims involving the non-signatory are "intimately founded in and intertwined with the underlying contract obligations." Id. at 888, citing In re Merrill Lynch Trust Co., 235 S. W. 3d 185, 193 (Tex. 2007).

46.     In this case, the PEA between Plaintiff and Nexstar contained a very broad arbitration clause. The torts of Defendant were specifically intended to cause and did cause the

termination of Plaintiff's employment with Nexstar, governed by the PEA. In light of the fact that Plaintiff has filed a AAA arbitration proceeding in Dallas County against Nexstar for wrongful termination in violation of PEA, and since all of the torts of Defendant alleged herein are based on her specific and relentless desire to coerce or unduly pressure Nexstar into terminating its employment relationship with Plaintiff under the PEA, Plaintiff's claims against Defendant are entirely intertwined with, and entirely relate to, the terms of Plaintiff's employment with Nexstar under the PEA. It is proper, therefore, to compel Defendant to attend arbitration. Natgasoline, 556 S. W. 3d at 88; see also Ascendant Anesthesia PLLC v. Abazi, 348 S. W. 3d 454 (Tex. App. -- Dallas 2011, no pet.) (the district court denied an employer's motion to compel arbitration, but the Dallas Court of Appeals reversed, ruling that "claims, even if otherwise not arbitrable, can become arbitrable when [the claims at issue are] factually intertwined with arbitrable claims"), citing Texas Petrochemicals LP v. ISP Water Management Services, LLC, 301 S.W. 3d 879, 880 (Tex. App. -- Beaumont 2009, no pet.). The Abazi court further held that a non-signatory falls within the scope of an arbitration agreement, thereby requiring the non-signatory's participation in arbitration, if the allegations involving the non-signatory are factually intertwined with arbitrable claims or otherwise touch upon the subject matter of the agreement containing the arbitration provision. Id. at 462.

47.     The Court ordering Defendant to participate in Plaintiff's arbitration against Nexstar as a party is also justified by the doctrine of direct benefits estoppel. Under this legal doctrine, a non-signatory such as Defendant, who seeks the benefit of an agreement, including the PEA between Plaintiff and Nexstar, or who seeks to enforce the terms of the agreement, cannot avoid the arbitration clause in the agreement. EnGlobal U.S., Inc. v. Gatlin, 449 S.W. 3d 269, 274-75 (Tex. App. – Beaumont 2014, no pet.). The Gaitlin court held that if a non-signatory

"seeks a direct benefit from a contract, an arbitration can be compelled, if liability under the claim arises solely from the contract or must be determined by reference to it." Id. Stated another way, if "the non-signatory consistently and knowingly insists that others treat it as a party to the contract during the life of the contract, the nonparty cannot later turn its back on the portions of the contract, such as the arbitration clause, that it finds distasteful." Id.; see also In re Weekley Homes, L.P., 180 S.W. 3d 127, 131-35 (Tex. 2005).

48.    Texas courts have specifically held that arbitration involving a non-signatory is proper for claims that include tortious interference and defamation. In In re Vesta Ins. Group, Inc., 192 S.W. 3d 759 (Tex. 2006), the Texas Supreme Court held a former insurance agent's claims against the insurer's parent corporation, its corporate officers, and its agents for tortious interference with contract were subject to arbitration under the contract's arbitration clause, even though the corporation, its officers and agents were not signatories, because all the claims at issue were based on the contract, not simply arising under general law. The Court reasoned: "While the boundaries of direct-benefits estoppel are not always clear, nonparties generally must arbitrate claims if liability arises from a contract with an arbitration clause, but not if liability arises from general obligations imposed by law." Id. at 762. The Court then ruled: "[W]e hold that tortious interference claims … arise more from the contract than general law, and thus fall on the arbitration side of the scale." Id. See also Craddick Partners, Ltd. V. Enersciences Holdings, LLC, No. 11-15-00014-CV; 2016 WL 3920024 (Tex. App. – Eastland 2016, no pet.) (arbitration involving a non-signatory was proper for claims involving tortious interference); In re: James E. Bashaw & Co., 305 S.W. 3d 44 (Tex. App. – Houston [1st Dist.] 2009) (orig. proceeding) (arbitration involving a non-signatory was proper for claims that included tortious interference and defamation).

PLAINTIFF'S ORIGINAL PETITION AND
ALTERNATIVE MOTION TO COMPEL ARBITRATION — Page 21

49.     In this case, Defendant's torts were specifically intended to cause Nexstar to terminate Plaintiffs employment relationship with Nexstar under the PEA, and the PEA contained a broad arbitration clause. Defendant's liability, therefore, arises under the PEA, which requires her participation in the arbitration. Defendant's acts of tortious interference are (1) entirely factually intertwined with Plaintiff's arbitrable claims against Nexstar for wrongful termination in breach of the PEA, and (2) touch upon the subject matter of the PEA, Plaintiff's employment relationship with Nexstar. Plaintiff's claims against Defendant are arbitrable, because Plaintiff's claims are both inextricably intertwined with the employment relationship in which Defendant chose to repeatedly and relentlessly inject herself by her torts of tortious interference, libel and slander and aiding and abetting libel and slander, and Plaintiff's employment relationship with Nexstar was governed by the PEA, with which Defendant interfered. Defendant purposefully and repetitively demanded that she was the final arbiter of whether Nexstar should fire Plaintiff for cause as defined under the PEA. Defendant insisted that Nexstar treat her as a party to the PEA with the sole power to determine whether Plaintiff should be fired for an alleged breach of the PEA based on Plaintiff broadcasting news stories which KTSM had approved in advance but were objectionable to Defendant. Defendant's acts of tortious interference, libel and slander and aiding and abetting libel and slander, and defamation entirety relate to the terms of the PEA, and therefore justify this Court ordering Defendant to participate in Plaintiff's arbitration because Defendant intentionally sought the benefit of determining whether Plaintiff had violated the PEA by airing of news stories to which Defendant objected. Defendant's liability, therefore, arises under the PEA. In re Vesta, 192 S.W. 3d 759.

50.     For the reasons stated in paragraphs 41 through 49, Plaintiff requests that this Court order Defendant to participate in Plaintiff's pending arbitration with Nexstar and stay this suit pending the results of the arbitration.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear and answer herein, and that this Court order Defendant to submit to joinder in Plaintiff's arbitration proceeding against Nexstar, or if does not, order, upon final hearing, that Plaintiff recover her actual damages against Defendant, punitive or exemplary damages against Defendant, prejudgment and post-judgment interest at the maximum legal rate, all costs of court, and such other and further relief at law or in equity to which Plaintiff may be justly entitled.

Respectfully submitted,

KILGORE & KILGORE, PLLC

By: /s/ *Robert E. Goodman, Jr.*
Robert E. Goodman, Jr.
State Bar No. 08158100
reg@kilgorelaw.com
John S. Morgan
State Bar No. 14447475
jsm@kilgorelaw.com
3141 Hood Street, Suite 500
Dallas, Texas 75219
(214) 969-9099 - Telephone
(214) 379-0840 - Fax

ATTORNEYS FOR PLAINTIFF

# EXHIBIT A

## PERFORMER EMPLOYMENT AGREEMENT

**THIS PERFORMER'S EMPLOYMENT AGREEMENT** (the "Agreement") is made as of July 28, 2021 by and between Christina Aguayo ("Performer"), and Nexstar Media Inc. (the "Company").

The Company desires to employ Performer as an on-the-air performer at its television broadcast station KTSM TV El Paso, TX (the "Station"), and Performer desires to be employed by the Company in such capacity on the terms and conditions set forth in this Agreement.

In consideration of the mutual promises set forth herein and the mutual benefits to be derived from this Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

**1.** **Positions and Duties**. The Company will employ Performer as an on-the-air performer at the Station. In such position, Performer will perform such duties as are assigned to him from time to time by the Company. These duties include, but are not limited to, gathering and/or reporting on news matters, anchoring or co-anchoring newscasts, research, script preparation, and such other duties as management of the Station from time to time may determine. During Performer's employment under this Agreement, the Performer shall devote his or her full working time to the performance of duties for the Station. Performer shall also be reasonably available on a regular basis for general staff promotional activities, the production of promotional material, and participation in community events.

Performer grants to the Company the right to use, and license others to use, the Performer's name, stage name, recorded voice, biographical data, portrait, likeness and picture in or on any medium of communication now or in the future available, for advertising purposes or trade in connection with the Performer's on-the-air performances (whether live or by recording) and other activities for the Station and in connection with the Station's products and services and the products and services of any sponsor of any of the programs in which the Performer appears (but no such use shall constitute an endorsement or testimonial by the Performer of any such product or service). Performer acknowledges the Company's rights set forth herein shall survive the termination of this Agreement with no further compensation payable to Performer.

Except as otherwise specifically set forth herein, Performer's employment with the Company will be governed by the policies and procedures set forth in the Company's Employee Handbook, as may be amended from time to time, and the Performer agrees to comply with all such policies and procedures.

Performer agrees to promote the business goodwill of the Station at all times and shall not engage in any activity detrimental to the business goodwill of the Station or which portrays the Company or Station in a negative or unfavorable light.

**2.     Term of Employment.**     Unless terminated earlier as provided in Paragraph 3, the Company's employment of Performer under this Agreement will begin on September 7, 2021 and continue through September 6, 2024 (the "Initial Term"); provided, however, that the term of employment under this Agreement will be automatically renewed for successive one-year periods (the first of which will commence on September 7, 2024, unless, at least sixty (60) days prior to the end of the then current term of employment under this Agreement, Performer or the Company gives written notice to the other of the notifying party's intent not to renew the term of employment under this Agreement as of the end of the then current term.

**3.     Termination.**     The Company's employment of Performer under this Agreement will terminate prior to the end of the term specified in Paragraph 2 only under the following circumstances:

**(a)     Death.**     Performer's death; in which case Performer's employment will terminate on the date of death;

**(b)     Termination by the Company for Cause.**     The Company may terminate Performer's employment at any time for Cause; such termination to be effective as of the date stated in a written notice of termination. For purposes of this Agreement, "Cause" is defined to mean any of the following activities by Performer:

**(i)**     the conviction of Performer of a felony or a crime involving moral turpitude or the commission of any act involving dishonesty, disloyalty or fraud with respect to the Company or any of its subsidiaries or affiliates;

**(ii)**     failure to perform duties which are reasonably directed by Station management and which are consistent with the terms of this Agreement and the position specified in Paragraph 1;

**(iii)**     any act(s) or failure(s) to act in any manner that threatens the qualification of the Company or its affiliates to maintain a broadcast license issued by the Federal Communications Commission ("FCC"), or which results in a violation of any rule or written policy of the FCC including but not limited to any utterance on the air that is obscene, indecent or profane;

**(iv)**     gross negligence or willful misconduct with respect to the Company or any of its subsidiaries or affiliates;

**(v)**     any material breach by Performer of a material provision of this Agreement;

**(vi)**     willful violation of Company policies;

**(vii)**     reporting to work under the influence of alcohol or illegal drugs;

---

(viii)   insubordination;

(ix)   excessive absenteeism;

(x)   inappropriate on-air comments disparaging a competitor, advertiser, or other party unless specifically included within a story;

(xi)   acting in a tortious manner towards a viewer;

(xii)   conduct that tends to bring Performer, the Company, the Station, or the Station's sponsors into a negative public light, jeopardizes the reputation and success of the Company or otherwise reflects unfavorably on the Company; or,

(xiii)   failure to improve performance as outlined in a written Performance Improvement Plan within the time frame set forth in the Plan.

(c)   **Termination by the Company Other Than for Cause**.   The Company may terminate Performer's employment for any reason or for no reason upon sixty (60) days' prior written notice to Performer, subject to payment of the termination payments specified in Paragraph 6. Such termination will be effective as of the date stated in a written notice of termination.

(d)   **Termination by Company During Probationary Period**.   The first 90 days of employment under this Agreement are considered a Probationary Period. If necessary, the Station will provide Performer with feedback regarding improvements to be made and Performer is expected to improve performance to an acceptable level by the end of the Probationary Period. If Performer fails to improve to an acceptable level as determined within the discretion of the Station by the end of the Probationary Period, Performer's employment under this Agreement will be terminated.

4.   **Compensation**.   The Company will pay Performer a Base Salary as follows:

During the first year of employment under this Agreement        $58,000.00

During the second year of employment under this Agreement        $60,000.00

During the third year of employment under this Agreement        $62,000.00

Plus cell phone $90 per month allowance

Performer's Base Salary will be paid in accordance with the Company's regular payroll practices. Performer acknowledges that Performer's position is a professional position in which Performer is required to perform varied and non-routine intellectual work that is original and creative in character and depends primarily on Performer's invention, imagination and talent and that Performer must consistently exercise discretion and independent judgment in the performance of Performer's duties hereunder. Accordingly, for all purposes, including, but not

limited to, wage and hour laws, Performer shall be deemed an "employee employed in a bona fide professional capacity" and exempt from all overtime reporting and compensation requirements.

    **5.**  **Fringe Benefits**.

    **(a)**  Performer will be eligible to participate in Company employee benefits plans and programs generally offered to Company employees under the terms and conditions of each such plan or program and subject to the eligibility and cost sharing provisions thereof.

    **(b)**  During the term of this Agreement, the Company will reimburse Performer for all approved business expenses which Performer incurs on the Company's behalf, upon presentation of appropriate documentation. Performer must comply with the Company's policies regarding obtaining approval for expenses prior to incurring them.

    **(c)**  In consideration for Performer agreeing to remain employed by the Company for the full Initial Term of this Agreement, the Company agrees to incur certain expenses on the Performer's behalf, including but not limited to expenses for coaching, production, advertising and promoting the Performer's image, and/or education ("Advance Items"). Performer acknowledges these payments by the Company will be in excess of $_____. Performer further acknowledges that the Company would not incur the expenses for these Advance Items without Performer's commitment to remain employed at the Station for full Initial Term. In addition to the value of the Advance Items, the Station will invest time and effort into developing its programming to improve the performance of the Station by giving viewers consistency in the on-air performers. Performer also acknowledges that the Initial Term protects the Station from another station hiring away its on-air performers during the term.

    **6.**  **Termination Payments**.  Performer will be entitled to receive the following payments upon termination of Performer's employment hereunder:

    **(a)**  In the event of the termination of Performer's employment pursuant to any of the following provisions:

| | |
|---|---|
| Paragraph 3(a) | [Death] |
| Paragraph 3(b) | [By the Company for Cause] |
| Paragraph 3(d) | [Probationary Period] |

the Company will pay to Performer (or Performer's estate if pursuant to 3(a)) as soon as practical following such termination, all accrued and unpaid Base Salary as of the date of termination as provided in Paragraph 4 and an amount (calculated at the rate of the Base Salary in effect on such date) in respect of all accrued but unutilized vacation time as of such date. Termination under any of these provisions will not require Performer to reimburse the Company for the Advance Items under paragraph 5(c) of this Agreement.

**(b)**     In the event of termination of Performer's employment pursuant to Paragraph 3(c) [Termination by the Company Other Than For Cause] the Company will pay Performer the amounts described in Paragraph 6(a) and will pay Performer two weeks additional Base Salary contingent upon Performer signing a separation agreement re-affirming Performer's obligations under paragraph 7 of this Agreement and containing a Release.

**(c)**     In the event Performer breaches this Agreement or otherwise fails to perform under this Agreement by resigning prior to the end of the Initial Term, or if Performer engages in intentional misconduct in an attempt to cause the Station to terminate Performer's employment For Cause, Performer agrees to repay to the Company a portion of the value of the Advance Items set forth in Paragraph 5(c) of this Agreement according to the following formula:

> [# of months in the Initial Term - # months employed under Agreement] divided by # of months in the Initial Term] multiplied by the Total Stipulated Value of Advance Items

Payment must be made within 10 days after Performer's employment with the Company ends.

7.     **Covenant Not to Compete and Non-Disclosure**.  In consideration for Performer's employment with the Company and the Company's provision of confidential information and/or specialized training to Performer, Performer hereby covenants and agrees that:

**(a)**     The Company is providing Performer with access to certain confidential information of the Company, including, but not limited to, research, news sources, financial and other Company information. In addition, the Station is making a substantial commitment to developing the Performer as a unique and recognizable personality, including but not limited to the promotion of Performer and investment and continuing education and further development of the Performer. Performer acknowledges that such unique services and abilities enable Performer to seek and obtain similar employment inside the designated market area in which the Station operates (the "Station's Market"). Performer further recognizes that the value of the Company's business would be injured if Performer obtained comparable employment within the Station's Market.

**(b)**     During the term of Performer's employment with the Company, the Performer shall not, without the prior written consent of the General Manager of the Station: (1) perform any services for any radio or commercial television station, including cable, closed circuit or pay television or any other broadcast, print or electronic (i.e. Internet) media; (2) permit or authorize the use by anyone other than the Station of Performer's real or stage name, portrait, picture or license or the use of any endorsement or testimonial in advertising or publicizing any product, service, cause or institution; or (3) engage in any activity relating to the sale, advertising or promotion of any articles or materials used in any programs broadcast on the Station.

**(c)**     For a period of one (1) year after Performer's employment at the Station ends for any reason, Performer will not accept employment involving the rendering of

any on-air services, making any on-air appearances, or making any appearances in any media (including electronic media) whether or not for compensation, live or recorded, over the facilities of any radio or commercial television station, including cable, closed circuit or pay television which broadcasts or transmits to any place within the Station's Market unless: (i) such appearance is on a commercial spot announcement prepared by or for a national (but not local) advertiser and broadcast by such advertiser in multiple markets; (ii) such appearance is on a national network program delivered by the network to its local affiliated station; or (iii) such appearance is a syndicated program broadcast in multiple markets.

**(d)** For a period of one (1) year after Performer's employment with the Company terminates, Performer will not hire, solicit, employ or contract with respect to employment any officer or other Performer of the Station.

**(e)** Performer agrees to disclose promptly to the Company and does assign and agree to assign to the Company, free from any obligation to Performer, all Performer's right, title and interest in and to any and all ideas, concepts, processes, improvements and inventions made, conceived, written, acquired, disclosed or developed by Performer, solely or in concert with others, during the term of Performer's employment by the Company, which relate to the business, activities or facilities of the Company, or resulting from or suggested by any work Performer may do for the Company or at its request. Performer further agrees to deliver to the Company any and all drawings, notes, photographs, copies, outlines, specifications, memoranda and data relating to such ideas, concepts, processes, improvements and inventions, to cooperate fully during Performer's employment and thereafter in the securing of copyright, trademark or patent protection or other similar rights in the United States and foreign countries, and to give evidence and testimony and to execute and deliver to the Company all documents requested by it in connection therewith.

**(f)** Except as expressly set forth below, Performer agrees, whether during Performer's employment pursuant to this Agreement or thereafter, except as authorized or directed by the Company in writing or pursuant to the normal exercise of Performer's responsibilities hereunder, not to disclose to others, use for Performer's or any other Person's benefit, copy or make notes of any confidential information or trade secrets or any other knowledge or information of or relating to the business, activities or facilities of the Company learned while working for the Company. Performer will not be bound by this obligation of confidentiality and nondisclosure if:

**(i)** the knowledge or information in question has become part of the public domain by publication or otherwise through no fault of Performer;

**(ii)** the knowledge or information in question is disclosed to the recipient by a third party and Performer reasonably believes such third party is in lawful possession of the knowledge or information and has the lawful right to make disclosure thereof; or

**(iii)** Performer is required to disclose the information in question pursuant to applicable law or by a court of competent jurisdiction with actual or apparent jurisdiction to order Performer to disclose or make accessible such information.

**(g)** Upon termination of employment pursuant to this Agreement, Performer will deliver to the Company all records, notes, data, memoranda, photographs, models and equipment of any nature which are in Performer's possession or control and which are the property of the Company.

**(h)** The parties understand and agree that the remedies at law for breach of the covenants in this Paragraph 7 would be inadequate and that the Company will be entitled to injunctive or such other equitable relief as a court may deem appropriate for any breach of these covenants. Notwithstanding the provisions set forth in Paragraph 15 below, the Company shall have the right to pursue such injunctive or other equitable relief in a court of law and without posting of any bond. If any of these covenants will at any time be adjudged invalid to any extent by any court of competent jurisdiction, such covenant will be deemed modified to the extent necessary to render it enforceable.

**8.** **Notices**. All notices and other communications which may or are required to be given hereunder or with respect hereto shall be in writing, shall be delivered personally or sent by nationally recognized overnight delivery service, charges prepaid, or by registered or certified mail, return-receipt requested, and shall be deemed to have been given or made when personally delivered, the next business day after delivery to such overnight delivery service, three (3) days after deposited certified mail postage prepaid, as the case may be, addressed as follows:

If to Performer: To Performer's address on file with the Company's Payroll Department.

If to the Company: *[insert station address]* Attention: General Manager with a copy (which shall not constitute notice) to Human Resources Department, Nexstar Media Group, Inc., 545 E. John Carpenter Freeway, Suite 700, Irving, Texas, 75062.

**9.** **Entire Agreement**. This instrument embodies the entire agreement between the parties hereto with respect to Performer's employment with the Company, and there have been and are no other agreements, representations or warranties between the parties regarding such matters.

**10.** **No Assignment**. This Agreement may not be assigned by Performer without the prior written consent of the Company and any attempted assignment without such prior written consent will be null and void and without legal effect. This Agreement will not be assigned by the Company without the prior written consent of Performer except to any other person or entity which may acquire or conduct the business of the Station, the Company, its Parent and/or their respective subsidiaries, if any.

**11.** **Amendment; Modification**. This Agreement will not be amended, modified or supplemented other than in a writing signed by the parties hereto.

**12.** **Severability**. The parties agree that if any provision of this Agreement is under any circumstances deemed invalid or inoperative, the Agreement will be construed with

the invalid or inoperative provision deleted, and the rights and obligations of the parties will be construed and enforced accordingly.

      **13.**    **Governing Law.** This Agreement will be governed by and construed in accordance with the internal law of the State of Texas without giving effect to any choice of law or conflict provision or rule that would cause the laws of any jurisdiction other than the State of Texas to be applied. Subject to the forum selection clause in the agreement to arbitrate contained in paragraph 15 of this Agreement, the parties agree that exclusive venue for any court proceeding will be in Dallas County, Texas.

      **14.**    **Representations.** Performer represents and warrants to the Company that Performer is not a party to or bound by any employment agreement, noncompete agreement or confidentiality agreement with any other person or entity.

      **15.**    **Strict Construction.** The parties to this Agreement have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

      **16.**    **Binding Arbitration.**

      Excluding workers compensation, unemployment compensation and any other claims which by law must be resolved in other forums, Company and Performer agree to resolve any and all disputes or claims related in any manner whatsoever to this Agreement and/or to Performer's employment, including, but not limited to, all claims beginning from the period of Performer's application for employment with the Company through termination of employment at Company, by binding arbitration pursuant to the National Rules for the Resolution of Employment Disputes of the American Arbitration Association (hereinafter "AAA"). Disputes related to employment include, but are not limited to, claims or charges based upon federal or state statutes, including, but not limited to, the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, as amended, and any other civil rights statute, the Americans with Disabilities Act, the Family and Medical Leave Act, the Fair Labor Standards Act or other wage statutes, claims under this Agreement, and claims based upon tort or contract laws or common law or any other federal or state or local law affecting employment in any manner whatsoever. (the "Claims"). In the event that arbitration is brought pursuant to any law or statute which provides for allocation of attorneys' fees and costs, the arbitrator shall have the authority to allocate attorneys' fees and costs pursuant to the applicable law or statute. Except with respect to the enforcement of the Company's rights under Paragraph 7 herein, the Company agrees to be bound by the arbitration procedure set forth in this Agreement. In the event Performer is unable to pay the applicable filing fee for arbitration due to extreme hardship, Performer may apply to AAA for deferral or reduction of the fees. AAA shall determine whether the Performer qualifies for financial hardship. To invoke the arbitration process, Performer or Company must contact the American Arbitration Association at 2200 Century Parkway, Suite 300, Atlanta, Georgia 30345-3202, 404-325-0101, direct toll free: 1-800-925-0155, facsimile 404-325-8034, or American Arbitration Association, 13455 Noel Road, Suite

1750, Dallas, Texas 75240, 972-702-8222, facsimile 972-490-9008, or the nearest regional office of AAA.

Company and Performer expressly agree that the Federal Arbitration Act governs the enforceability of any and all of the arbitration provisions of this Agreement, and judgment upon the award rendered by the arbitrator(s) may be entered by any court having jurisdiction thereof. Questions of arbitrability (that is whether an issue is subject to arbitration under this agreement) shall be decided by the arbitrator. Likewise, procedural questions which arise out of the dispute and bear on its final disposition are matters for the arbitrator to decide.

This Agreement is an agreement as to choice of forum only and is not intended to extend or limit any applicable statute of limitation. Performer and Company understand and agree that any claim or demand for arbitration will be timely only if filed with AAA within the time in which an administrative charge or a complaint could have been filed if the claim or demand is one which could be filed with an administrative agency or court. If the arbitration claim raises an issue which could not have been timely filed with the appropriate administrative agency or court, then the claim must be treated as the administrative agency or court would have treated it. Claims must be filed within the time set by the appropriate statute of limitation.

By signing this Agreement, Performer waives his/her right to commence, be a party to, or class member in any court action against Company relating to employment issues. If any claim is found not to be subject to this Agreement and the arbitration procedure, exclusive venue for any court proceeding shall be in Dallas County, Texas.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**Christina Aguayo**

**Nexstar Media Inc.**

By:

**David Candelaria**
**VP/General Manager**                                                    **KTSM**

By:

**Julie Pruett**
**Title: SVP/Regional Manager**

# EXHIBIT B

February 8, 2022

VIA HAND DELIVERY

Ms. Christina Aguayo

Re:     Termination of Employment

Dear Christina:

Pursuant to the provisions of paragraph 3(b)(xii) of your Performer Employment Agreement
with Nexstar this letter serves as written notice that your employment is terminated effective
immediately for engaging in conduct that tends to bring you, the company, the station and the
station's sponsors into a negative public light, jeopardizes the reputation or success of the
company, or otherwise reflects unfavorably on the company.

You will be paid current through today plus for any accrued/unused vacation time.  If you
participate in our benefits plans you will have coverage through February 28, 2022.  Thereafter,
you will receive information from the providers regarding your options for continued
participation, if any.  You are not eligible for rehire with the company.

Sincerely,

David Candelaria
VP/GM KTSM

# EXHIBIT C1



AMERICAN ARBITRATION ASSOCIATION®

**EMPLOYMENT ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

To ensure your demand is processed promptly, please file online at www.adr.org/support. Complete this form, provide last known email addresses and include a copy of the Arbitration Agreement, Plan or Contract.

## Parties (Claimant)

| | | |
|---|---|---|
| Name of Claimant: Christina Aguayo | | |
| Address: 420 W. Stewart Street | | |
| City: Dayton | State: Ohio ▼ | Zip Code: 45417 |
| Phone No.: 720-334-3243 | Email Address: christinaaguagy11@gmail.com | |
| Representative's Name (if known): Robert E. Goodman, Jr. | | |
| Firm (if applicable): Kilgore & Kilgore, PLLC | | |
| Representative's Address: 3141 Hood Street, Suite 500 | | |
| City: Dallas | State: Texas ▼ | Zip Code: 75219 |
| Phone No.: 214-969-9099 | Email Address: reg@kilgorelaw.com | |

## Parties (Respondent)

| | | |
|---|---|---|
| Name of Respondent: Nexstar Media Group, Inc., KTSM-TV, Andra Litton, Tim Gutierrez, Chris Babcock, Natassia Paloma, Darren Hunt | | |
| Address: 545 E. John Carpenter Freeway, Suite 700 | | |
| City: Irving | State: Texas ▼ | Zip Code: 75062 |
| Phone No.: 972-373-8800 | Email Address: psook@nexstar.com | |
| Representative's Name (if known): William L. Davis | | |
| Firm (if applicable): Jackson Lewis, PC | | |
| Representative's Address: 500 N. Akard, Suite 2500 | | |
| City: Dallas | State: Texas ▼ | Zip Code: 75201 |
| Phone No.: 214-520-2400 | Email Address: William.Davis@jacksonlewis.com | |

**Mediation:** If you would like the AAA to contact the other parties and attempt to arrange mediation, please check this box ☑.

Claim: What was/is the employee/worker's annual wage range? ☑ Less than $100,000 ☐ $100,000-$250,000 ☐ Over $250,000
*Note: This question is required by California law.*

Amount of Claim: Over $2,000,000.00

Claim involves: ☐ Statutorily Protected Rights ☑ Non-Statutorily Protected Rights

In detail, please describe the nature of each claim. You may attach additional pages if necessary:

Ms. Aguayo's notice of claims and Original Arbitration Complaint are attached respectively as Exhibit "A" and Exhibit "B" and incorporated as if fully set forth herein.

 AMERICAN ARBITRATION ASSOCIATION®

**EMPLOYMENT ARBITRATION RULES
DEMAND FOR ARBITRATION**

Other Relief Sought: ☑ Attorneys Fees  ☑ Interest  ☑ Arbitration Costs  ☑ Punitive/ Exemplary
☑ Other:  all actual, including compensatory, and loss of reputation damages in the past, present and future.

Please describe the qualifications for arbitrator(s) to hear this dispute:

The Performer Employment Agreement between the Parties requires arbitration before the American Arbitration Association on page 8-9, paragraph 16. This Agreement is attached as Exhibit "C".

| Hearing: Estimated time needed for hearings overall: | hours  or  6 | days |
|---|---|---|

Hearing Locale:  Dallas

*(check one)* ☐ Requested by Claimant  ☐ Locale provision included in the contract

Filing Fee requirement or $300 (max amount per AAA)

Filing by Company: ☐ $2,200 single arbitrator  ☐ $2,800 three arbitrator panel

Notice: To begin proceedings, **please file online at www.adr.org/fileonline.** You will need to upload a copy of this Demand and the Arbitration Agreement, and pay the appropriate fee.

| Signature (may be signed by a representative): | Date:  10/26/22 |
|---|---|

Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. Only those disputes arising out of employer plans are included in the consumer definition. If you believe that you meet these requirements, you must submit to the AAA a declaration under oath regarding your monthly income and the number of persons in your household. Please contact the AAA's Western Case Management Center at 1-800-778-7879. If you have any questions regarding the waiver of administrative fees, AAA Customer Service can be reached at 1-800-778-7879. Please visit our website at www.adr.org/support to file this case online.

# EXHIBIT "A"



**KILGORE LAW**

Robert E. Goodman, Jr.
reg@kilgorelaw.com
214-379-0823 direct
214-379-0840 telecopy

October 11, 2022

**Presentment of Christina Aguayo's claim for breach of the performer employer agreement and notice of her claims for libel and slander.**

By Email and Certified Mail
psook@nexstar.com

Mr. Perry A. Sook, Chief Executive Officer
Nexstar Media Group, Inc.
545 E. John Carpenter Freeway, Suite 700
Irving, Texas 75062


By Email and Certified Mail
tbush@nexstar.com

Ms. Terri Bush, SVP, Human Resources and
Associate General Counsel
Nexstar Media Group, Inc.
545 E. John Carpenter Freeway, Suite 700
Irving, Texas 75062


By Certified Mail

Human Resources Department
Nexstar Media Group, Inc.
545 E. John Carpenter Freeway, Suite 700
Irving, Texas 75062


By Email and Certified Mail
dcandelaria@ktsm.com

David Candelaria, General Manager
KTSM-TV
801 N. Oregon Street
El Paso, Texas 79901


RE:   Christina Aguayo

Dear Mr. Sook:

This correspondence is a letter of representation on behalf of Christina Aguayo regarding the wrongful termination of her employment by Nexstar Media Group, Inc. ("Nexstar") from Nexstar's affiliated television station KTSM-9 TV ("KTSM") in breach of her performer employment agreement with Nexstar, and a notice of her claims for libel and defamation against Nexstar through KTSM. Notice of Ms. Aguayo's claim for breach of her performer employment agreement with Nexstar is being given pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code and notice of her claims for libel and defamation is being given pursuant to Chapter 73 of the Texas Civil Practice and Remedies Code.

October 11, 2022
Page 2

## Background

    Nexstar and Ms. Aguayo entered into a performer employment agreement ("agreement") on July 28, 2021. After signing the agreement, Ms. Aguayo began employment with Nexstar on or about September 7, 2021 at KTSM in El Paso as an on-screen news reporter. The agreement defined Ms. Aguayo's role as a "performer," with "such duties as [were] assigned to [her] from time to time by the Company." While employed, Ms. Aguayo diligently performed her assigned duties, primarily including reporting various news stories. Ms. Aguayo received prior approval for all the news stories she reported on television, including stories she developed on weekends during her time off.

    Based on the occurrences set forth below, Nexstar wrongfully terminated Ms. Aguayo's employment on February 8, 2022 in breach of her performer employer agreement, falsely claiming Ms. Aguayo had engaged in conduct detrimental to Nexstar and KTSM. Nexstar's termination of Ms. Aguayo's employment was accompanied by libelous and slanderous statements published by Nexstar and its KTSM employees in the course and scope of their employment.

    The termination and defamation occurred because of complaints by non-employees regarding Ms. Aguayo's reporting of certain news stories which KTSM had approved prior to her television reporting. That is not a valid reason under paragraph 3, "Termination," subsection (b)(xii) of the performer employment agreement for terminating her employment, nor a defense to the defamatory statements about her. Accordingly, it is clear that Nexstar's termination of Ms. Aguayo's employment is a breach of contract and that the defamation of her is indefensible. Indeed, subsequent to her termination, Ms. Aguayo applied for and received unemployment benefits under Texas law, which Nexstar did not contest on the ground that Ms. Aguayo's termination was caused by any misconduct by her in connection with her employment. That failure to contest her unemployment benefits is admissible and inconsistent with Nexstar's stated reasons for her termination and the defamation.

    From the beginning of Ms. Aguayo's employment at KTSM until October 20, 2021, the station's management and employees held Ms. Aguayo in high regard, providing her positive feedback for her excellent job performance. This only changed on October 21, 2021, after Ms. Aguayo interviewed Texas Attorney General Ken Paxton. When Ms. Aguayo arrived at the station to meet with her photographer to proceed with the interview, KTSM's assignments manager, Andra Litton, the assistant to the station's news director, Mr. Gutierrez, approached Ms. Aguayo and instructed her to ask Attorney General Paxton a list of questions prepared by Ms. Litton which had not been either submitted to or approved by Mr. Paxton in advance. The pre-approval of questions by political figures such as Attorney General Paxton is normal and customary in the television reporting industry. Ms. Litton and Mr. Gutierrez instructed Ms. Aguayo to "blindside" Mr. Paxton and apologize for asking unapproved questions afterwards. Ms. Aguayo refused this unethical instruction because complying with their demand would not only be detrimental to Ms. Aguayo's reputation as a journalist, but, also, Attorney General Paxton had never previously agreed to an interview with a local station in El Paso and "blind siding" Mr. Paxton could deter him from conducting any other news interviews in El Paso. Accordingly, Ms. Aguayo did not want

October 11, 2022
Page 3

to jeopardize a commitment regarding questions she had made to Mr. Paxton prior to the interview. We have every reason to believe Ms. Litton prepared the list of unapproved questions because Ms. Litton worked on the election campaign for Congresswomen Veronica Escobar and is a close friend of Ms. Escobar's Communications and Special Projects Director, Elizabeth Lopez-Sandoval, and both the Congresswoman and Ms. Lopez-Sandoval had political differences with Attorney General Paxton.

On October 28, 2021, the station aired Ms. Aguayo's interview with Attorney General Paxton on the Sunday night news show. The next day, October 29, 2021, Ms. Litton and Chris Babcock, the station's website director, removed Ms. Aguayo's interview with Mr. Paxton from the station's website. These persons told Ms. Aguayo that the station's news director Mr. Gutierrez and general manager David Candelaria instructed Ms. Litton and Mr. Babcock to remove the Ken Paxton interview. Since Mr. Candelaria had approved airing the Ken Paxton interview in advance, Ms. Aguayo went to his office to verify the truth of the claim that he had approved of the removal of the story from the website. She determined Mr. Candelaria did not find anything objectionable about Ms. Aguayo's interview of Attorney General Paxton. Mr. Candelaria then instructed Ms. Litton and Mr. Babcock to put the story back on the station's website.

Subsequently, Mr. Candelaria told Ms. Aguayo that Congresswoman Escobar called Mr. Candelaria about the Ken Paxton story and complained about Ms. Aguayo and the story based on Congressmen Escobar's political views contrary to those of Attorney General Paxton. After Mr. Candelaria received a complaining phone call from Congresswoman Escobar, Mr. Candelaria informed Ms. Aguayo that her reporting needed to be "more balanced," which under the circumstances, necessarily meant that Ms. Aguayo should only report stories which satisfied Congresswoman Escobar's political views.

Subsequently, Ms. Aguayo learned that multiple defamatory stories about her were published on various social media platforms by, Nexstar employees. One false story was instigated by a representative of Congresswoman Escobar's office, who Ms. Aguayo believes was Ms. Lopez-Sandoval, based on false information, to the Democratic Party of El Paso, which itself then published defamatory statements about Ms. Aguayo on its own Facebook social media site. These defamatory statements were also made on the social media websites of KissFM 93.1, the Lionstar Blog, the website for the Democratic Party of El Paso and FTVLive.com. These social media sites published defamatory stories regarding Ms. Aguayo's interview of Ken Paxton and her employment at KTSM on or about October 26, 2021 through October 28, 2021, and also during the first week of February 2022. These defamatory publications stated Ms. Aguayo's reporting of her interview of Ken Paxton was "unbalanced," "inaccurate," "right leaning", did not question Mr. Paxton's facts, was a "five-minute campaign ad [for Mr. Paxton]," as well as stating that numerous KTSM news staff had complained about Ms. Aguayo's biased and inaccurate reporting. These defamatory social media publications defamed Ms. Aguayo's character and professional reputation, and, as such, constitute libel per se.

Mr. Gutierrez subsequently admitted to Ms. Aguayo that Congresswoman Escobar, Ms. Lopez-Sandoval and the Chairwoman of the El Paso Democratic Party, Dora Oaxaca, actively

October 11, 2022
Page 4

encouraged and assisted in the publication of the defamatory statements about Ms. Aguayo by the three entities noted above in order to convince KTSM to fire Ms. Aguayo notwithstanding that her news report about Mr. Paxton was honest, unbiased and approved in advance. These facts demonstrate Ms. Aguayo's reporting of her interview of Attorney General Paxton created an untenable situation for Ms. Aguayo at KTSM from October 28, 2021 through the date of her wrongful termination of employment on February 8, 2022.

On or about November 9, 2021, Ms. Aguayo interviewed Congressman Tony Gonzales. After this interview, Ms. Aguayo reached out to Congresswoman Escobar by email, asking Ms. Escobar if she wanted to respond to statements made by Congressman Gonzales. Congresswoman Escobar did not respond to Ms. Aguayo's email inquiry. When KTSM reported Ms. Aguayo's interview of Congressman Gonzales on television, Ms. Aguayo accurately stated she had reached out to Congresswoman Escobar but the Congresswoman had not responded by the time of the broadcast.

After this broadcast, Congresswoman Escobar contacted Mr. Candelaria and she stated that she was very upset about Ms. Aguayo's reporting of the interview of Congressman Gonzales. Mr. Candelaria responded by reprimanding Ms. Aguayo by text message. Mr. Candelaria asked Ms. Aguayo to prove that she had emailed Congresswoman Escobar for a comment and Ms. Aguayo provided to Mr. Candelaria her email to the Congresswoman. Even though Mr. Candelaria received proof of Ms. Aguayo's email to Congresswoman Escobar, Mr. Candelaria forced Ms. Aguayo to apologize on television regarding her prior statement that Congresswoman Escobar did not respond to Ms. Aguayo's request for a comment. His forcing Ms. Aguayo to lie on television was outrageous.

On or about November 19, 2021, Ms. Aguayo came to the station on her day off to conduct an exclusive interview with Texas Governor Greg Abbott. Prior to this interview, Governor Abbott has not consented to any local interviews in El Paso. Mr. Gutierrez was in the control booth during Ms. Aguayo's interview of Governor Abbott. After this interview, Mr. Gutierrez praised Ms. Aguayo for her interview of the Governor.

On or about November 20, 2021, KTSM broadcasted Ms. Aguayo's interview of Governor Abbott. Mr. Candelaria again praised Ms. Aguayo's work after the station aired this interview. Subsequently, Congresswoman Escobar again complained to Mr. Candelaria about Ms. Aguayo in both emails and in text messages. Due to Congresswoman Escobar's complaints, Mr. Candelaria began criticizing Ms. Aguayo again. This unfair criticism resulted in an increasingly difficult situation for Ms. Aguayo for the remainder of her employment. Her situation became further aggravated after Ms. Aguayo interviewed Irene Armendariz-Jackson, who ran for Congress against Congresswoman Escobar. After Ms. Aguayo's interview of Ms. Armendariz–Jackson, Mr. Gutierrez reprimanded Ms. Aguayo and told her KTSM would extend Ms. Aguayo's 90-day probation another 30 days solely based on Ms. Aguayo's interview of Ms. Armendariz-Jackson. Mr. Gutierrez did not accuse Ms. Aguayo of providing either improper or biased content in her interview of Ms. Armendariz-Jackson.

October 11, 2022
Page 5

During those additional 30 days of probation, Ms. Aguayo refrained from reporting any news stories containing relevant current events. This caused Ms. Aguayo to lose followers on social media and to lose her popularity and respect in the local community.

On or about February 1, 2022, Ms. Aguayo interviewed a border patrol veteran who is the husband of Ms. Armendariz–Jackson. Ms. Aguayo's story was approved for a television broadcast in advance by Mr. Gutierrez. After the story was aired on television, Mr. Gutierrez praised the story and Ms. Aguayo's handling of the interview. Congresswoman Escobar, however, was upset about the story and sent numerous emails complaining about Ms. Aguayo to Mr. Candelaria.

On or about February 5 or 6, 2022, Ms. Aguayo ran a 25-second story about a Trump rally in Texas. Due to Ms. Aguayo's concerns regarding the station's hostile criticism, Ms. Aguayo limited the story to inform the public that the Trump rally occurred in Texas, that Governor Abbott was present at the rally and that the Governor appeared on the stage and made some public statements. Ms. Aguayo ran a five second sound bite from Governor Abbott while he was speaking on the stage. This story was approved in writing by Mr. Gutierrez prior to the station airing the story. After KTSM aired the story, Congresswoman Escobar and her staff sent several emails complaining about Ms. Aguayo and the Trump rally story to Mr. Candelaria.

On February 8, 2022, Nexstar terminated Ms. Aguayo's employment at KTSM, claiming the reason for her termination was Ms. Aguayo's broadcasting of the two news stories regarding the border patrol officer and the Trump rally. Nexstar falsely claimed, illogically and without explanation, that the publication of these news stories, although approved in advance by the station's management, was "conduct detrimental" to Nexstar and its affiliated station KTSM.

### Ms. Aguayo's causes of action

The factual background set forth above is a mere summary of the breach of contract and slander and libel claims to which Ms. Aguayo was made subject. Nexstar's employees were responsible for making their own multiple defamatory statements and for encouraging multiple non-employees to likewise make multiple defamatory statements which were direct character assassinations of Ms. Aguayo with the specific intent of permanently damaging or destroying her career and professional reputation.

The employees of Nexstar at KTSM who made defamatory statements about Ms. Aguayo or conspired with, and aided and abetted, others in making defamatory statements did so with actual knowledge that their defamatory statements were intentionally false and would severely damage, if not destroy, Ms. Aguayo's career as a journalist and a television reporter, and also cause her substantial mental or emotional distress. These employees include but are not limited to Andra Litton, Chris Babcock, Natassia Paloma and Darren Hunt. Each of these employees repetitively published defamatory statements about Ms. Aguayo which accused her of dishonesty in her reporting, political bias, publishing intentionally false information, being a fake journalist, carrying out a "far-right agenda," as well as other similar false criticisms. These statements were made verbally to other employees of KTSM, and some were also communicated to staff members of

October 11, 2022
Page 6

Congresswoman Escobar's office and other social media outlets on or about October 26, 2021 through October 28, 2021 and also in the first week of February 2022. They were all slander per se.

Nexstar's termination of Ms. Aguayo's employment based on alleged "conduct detrimental" to Nexstar pertaining to the two news stories identified at her termination was clearly pretextual. Ms. Aguayo received approval prior to airing the two news stories identified by Nexstar as she did in the case of all other news stories which Congresswoman Escobar considered politically objectionable. Further, Nexstar did not claim prior to Ms. Aguayo's wrongful termination that Ms. Aguayo's reporting of those stories put Nexstar or KTSM "into a negative public light, jeopardizes the reputation and success of the Company, otherwise reflects unfavorably on the Company …", which is required for a termination for cause under the agreement, paragraph 3, subsection (b) (xii).

### Ms. Aguayo's damages and proposed terms of settlement of all claims

Ms. Aguayo has sustained substantial actual damages as a proximate result of the misconduct of Nexstar acting through its agents, employees and representatives at KTSM. Ms. Aguayo's claim for actual damages will include, initially, her past lost wages and benefits from the date of her wrongful termination to the date of this correspondence, in the amount of $58,998.30. This amount consists of Mr. Aguayo's lost wages for 35 weeks at $1,115.38 per week, plus the value of her dental and vision insurance coverage and her cell phone allowance in the amount of $580 per month paid by Nexstar, as well as her loss of rental income in the amount of $13,500 to date, because Ms. Aguayo remains unemployed and cannot afford to rent an apartment and therefore Ms. Aguayo is residing in a home that she had previously rented to tenants.

Ms. Aguayo has been unable to obtain new employment as a journalist or news reporter due to the negative job reference from Nexstar and the defamatory social media posts and stories about her. Accordingly, Ms. Aguayo has a substantial claim for loss of compensation and benefits in the future and possibly for the remainder of her work life, which even on a present value basis will be very substantial. Ms. Aguayo has also suffered damages to her reputation in an amount necessarily to be decided by a trier of fact.

Finally, with respect to her claims for defamation, Ms. Aguayo has sustained substantial non-pecuniary damages for her mental anguish, with physical and bodily manifestations in the past, present and into the future. These damages include Ms. Aguayo suffering from depression, self-doubt, feelings of hopelessness, persistent crying, loss of self-esteem, constant anxiety, stress and fear over her finances, loss of sleep, worries about her reputation and career, flashbacks, nightmares, heartbreak and social isolation due to fear of facing more defamation and accusations of impropriety. These damages severely affect Ms. Aguayo's daily life activities.

Pursuant to Section 73.055(a)(1) and (b), Ms. Aguayo demands a full retraction, clarification, or correction of all previous libelous and defamatory statements and publications caused or contributed to by Nexstar, through its representatives, agents and employees. She

October 11, 2022
Page 7

specifically demands Nexstar print the following retraction, clarification or correction for 10 consecutive days on Nexstar's company website and on KTSM's website, as well as publish this retraction on television for 10 consecutive days nightly on KTSM's 6:00 p.m. and 10:00 p.m. news broadcasts, as follows: "KTSM-9 TV and Nexstar Media Group, Inc. hereby fully retract any negative and false statements made by the management and employees of KTSM-9 TV and Nexstar Media Group, Inc. regarding Ms. Christina Aguayo, her news reporting and her employment at KTSM-9 TV and Nexstar Media Group, Inc. At all times, Ms. Aguayo demonstrated the highest ethical standards of a news reporter and broadcaster, and she never engaged in any conduct that was detrimental to either KTSM-9 TV or Nexstar Media Group, Inc. We apologize to Ms. Aguayo for any and all of our previous statements to the contrary that have impugned Ms. Aguayo's integrity, reputation and job performance. We acknowledge and admit KTSM-9 TV and Nexstar Media Group, Inc. wrongfully terminated Ms. Aguayo's employment, because she did not engage in any misconduct in connection with her employment or in any conduct that was detrimental to KTSM-9 TV or to Nexstar Media Group, Inc. Ms. Aguayo's job performance and her character have been and are exceptional in all respects."

The purpose of this letter is, beyond the notice of defamation, to determine if Nexstar Media Group, Inc. desires to explore, outside of arbitration, resolution of the claims against it and its employees. Absent agreement to mediation and a tolling agreement no later than October 20, 2022, Ms. Aguayo shall institute an arbitration proceeding pursuant to the arbitration provision of her performer employer agreement against it and all of such potential respondents and seek to recover all of Ms. Aguayo's actual and punitive damages in the past, present and future, a complete retraction of all libelous and defamatory statements in the form set forth above, as well as recovery of Ms. Aguayo's reasonable and necessary attorney's fees, costs and expenses incurred in pursuing her breach of contract claim. This law firm is representing Ms. Aguayo on a contingent fee basis, but this firm shall track its attorney's fees on an hourly basis of $500 per hour, a reasonable and necessary charge for attorneys in Dallas with this law firm's level of experience and expertise.

I suggest mediation with Deborah Hankinson, former justice of the Texas Supreme Court and well-regarded Dallas mediator.

October 11, 2022
Page 8

**<u>Demand to provide this correspondence to Nexstar's insurance carriers.</u>**

I request that Nexstar provide a copy of this correspondence to all of Nexstar's primary, excess and umbrella insurance carriers, which may defend and indemnify Nexstar and its affiliated station KTSM from Ms. Aguayo's claims and causes of action. Further, I request that Nexstar instruct the claims handlers for these insurers to contact me directly as soon as possible.

I appreciate your attention to this correspondence. I look forward to hearing your response.

Very truly yours,

Robert E. Goodman, Jr.

# EXHIBIT C2

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| CHRISTINA AGUAYO | § |
| | § |
| vs. | § |
| | § |
| NEXSTAR MEDIA GROUP, INC., | §   Case No. _____ |
| KTSM-TV9, ANDRA LITTON, TIM | § |
| GUTIERREZ, CHRIS BABCOCK, | § |
| NATASSIA PALOMA AND DARREN | § |
| HUNT | § |

<u>CLAIMANT'S ORIGINAL CLAIM IN ARBITRATION</u>

TO THE HONORABLE ARBITRATORS:

Claimant, Christina Aguayo ("Claimant") files her Original Arbitration Complaint against Nexstar Media Group, Inc., KTSM-TV9, Andra Litton, Tim Gutierrez, Chris Babcock, Natassia Paloma and Darren Hunt ("Respondents") and would show the Arbitrators as follows:

<u>PARTIES</u>

Claimant Christina Aguayo is appearing through her attorney of record, Robert E. Goodman, Kilgore & Kilgore, PLLC, 3141 Hood Street, Suite 500, Dallas, Texas 75219.

Respondent Nextar Media Group, Inc. may be served through its representative, William L. Davis, Jackson Lewis, P.C., 500 N. Akard, Suite 2500, Dallas, Texas 75201.

Respondent KTSM-TV9 is a television station that is owned by and is an affiliate of Nexstar Media Group, Inc., and may be served through its representative, William L. Davis, Jackson Lewis, P.C., 500 N. Akard, Suite 2500, Dallas, Texas 75201.

Respondent Andra Litton is an employee of Nexstar Media Group, Inc., and may be served through her representative, William L. Davis, Jackson Lewis, P.C., 500 N. Akard, Suite 2500, Dallas, Texas 75201.

Respondent Tim Gutierrez is an employee of Nexstar Media Group, Inc., and may be served through his representative, William L. Davis, Jackson Lewis, P.C., 500 N. Akard, Suite 2500, Dallas, Texas 75201.

Respondent Chris Babcock is an employee of Nexstar Media Group, Inc., and may be served through his representative, William L. Davis, Jackson Lewis, P.C., 500 N. Akard, Suite 2500, Dallas, Texas 75201.

Respondent Natassia Paloma is an employee of Nexstar Media Group, Inc., and may be served through her representative, William L. Davis, Jackson Lewis, P.C., 500 N. Akard, Suite 2500, Dallas, Texas 75201.

Respondent Darren Hunt is an employee of Nexstar Media Group, Inc., and may be served through his representative, William L. Davis, Jackson Lewis, P.C., 500 N. Akard, Suite 2500, Dallas, Texas 75201.

AGREEMENT TO ARBITRATE

Respondent Nexstar Media Group, Inc. and Claimant Christina Aguayo entered into a written contract entitled performer employment agreement dated July 28, 2021, which requires arbitration of any dispute relating to the employment relationship between the Claimant and Respondent Nexstar Media Group, Inc., before the American Arbitration Association, on pages 8-9, paragraph 16. The agreement specifically identifies KTSM TV9 as the "station" where Claimant performed her job duties. The remaining Respondents were all employees of Nexstar, working at KTSM. The agreement provides arbitration can occur at the Dallas, Texas office of the American Arbitration Association.

This performer employment agreement is attached as Exhibit "A."

Claimant seeks monetary relief of more than $2,000,000.00, and equitable relief consisting of a published retraction of all defamatory statements and publications made by each and all of the Respondents.

FACTUAL BACKGROUND

Nexstar Media Group, Inc. ("Nexstar") and Claimant entered into a performer employment agreement ("agreement") on July 28, 2021. After signing the agreement, Claimant began employment with Nexstar on or about September 7, 2021 at KTSM-TV9 ("KTSM") as an on-screen news reporter. The agreement defined Claimant's role as a "performer," with "such duties as [were] assigned to [her] from time to time by the Company." Exhibit "A", page 1, para. 1. While employed, Claimant diligently performed her assigned duties consisting of preparing and broadcasting various news stories. Ms. Aguayo received prior approval from KTSM's management for all the news stories she reported on television, including stories she developed during her time off.

Based on the occurrences set forth below, Nexstar wrongfully terminated Claimant's employment on February 8, 2022 in breach of the agreement, falsely claiming Claimant had engaged in conduct detrimental to Nexstar, through KTSM's decision to broadcast 2 news stories which KTSM's management had approved prior to airing.  Nexstar's termination of Claimant's employment was preceded by and accompanied by libelous and slanderous statements published by Nexstar and its KTSM employees, who are the individual Respondents, in the course and scope of their employment.

The events leading to the wrongful termination and the continuing defamation of Claimant began due to complaints by non-employees regarding Claimant's reporting of certain news stories which KTSM had approved prior to her television reporting. Complaints by non-

employees do not constitute a valid reason for Nexstar's termination of Claimant's employment, under the agreement's paragraph 3, entitled "Termination," subsection (b)(xii), and are not a defense to the defamatory statements made by Respondents about her. Accordingly, Nexstar's termination of Claimant's employment was a breach of contract and the defamation of her is indefensible. Indeed, subsequent to her termination, Claimant applied for and received unemployment benefits under Texas law, which Nexstar did not contest on the ground that Claimant's termination was caused by any misconduct by her in connection with her employment. Nexstar's failure to contest her unemployment benefits is admissible and inconsistent with Nexstar's stated reasons for the termination of Claimant's employment and the Respondents' defamation of Claimant.

From the beginning of Claimant's employment at KTSM until October 20, 2021, the station's management and employees held Claimant in high regard, providing her positive feedback for her excellent job performance. This only changed after October 21, 2021, when Claimant interviewed Texas Attorney General Ken Paxton. When Claimant arrived at the station to meet with her photographer to proceed with the interview, KTSM's assignments manager, Respondent Andra Litton, the assistant to the station's news director, and Respondent Tim Gutierrez approached Claimant and instructed her to ask Attorney General Paxton a list of questions prepared by Ms. Litton which had not been either submitted to or approved by Mr. Paxton in advance. The pre-approval of questions by political figures such as Attorney General Paxton is normal and customary in the television reporting industry. Ms. Litton and Mr. Gutierrez instructed Claimant to "blindside" Mr. Paxton and apologize for asking unapproved questions afterwards. Claimant refused this unethical instruction because complying with their demand would not only be detrimental to Claimant's reputation as a journalist, but, also,

Attorney General Paxton had never previously agreed to an interview with a local station in El Paso and "blind siding" Mr. Paxton could deter him from conducting any other news interviews in El Paso. Accordingly, Claimant did not want to jeopardize her commitment regarding questions she provided to Mr. Paxton prior to the interview. Claimant reasonably suspects Ms. Litton prepared the list of unapproved questions because Ms. Litton worked on the election campaign for Congresswomen Veronica Escobar and is a close friend of Ms. Escobar's Communications and Special Projects Director, Elizabeth Lopez-Sandoval, and both the Congresswoman and Ms. Lopez-Sandoval had political differences with Attorney General Paxton.

On October 28, 2021, the station aired Claimant's interview with Attorney General Paxton on the Sunday night news show. The next day, October 29, 2021, Ms. Litton and Respondent Chris Babcock, the station's website director, removed Claimant's interview with Mr. Paxton from the station's website. These Respondents told Claimant that the station's news director Mr. Gutierrez and general manager David Candelaria instructed Ms. Litton and Mr. Babcock to remove the Ken Paxton interview. Since Mr. Candelaria had approved airing the Ken Paxton interview in advance, Claimant went to his office to verify the truth of their claim that he had approved of the removal of the story from KTSM's website. Claimant determined Mr. Candelaria did not find anything objectionable either about Claimant's interview of Attorney General Paxton or KTSM's decision to air that story. Mr. Candelaria then instructed Ms. Litton and Mr. Babcock to put the story back on the station's website.

Subsequently, Mr. Candelaria told Claimant that Congresswoman Escobar called Mr. Candelaria about the Ken Paxton story and complained about Claimant and the story, based on Congressmen Escobar's political views contrary to those of Attorney General Paxton. After Mr.

Candelaria received a complaining phone call from Congresswoman Escobar, Mr. Candelaria informed Claimant that her news reporting needed to be "more balanced," which under the circumstances, necessarily meant that Claimant should only report stories which satisfied Congresswoman Escobar's political views.

Subsequently, Claimant learned that multiple defamatory stories about her were published on various social media platforms by one or more of the individual Respondents, who were all Nexstar employees. One false story was instigated by a representative of Congresswoman Escobar's office, who Claimant reasonably believes was Ms. Lopez-Sandoval, based on false information provided to the Democratic Party of El Paso, which itself then published defamatory statements about Claimant on its own Facebook social media site. These defamatory statements were also made on the social media websites of KissFM 93.1, the Lionstar Blog, the website for the Democratic Party of El Paso and FTVLive.com. These social media sites published defamatory stories regarding Claimant's interview of Ken Paxton and her employment at KTSM on or about October 26, 2021 through October 28, 2021, and also during the first week of February 2022. These defamatory publications stated Claimant's reporting of her interview of Ken Paxton was "unbalanced," "inaccurate," "right leaning", "did not question Mr. Paxton's facts," was a "five-minute campaign ad [for Mr. Paxton]," as well as stating that numerous KTSM news staff had complained about Claimant's biased and inaccurate reporting. These defamatory social media publications defamed Claimant's character and professional reputation, and, as such, constitute libel per se.

Mr. Gutierrez subsequently admitted to Claimant that Congresswoman Escobar, Ms. Lopez-Sandoval and the Chairwoman of the El Paso Democratic Party, Dora Oaxaca, actively encouraged and assisted in the publication of the defamatory statements about Claimant by the

three entities noted above in order to convince KTSM to fire Claimant notwithstanding that her news report about Mr. Paxton was honest, unbiased and approved in advance. These facts demonstrate Claimant's reporting of her interview of Attorney General Paxton created an untenable situation for Claimant at KTSM from October 28, 2021 through the date of her wrongful termination of employment by Nexstar on February 8, 2022.

On or about November 9, 2021, Claimant interviewed Congressman Tony Gonzales. After this interview, Claimant reached out to Congresswoman Escobar by email, asking Ms. Escobar if she wanted to respond to statements made by Congressman Gonzales. Congresswoman Escobar did not respond to Claimant's email inquiry. When KTSM reported Claimant's interview of Congressman Gonzales on television, Claimant accurately stated she had reached out to Congresswoman Escobar but the Congresswoman had not responded by the time of the broadcast.

After this broadcast, Congresswoman Escobar contacted Mr. Candelaria and stated that she was very upset about Claimant's reporting of the interview of Congressman Gonzales. Mr. Candelaria responded by reprimanding Claimant by text message. Mr. Candelaria asked Claimant to prove that she had emailed Congresswoman Escobar for a comment and Claimant provided to Mr. Candelaria her email to the Congresswoman. Even though Mr. Candelaria received proof of Claimant's email to Congresswoman Escobar, Mr. Candelaria forced Claimant to apologize on television regarding her prior statement that Congresswoman Escobar did not respond to Claimant's request for a comment. His forcing Claimant to lie on television was outrageous.

On or about November 19, 2021, Claimant came to the station on her day off to conduct an exclusive interview with Texas Governor Greg Abbott. Prior to this interview, Governor

Abbott has not consented to any local interviews in El Paso. Mr. Gutierrez was in the control booth during Claimant's interview of Governor Abbott. After this interview, Mr. Gutierrez praised Claimant for her interview of the Governor.

On or about November 20, 2021, KTSM broadcasted Claimant's interview of Governor Abbott. Mr. Candelaria again praised Claimant's work after KTSM aired this interview. Subsequently, Congresswoman Escobar again complained to Mr. Candelaria about Claimant in both emails and text messages. Due to Congresswoman Escobar's complaints, Mr. Candelaria began criticizing Claimant again. This unfair criticism resulted in an increasingly difficult situation for Claimant for the remainder of her employment. Her situation became further aggravated after Claimant interviewed Irene Armendariz-Jackson, who ran for Congress against Congresswoman Escobar. Congresswoman Escobar again complained to Mr. Candeleria about Claimant and the news story. Then, after Claimant's interview of Ms. Armendariz–Jackson was broadcasted, Mr. Gutierrez reprimanded Claimant and told her KTSM would extend Claimant's 90-day probation another 30 days solely based on Claimant's interview of Ms. Armendariz-Jackson. Mr. Gutierrez did not accuse Claimant of providing either improper or biased content in her interview of Ms. Armendariz-Jackson.

During those additional 30 days of probation, Claimant refrained from reporting any news stories containing relevant current events. This caused Claimant to lose followers on social media and to lose her popularity and respect in the local community.

On or about February 1, 2022, Claimant interviewed a border patrol veteran who is the husband of Ms. Armendariz–Jackson. Claimant's story was approved for a television broadcast in advance by Mr. Gutierrez. After the story was aired on television, Mr. Gutierrez praised the

story and Claimant's handling of the interview. Congresswoman Escobar, however, was upset about the story and sent numerous emails complaining about Claimant to Mr. Candelaria.

On or about February 5 or 6, 2022, Claimant ran a 25-second story about a Trump rally in Texas. Due to Claimant's concerns regarding the station's hostile criticism, Claimant limited the story to inform the public that the Trump rally occurred in Texas, that Governor Abbott was present at the rally and that the Governor appeared on the stage and made some public statements. Claimant ran a five second sound bite from Governor Abbott while he was speaking on the stage. This story was approved in writing by Mr. Gutierrez prior to the station airing the story. After KTSM aired the story, Congresswoman Escobar and her staff sent several emails complaining about Claimant and the Trump rally story to Mr. Candelaria.

On February 8, 2022, Nexstar terminated Claimant's employment with Nexstar, claiming the reason for her termination was Claimant's broadcasting of the 2 news stories regarding the border patrol officer and the Trump rally. Nexstar falsely claimed, illogically and without explanation, that the publication of these news stories, although approved in advance by the station's management, was "conduct detrimental" to Nexstar and its affiliated station KTSM.

CLAIMANT'S CAUSES OF ACTION

As the Factual Background demonstrates, the individual Respondents Andra Litton, Chris Babcock, Natassia Paloma and Darren Hunt were or are all employees of Nexstar at KTSM who perpetrated the torts of libel, libel per se, defamation and defamation per se against the Claimant. Further, the individual Respondents engaged a civil conspiracy with each other and with certain non-employees, as well as aided and abetted each other and certain non-employees to perpetrate the torts of libel, libel per se, defamation and defamation per se against the Claimant. These individual Respondents acted as a coordinated, joint enterprise that warrants joint and several

liability, These Respondents perpetrated these torts against Claimant with actual knowledge that their defamatory statements, which were made both orally and in written publications, were malicious, intentionally false and would severely damage, if not destroy, Claimant's career as a journalist and a television reporter, and cause Claimant substantial mental or emotional distress. These Respondents repetitively published defamatory statements about Claimant which accused her of dishonesty in her reporting, political bias, publishing intentionally false information, being a fake journalist, carrying out a "far-right agenda," as well as other similar false criticisms. These statements were made verbally to other employees of KTSM, were published by non-employees on various public and social media platforms based on the requests made by these Respondents, and some of these defamatory statements were also communicated to staff members of Congresswoman Escobar's office. This tortious misconduct by these Respondents all occurred in the course and scope of their job duties for Nexstar while working at KTSM. These Respondents began their tortious misconduct on or about October 28, 2021, immediately after KTSM aired the Claimant's interview of Texas Attorney General Ken Paxton and continued up to and after Nexstar's wrongful termination of Claimant's employment on February 8, 2022. The Respondents' tortious misconduct toward Claimant proximately caused Claimant to sustain actual damages, consisting of both monetary or pecuniary losses and non-pecuniary losses in the past, present and in all reasonable probability into the future and probably for the remainder of the Claimant's life.

Claimant also seeks to recover from all the individual Respondents, jointly and severally, punitive or exemplary damages in amounts in the discretion of the arbitrators, to punish the individual Respondents for their intentional and malicious misconduct, and to deter these Respondents from engaging in similar misconduct in the future. Claimant shall demonstrate by

clear and convincing evidence the tortious misconduct of each and all of the individual Respondents were undertaken deliberately, with malice and with specific knowledge that their misconduct would harm Claimant and posed a severe risk of serious harm or damage to Claimant.

The Respondent Nexstar breached the performer employer agreement with Claimant by terminating Claimant's employment without a valid cause as defined in the agreement. Nexstar's pretextual termination of Claimant's employment was based on alleged "conduct detrimental" to Nexstar pertaining to the two news stories identified at her termination. Claimant received approval prior to airing these two news stories identified by Nexstar, as Claimant did in the case of all other news stories which Congresswoman Escobar and the individual Respondents considered politically objectionable. Further, Nexstar did not claim prior to Claimant's wrongful termination that Claimant's reporting of those stories put Nexstar or KTSM "into a negative public light, jeopardizes the reputation and success of the Company, otherwise reflects unfavorably on the Company …", which is required for a termination for cause under the agreement, paragraph 3, subsection (b) (xii). Nexstar's termination of Claimant's employment, therefore, was a breach of contract that proximately caused Claimant to sustain actual and consequential damages, consisting of both monetary or pecuniary losses and non-pecuniary losses in the past, present and in all reasonable probability into the future and probably for the remainder of the Claimant's life.

### CLAIMANT'S DAMAGES AND REQUESTED RELIEF

Claimant has sustained substantial actual damages as a proximate result of the misconduct of Respondent Nexstar acting through the individual Respondents acting in the course and scope of their employment. Claimant's claim for actual damages includes her past

pecuniary losses consisting of her past lost wages and benefits from the date of her wrongful termination to the date of the conclusion of this arbitration. These damages can be calculated based on her weekly salary set forth in the agreement, plus the value of her dental and vision insurance coverage and her cell phone allowance in the amount of $580 per month paid by Nexstar, as well as her loss of rental income in the amount of $1,500 per month, because Claimant remains unemployed and cannot afford to rent an apartment and therefore Claimant is residing in a home that she had previously rented to tenants and had previously derived income.

Claimant has been unable to obtain new employment as a journalist or news reporter due to the negative job reference from Nexstar and the defamatory social media posts and stories about her. Accordingly, Claimant has a substantial claim for pecuniary or monetary losses consisting of lost earning capacity or lost wages and benefits in the future and in all reasonable probability for the remainder of Claimant's work life, which even on a present value basis is very substantial. Claimant has also suffered damages to her personal and professional reputation in amounts necessarily to be decided by the arbitrators in their discretion.

Claimant also seeks to recover all her reasonable and necessary attorney's fees, costs and expenses, incurred by Claimant in prosecuting her breach of contract cause of action against Nexstar based on Nexstar's wrongful termination of Claimant in breach of the agreement. Claimant is represented by the Undersigned attorneys of the Kilgore and Kilgore, PLLC law firm. Although this law firm is representing Claimant on a contingent fee basis, the Kilgore and Kilgore PLLC law firm is tracking its attorney time for prosecuting this arbitration at the rate of $500 per hour, which is a reasonable and necessary charge for attorney's fees for a law firm in this location and with its excellent reputation and standing in the relevant legal community. Claimant also seeks to recover all her reasonable and necessary attorney's fees, costs and

expenses for any necessary proceedings in a court of law either prior to or after competition of this arbitration, and for any necessary appeals to a court of appeals or to the Texas Supreme Court, conditioned on success on appeal.

Finally, with respect to her claims for defamation, consisting of the individual Respondents' torts of defamation, defamation per se, libel and libel per se, Claimant has sustained substantial non-pecuniary damages for her mental anguish with physical and bodily manifestations in the past, present and into the future and probably for the remainder of her life. These damages include Claimant suffering from depression, self-doubt, feelings of hopelessness, persistent crying, loss of self-esteem, constant anxiety, stress and fear over her finances, loss of sleep, worries about her reputation and career, flashbacks, nightmares, heartbreak and social isolation due to fear of facing more unjustified defamation and accusations of impropriety. These damages severely and adversely impact Claimant's daily life and her activities.

Pursuant to Section 73.055(a)(1) and (b), Claimant also seeks equitable relief consisting of Respondents Nexstar and KTSM publishing a full retraction, clarification, or correction of all previous libelous and defamatory statements and publications caused or contributed to by Nexstar and KTSM, through the individual Respondents acting in the course and scope of their employment. Claimant specifically demands Nexstar and KTSM print the following retraction, clarification or correction for 10 consecutive days nightly on KTSM's 6:00 p.m. and 10:00 p.m. news broadcasts, and on Nexstar's corporate webpage, as follows: "KTSM-9 TV and Nexstar Media Group, Inc. hereby fully retract any negative and false statements made by the management and employees of KTSM-9 TV and Nexstar Media Group, Inc. regarding Ms. Christina Aguayo, her news reporting and her employment at KTSM-9 TV and Nexstar Media Group, Inc. At all times, Ms. Aguayo demonstrated the highest ethical standards of a news

reporter and broadcaster, and she never engaged in any conduct that was detrimental to either KTSM-9 TV or Nexstar Media Group, Inc. We apologize to Ms. Aguayo for any and all of our previous statements to the contrary that have impugned Ms. Aguayo's integrity, reputation and job performance. We acknowledge and admit KTSM-9 TV and Nexstar Media Group, Inc. wrongfully terminated Ms. Aguayo's employment, because she did not engage in any misconduct in connection with her employment or in any conduct that was detrimental to KTSM-9 TV or to Nexstar Media Group, Inc. Ms. Aguayo's job performance and her character have been and are exceptional in all respects."

Claimant has satisfied all conditions precedent to asserting all of her claims and causes of action.

WHEREFORE, PREMISES CONSIDERED, Claimant prays that Respondents appear and answer herein, and that upon final hearing, Claimant recover an arbitration award with the following relief against Respondents as follows:

1.      An award in favor of Claimant and against all individual Respondents, jointly and severally, and also against Respondents Nexstar Media Group, Inc. and KTSM-9 TV, awarding all of Claimant's actual, pecuniary damages consisting of all of her past and future lost wages and benefits, which includes damages for her past and future loss of earnings capacity which in all reasonable probability should extend for the remainder of her life;

2.      An award in favor of Claimant and against all individual Respondents, jointly and several, awarding all of Claimant's past and future non-pecuniary losses or damages, consisting of Claimant's emotional pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses suffered by Claimant in the past, present and into the future and in all reasonable probability for the remainder of her life;

3.      An award in favor of Claimant and against the individual Respondents, jointly and severally, for exemplary and punitive damages in amounts sufficient to both adequately punish each and all of the individual Respondents for their misconduct and the grievous harm they intentionally and maliciously perpetrated on Claimant, and in amounts sufficient to deter each and all of the individual Respondents from engaging in any similar tortious misconduct in the future;

4.      An award in favor of Claimant consisting of equitable relief to Claimant in the form of a retraction, clarification or correction in the form set forth above, published by both Nexstar and KTSM in the manner and for the duration set forth above;

5.      Prejudgment and post-judgment interest at the maximum legal rate;

6.      Claimant's reasonable and necessary attorney's fees, costs and expenses for prosecuting this arbitration proceedings, and for any necessary proceedings in a court of law, and for any necessary proceedings in a court of appeals or in the Texas Supreme Court, conditioned on success on appeal;

7.      Expert fees;

8.      All costs of court; and

9.      Such other and further relief at law or in equity to which Claimant may be justly entitled.

Respectfully submitted,

KILGORE & KILGORE, PLLC

By: /s/ *Robert E. Goodman, Jr.*
Robert E. Goodman, Jr.
State Bar No. 08158100
reg@kilgorelaw.com
John S. Morgan
State Bar No. 14447475
jsm@kilgorelaw.com
3141 Hood Street, Suite 500
Dallas, Texas 75219
(214) 969-9099 - Telephone
(214) 379-0840 - Fax

ATTORNEYS FOR CLAIMANT

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on October 26, 2022, I served Respondents' counsel a copy of this Claim in Arbitration via email.

William L. Davis
Jackson Lewis, P.C.
500 N. Akard, Suite 2500
Dallas, Texas 75201

/s/ Robert E. Goodman, Jr.
Robert E. Goodman, Jr.

# EXHIBIT A

## PERFORMER EMPLOYMENT AGREEMENT

**THIS PERFORMER'S EMPLOYMENT AGREEMENT** (the "Agreement") is made as of July 28, 2021 by and between Christina Aguayo ("Performer"), and Nexstar Media Inc. (the "Company").

The Company desires to employ Performer as an on-the-air performer at its television broadcast station KTSM TV El Paso, TX (the "Station"), and Performer desires to be employed by the Company in such capacity on the terms and conditions set forth in this Agreement.

In consideration of the mutual promises set forth herein and the mutual benefits to be derived from this Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1.     **Positions and Duties**.  The Company will employ Performer as an on-the-air performer at the Station.  In such position, Performer will perform such duties as are assigned to him from time to time by the Company.  These duties include, but are not limited to, gathering and/or reporting on news matters, anchoring or co-anchoring newscasts, research, script preparation, and such other duties as management of the Station from time to time may determine.  During Performer's employment under this Agreement, the Performer shall devote his or her full working time to the performance of duties for the Station.  Performer shall also be reasonably available on a regular basis for general staff promotional activities, the production of promotional material, and participation in community events.

Performer grants to the Company the right to use, and license others to use, the Performer's name, stage name, recorded voice, biographical data, portrait, likeness and picture in or on any medium of communication now or in the future available, for advertising purposes or trade in connection with the Performer's on-the-air performances (whether live or by recording) and other activities for the Station and in connection with the Station's products and services and the products and services of any sponsor of any of the programs in which the Performer appears (but no such use shall constitute an endorsement or testimonial by the Performer of any such product or service).  Performer acknowledges the Company's rights set forth herein shall survive the termination of this Agreement with no further compensation payable to Performer.

Except as otherwise specifically set forth herein, Performer's employment with the Company will be governed by the policies and procedures set forth in the Company's Employee Handbook, as may be amended from time to time, and the Performer agrees to comply with all such policies and procedures.

Performer agrees to promote the business goodwill of the Station at all times and shall not engage in any activity detrimental to the business goodwill of the Station or which portrays the Company or Station in a negative or unfavorable light.

**2.    Term of Employment**.    Unless terminated earlier as provided in Paragraph 3, the Company's employment of Performer under this Agreement will begin on September 7, 2021 and continue through September 6, 2024 (the "Initial Term"); provided, however, that the term of employment under this Agreement will be automatically renewed for successive one-year periods (the first of which will commence on September 7, 2024, unless, at least sixty (60) days prior to the end of the then current term of employment under this Agreement, Performer or the Company gives written notice to the other of the notifying party's intent not to renew the term of employment under this Agreement as of the end of the then current term.

**3.    Termination**.    The Company's employment of Performer under this Agreement will terminate prior to the end of the term specified in Paragraph 2 only under the following circumstances:

**(a)    Death**.    Performer's death; in which case Performer's employment will terminate on the date of death;

**(b)    Termination by the Company for Cause**.    The Company may terminate Performer's employment at any time for Cause; such termination to be effective as of the date stated in a written notice of termination.  For purposes of this Agreement, "Cause" is defined to mean any of the following activities by Performer:

**(i)**    the conviction of Performer of a felony or a crime involving moral turpitude or the commission of any act involving dishonesty, disloyalty or fraud with respect to the Company or any of its subsidiaries or affiliates;

**(ii)**    failure to perform duties which are reasonably directed by Station management and which are consistent with the terms of this Agreement and the position specified in Paragraph 1;

**(iii)**    any act(s) or failure(s) to act in any manner that threatens the qualification of the Company or its affiliates to maintain a broadcast license issued by the Federal Communications Commission ("FCC"), or which results in a violation of any rule or written policy of the FCC including but not limited to any utterance on the air that is obscene, indecent or profane;

**(iv)**    gross negligence or willful misconduct with respect to the Company or any of its subsidiaries or affiliates;

**(v)**    any material breach by Performer of a material provision of this Agreement;

**(vi)**    willful violation of Company policies;

**(vii)**    reporting to work under the influence of alcohol or illegal drugs;

---

**PERFORMER EMPLOYMENT AGREEMENT**                                                                 Page 2

**(viii)**    insubordination;

**(ix)**    excessive absenteeism;

**(x)**    inappropriate on-air comments disparaging a competitor, advertiser, or other party unless specifically included within a story;

**(xi)**    acting in a tortious manner towards a viewer;

**(xii)**    conduct that tends to bring Performer, the Company, the Station, or the Station's sponsors into a negative public light, jeopardizes the reputation and success of the Company or otherwise reflects unfavorably on the Company; or,

**(xiii)**    failure to improve performance as outlined in a written Performance Improvement Plan within the time frame set forth in the Plan.

**(c)**    **Termination by the Company Other Than for Cause**.    The Company may terminate Performer's employment for any reason or for no reason upon sixty (60) days' prior written notice to Performer, subject to payment of the termination payments specified in Paragraph 6. Such termination will be effective as of the date stated in a written notice of termination.

**(d)**    **Termination by Company During Probationary Period**.    The first 90 days of employment under this Agreement are considered a Probationary Period. If necessary, the Station will provide Performer with feedback regarding improvements to be made and Performer is expected to improve performance to an acceptable level by the end of the Probationary Period. If Performer fails to improve to an acceptable level as determined within the discretion of the Station by the end of the Probationary Period, Performer's employment under this Agreement will be terminated.

**4.**    **Compensation**.    The Company will pay Performer a Base Salary as follows:

| | |
|---|---|
| During the first year of employment under this Agreement | $58,000.00 |
| During the second year of employment under this Agreement | $60,000.00 |
| During the third year of employment under this Agreement | $62,000.00 |

Plus cell phone $90 per month allowance

Performer's Base Salary will be paid in accordance with the Company's regular payroll practices. Performer acknowledges that Performer's position is a professional position in which Performer is required to perform varied and non-routine intellectual work that is original and creative in character and depends primarily on Performer's invention, imagination and talent and that Performer must consistently exercise discretion and independent judgment in the performance of Performer's duties hereunder. Accordingly, for all purposes, including, but not

limited to, wage and hour laws, Performer shall be deemed an "employee employed in a bona fide professional capacity" and exempt from all overtime reporting and compensation requirements.

        **5.**     **Fringe Benefits**.

        **(a)**     Performer will be eligible to participate in Company employee benefits plans and programs generally offered to Company employees under the terms and conditions of each such plan or program and subject to the eligibility and cost sharing provisions thereof.

        **(b)**     During the term of this Agreement, the Company will reimburse Performer for all approved business expenses which Performer incurs on the Company's behalf, upon presentation of appropriate documentation. Performer must comply with the Company's policies regarding obtaining approval for expenses prior to incurring them.

        **(c)**     In consideration for Performer agreeing to remain employed by the Company for the full Initial Term of this Agreement, the Company agrees to incur certain expenses on the Performer's behalf, including but not limited to expenses for coaching, production, advertising and promoting the Performer's image, and/or education ("Advance Items"). Performer acknowledges these payments by the Company will be in excess of $_____. Performer further acknowledges that the Company would not incur the expenses for these Advance Items without Performer's commitment to remain employed at the Station for full Initial Term. In addition to the value of the Advance Items, the Station will invest time and effort into developing its programming to improve the performance of the Station by giving viewers consistency in the on-air performers. Performer also acknowledges that the Initial Term protects the Station from another station hiring away its on-air performers during the term.

        **6.**     **Termination Payments**.     Performer will be entitled to receive the following payments upon termination of Performer's employment hereunder:

        **(a)**     In the event of the termination of Performer's employment pursuant to any of the following provisions:

| | |
|---|---|
| Paragraph 3(a) | [Death] |
| Paragraph 3(b) | [By the Company for Cause] |
| Paragraph 3(d) | [Probationary Period] |

the Company will pay to Performer (or Performer's estate if pursuant to 3(a)) as soon as practical following such termination, all accrued and unpaid Base Salary as of the date of termination as provided in Paragraph 4 and an amount (calculated at the rate of the Base Salary in effect on such date) in respect of all accrued but unutilized vacation time as of such date. Termination under any of these provisions will not require Performer to reimburse the Company for the Advance Items under paragraph 5(c) of this Agreement.

**(b)**       In the event of termination of Performer's employment pursuant to Paragraph 3(c) [Termination by the Company Other Than For Cause] the Company will pay Performer the amounts described in Paragraph 6(a) and will pay Performer two weeks additional Base Salary contingent upon Performer signing a separation agreement re-affirming Performer's obligations under paragraph 7 of this Agreement and containing a Release.

**(c)**       In the event Performer breaches this Agreement or otherwise fails to perform under this Agreement by resigning prior to the end of the Initial Term, or if Performer engages in intentional misconduct in an attempt to cause the Station to terminate Performer's employment For Cause, Performer agrees to repay to the Company a portion of the value of the Advance Items set forth in Paragraph 5(c) of this Agreement according to the following formula:

> [# of months in the Initial Term - # months employed under Agreement] divided by # of months in the Initial Term] multiplied by the Total Stipulated Value of Advance Items

Payment must be made within 10 days after Performer's employment with the Company ends.

7.       **Covenant Not to Compete and Non-Disclosure**.  In consideration for Performer's employment with the Company and the Company's provision of confidential information and/or specialized training to Performer, Performer hereby covenants and agrees that:

**(a)**       The Company is providing Performer with access to certain confidential information of the Company, including, but not limited to, research, news sources, financial and other Company information.  In addition, the Station is making a substantial commitment to developing the Performer as a unique and recognizable personality, including but not limited to the promotion of Performer and investment and continuing education and further development of the Performer.  Performer acknowledges that such unique services and abilities enable Performer to seek and obtain similar employment inside the designated market area in which the Station operates (the "Station's Market").  Performer further recognizes that the value of the Company's business would be injured if Performer obtained comparable employment within the Station's Market.

**(b)**       During the term of Performer's employment with the Company, the Performer shall not, without the prior written consent of the General Manager of the Station: (1) perform any services for any radio or commercial television station, including cable, closed circuit or pay television or any other broadcast, print or electronic (i.e. Internet) media; (2) permit or authorize the use by anyone other than the Station of Performer's real or stage name, portrait, picture or license or the use of any endorsement or testimonial in advertising or publicizing any product, service, cause or institution; or (3) engage in any activity relating to the sale, advertising or promotion of any articles or materials used in any programs broadcast on the Station.

**(c)**       For a period of one (1) year after Performer's employment at the Station ends for any reason, Performer will not accept employment involving the rendering of

any on-air services, making any on-air appearances, or making any appearances in any media (including electronic media) whether or not for compensation, live or recorded, over the facilities of any radio or commercial television station, including cable, closed circuit or pay television which broadcasts or transmits to any place within the Station's Market unless: (i) such appearance is on a commercial spot announcement prepared by or for a national (but not local) advertiser and broadcast by such advertiser in multiple markets; (ii) such appearance is on a national network program delivered by the network to its local affiliated station; or (iii) such appearance is a syndicated program broadcast in multiple markets.

        **(d)**     For a period of one (1) year after Performer's employment with the Company terminates, Performer will not hire, solicit, employ or contract with respect to employment any officer or other Performer of the Station.

        **(e)**     Performer agrees to disclose promptly to the Company and does assign and agree to assign to the Company, free from any obligation to Performer, all Performer's right, title and interest in and to any and all ideas, concepts, processes, improvements and inventions made, conceived, written, acquired, disclosed or developed by Performer, solely or in concert with others, during the term of Performer's employment by the Company, which relate to the business, activities or facilities of the Company, or resulting from or suggested by any work Performer may do for the Company or at its request. Performer further agrees to deliver to the Company any and all drawings, notes, photographs, copies, outlines, specifications, memoranda and data relating to such ideas, concepts, processes, improvements and inventions, to cooperate fully during Performer's employment and thereafter in the securing of copyright, trademark or patent protection or other similar rights in the United States and foreign countries, and to give evidence and testimony and to execute and deliver to the Company all documents requested by it in connection therewith.

        **(f)**     Except as expressly set forth below, Performer agrees, whether during Performer's employment pursuant to this Agreement or thereafter, except as authorized or directed by the Company in writing or pursuant to the normal exercise of Performer's responsibilities hereunder, not to disclose to others, use for Performer's or any other Person's benefit, copy or make notes of any confidential information or trade secrets or any other knowledge or information of or relating to the business, activities or facilities of the Company learned while working for the Company. Performer will not be bound by this obligation of confidentiality and nondisclosure if:

        **(i)**     the knowledge or information in question has become part of the public domain by publication or otherwise through no fault of Performer;

        **(ii)**     the knowledge or information in question is disclosed to the recipient by a third party and Performer reasonably believes such third party is in lawful possession of the knowledge or information and has the lawful right to make disclosure thereof; or

        **(iii)**     Performer is required to disclose the information in question pursuant to applicable law or by a court of competent jurisdiction with actual or apparent jurisdiction to order Performer to disclose or make accessible such information.

(g)    Upon termination of employment pursuant to this Agreement, Performer will deliver to the Company all records, notes, data, memoranda, photographs, models and equipment of any nature which are in Performer's possession or control and which are the property of the Company.

(h)    The parties understand and agree that the remedies at law for breach of the covenants in this Paragraph 7 would be inadequate and that the Company will be entitled to injunctive or such other equitable relief as a court may deem appropriate for any breach of these covenants. Notwithstanding the provisions set forth in Paragraph 15 below, the Company shall have the right to pursue such injunctive or other equitable relief in a court of law and without posting of any bond. If any of these covenants will at any time be adjudged invalid to any extent by any court of competent jurisdiction, such covenant will be deemed modified to the extent necessary to render it enforceable.

**8.**    **Notices**. All notices and other communications which may or are required to be given hereunder or with respect hereto shall be in writing, shall be delivered personally or sent by nationally recognized overnight delivery service, charges prepaid, or by registered or certified mail, return-receipt requested, and shall be deemed to have been given or made when personally delivered, the next business day after delivery to such overnight delivery service, three (3) days after deposited certified mail postage prepaid, as the case may be, addressed as follows:

If to Performer: To Performer's address on file with the Company's Payroll Department.

If to the Company: *[insert station address]* Attention: General Manager with a copy (which shall not constitute notice) to Human Resources Department, Nexstar Media Group, Inc., 545 E. John Carpenter Freeway, Suite 700, Irving, Texas, 75062.

**9.**    **Entire Agreement**. This instrument embodies the entire agreement between the parties hereto with respect to Performer's employment with the Company, and there have been and are no other agreements, representations or warranties between the parties regarding such matters.

**10.**    **No Assignment**. This Agreement may not be assigned by Performer without the prior written consent of the Company and any attempted assignment without such prior written consent will be null and void and without legal effect. This Agreement will not be assigned by the Company without the prior written consent of Performer except to any other person or entity which may acquire or conduct the business of the Station, the Company, its Parent and/or their respective subsidiaries, if any.

**11.**    **Amendment; Modification**. This Agreement will not be amended, modified or supplemented other than in a writing signed by the parties hereto.

**12.**    **Severability**. The parties agree that if any provision of this Agreement is under any circumstances deemed invalid or inoperative, the Agreement will be construed with

the invalid or inoperative provision deleted, and the rights and obligations of the parties will be construed and enforced accordingly.

**13.     Governing Law.** This Agreement will be governed by and construed in accordance with the internal law of the State of Texas without giving effect to any choice of law or conflict provision or rule that would cause the laws of any jurisdiction other than the State of Texas to be applied. Subject to the forum selection clause in the agreement to arbitrate contained in paragraph 15 of this Agreement, the parties agree that exclusive venue for any court proceeding will be in Dallas County, Texas.

**14.     Representations**. Performer represents and warrants to the Company that Performer is not a party to or bound by any employment agreement, noncompete agreement or confidentiality agreement with any other person or entity.

**15.     Strict Construction**. The parties to this Agreement have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

**16.     Binding Arbitration**.

Excluding workers compensation, unemployment compensation and any other claims which by law must be resolved in other forums, Company and Performer agree to resolve any and all disputes or claims related in any manner whatsoever to this Agreement and/or to Performer's employment, including, but not limited to, all claims beginning from the period of Performer's application for employment with the Company through termination of employment at Company, by binding arbitration pursuant to the National Rules for the Resolution of Employment Disputes of the American Arbitration Association (hereinafter "AAA"). Disputes related to employment include, but are not limited to, claims or charges based upon federal or state statutes, including, but not limited to, the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, as amended, and any other civil rights statute, the Americans with Disabilities Act, the Family and Medical Leave Act, the Fair Labor Standards Act or other wage statutes, claims under this Agreement, and claims based upon tort or contract laws or common law or any other federal or state or local law affecting employment in any manner whatsoever. (the "Claims"). In the event that arbitration is brought pursuant to any law or statute which provides for allocation of attorneys' fees and costs, the arbitrator shall have the authority to allocate attorneys' fees and costs pursuant to the applicable law or statute.     Except with respect to the enforcement of the Company's rights under Paragraph 7 herein, the Company agrees to be bound by the arbitration procedure set forth in this Agreement. In the event Performer is unable to pay the applicable filing fee for arbitration due to extreme hardship, Performer may apply to AAA for deferral or reduction of the fees. AAA shall determine whether the Performer qualifies for financial hardship. To invoke the arbitration process, Performer or Company must contact the American Arbitration Association at 2200 Century Parkway, Suite 300, Atlanta, Georgia 30345-3202, 404-325-0101, direct toll free: 1-800-925-0155, facsimile 404-325-8034, or American Arbitration Association, 13455 Noel Road, Suite

1750, Dallas, Texas 75240, 972-702-8222, facsimile 972-490-9008, or the nearest regional office of AAA.

Company and Performer expressly agree that the Federal Arbitration Act governs the enforceability of any and all of the arbitration provisions of this Agreement, and judgment upon the award rendered by the arbitrator(s) may be entered by any court having jurisdiction thereof. Questions of arbitrability (that is whether an issue is subject to arbitration under this agreement) shall be decided by the arbitrator. Likewise, procedural questions which arise out of the dispute and bear on its final disposition are matters for the arbitrator to decide.

This Agreement is an agreement as to choice of forum only and is not intended to extend or limit any applicable statute of limitation. Performer and Company understand and agree that any claim or demand for arbitration will be timely only if filed with AAA within the time in which an administrative charge or a complaint could have been filed if the claim or demand is one which could be filed with an administrative agency or court. If the arbitration claim raises an issue which could not have been timely filed with the appropriate administrative agency or court, then the claim must be treated as the administrative agency or court would have treated it. Claims must be filed within the time set by the appropriate statute of limitation.

By signing this Agreement, Performer waives his/her right to commence, be a party to, or class member in any court action against Company relating to employment issues. If any claim is found not to be subject to this Agreement and the arbitration procedure, exclusive venue for any court proceeding shall be in Dallas County, Texas.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**Christina Aguayo**

**Nexstar Media Inc.**
By:

**David Candelaria**
**VP/General Manager**                                           **KTSM**

By:

**Julie Pruett**
**Title: SVP/Regional Manager**

# EXHIBIT D

**Katelynn Nolen**

**From:** Lerma Jr., Eduardo <Eduardo.Lerma@mail.house.gov>
**Sent:** Wednesday, October 26, 2022 12:10 PM
**To:** Robert E. Goodman, Jr.
**Subject:** Response re: Christina Aguayo

Hello Mr. Goodman,

In response to your letter dated October 26, 2022, the Congresswoman will not consent to joinder in the arbitration. Thank you for your letter.

**Eduardo N. Lerma, Jr.**
Chief of Staff
Office of Congresswoman Veronica Escobar (TX-16)
1505 Longworth House Office Building
Washington, DC 20515
202.225.4831
Eduardo.Lerma@mail.house.gov
www.escobar.house.gov

  

*Get the latest news and updates directly to your inbox. Subscribe to our newsletter HERE.*

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Robert Goodman, Jr.
Bar No. 08158100
reg@kilgorelaw.com
Envelope ID: 70751012
Status as of 12/9/2022 10:10 AM CST

Associated Case Party: CHRISTINA AGUAYO

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Robert E.Goodman, Jr. | | reg@kilgorelaw.com | 12/6/2022 3:11:35 PM | SENT |
| John S.Morgan | | jsm@kilgorelaw.com | 12/6/2022 3:11:35 PM | SENT |
| Patricia Milfeld | | pam@kilgorelaw.com | 12/6/2022 3:11:35 PM | SENT |