UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHRISTINA AGUAYO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 3:23-CV-539-E |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

**SECOND AMENDED COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Christina Aguayo ("Plaintiff") files this Second Amended Complaint against Defendant United States of America on behalf of Congresswoman Veronica Escobar ("Defendant"), and would show the Court as follows:

**I.**

**PARTIES**

1. Plaintiff Christina Aguayo is an individual who is appearing in court through her attorneys of record, Robert E. Goodman, Jr. and John S. Morgan, Kilgore & Kilgore, PLLC, 3141 Hood Street, Suite 500, Dallas, Texas 75219.

2. Defendant United States of America on behalf of Congresswoman Veronica Escobar ("Escobar") can be served through its attorney of record, Brian W. Stoltz, Assistant United States Attorney, 1100 Commerce Street, Third Floor, Dallas, Texas 75242-1699. Escobar is a member of the United States Congress for the 16th District of Texas.

## II.

## JURISDICTION AND VENUE

3.        This Court has jurisdiction over the parties and this action. Venue is proper in this Court.

## III.

## FACTS SUPPORTING PLAINTIFF'S CLAIMS

4.        On July 28, 2021, Plaintiff signed a written employment contract with Nexstar Media Group, Inc. ("Nexstar") entitled Performer Employer Agreement (the "agreement"). Pursuant to the agreement, Plaintiff began employment with Nexstar on September 7, 2021 at Nexstar's affiliate KTSM-TV9 ("KTSM") in El Paso, Texas, as an on-screen news reporter. The agreement defined Plaintiff's role as a "performer," with "such duties as [were] assigned to [her] from time to time by the Company." Exhibit "A", page 1, para. 1. While employed, Plaintiff diligently performed her assigned duties, consisting of preparing and broadcasting various news stories. Plaintiff received prior approval from KTSM's management, who were all Nexstar employees, for all news stories she reported, including stories she developed during time off from work.

5.        Due to tortious interference by Escobar with Plaintiff's employment with Nexstar governed by the agreement, and defamation perpetrated by Escobar, within the State of Texas, Nexstar terminated Plaintiff's employment on February 8, 2022 in breach of the agreement, falsely claiming Plaintiff had engaged in conduct detrimental to Nexstar, in violation of paragraph 3 of the agreement, based on two news stories reported by Escobar which KTSM's management had approved prior to airing. Nexstar's termination of Plaintiff's employment was preceded and accompanied by libelous and slanderous statements concerning Plaintiff published

SECOND AMENDED COMPLAINT - Page 2

by Nexstar's KTSM employees, by Escobar, and by others at the request, instigation or encouragement of Escobar. At all times, Escobar's tortious interference with Plaintiff's employment with Nexstar and her defamation of Plaintiff, committed as principal, conspirator and aider and abettor, occurred outside of the course-and-scope of her office or employment as a Member of the United States Congress for the 16th Congressional District of Texas.

6.      The events leading to Plaintiff's wrongful termination began with defamatory statements by Escobar herself regarding Plaintiff's reporting of certain news stories which KTSM had approved. Such defamatory complaints by Escobar, and further defamatory statements by Escobar, or in which she conspired or which she aided and abetted, regarding Plaintiff, did not constitute a valid reason for Nexstar's termination of Plaintiff's employment under paragraph 3 of the agreement, entitled "Termination," subsection (b)(xii).

7.      From the beginning of Plaintiff's employment at KTSM until October 20, 2021, KTSM's management and non-management employees provided her positive feedback for her excellent job performance. This changed after October 21, 2021, when Plaintiff interviewed Texas Attorney General Ken Paxton based on questions agreed to be addressed by Mr. Paxton. When Plaintiff arrived at the KTSM station to meet with her photographer to proceed with the interview, KTSM's assignments manager, Andra Litton, assistant to the KTSM's news director, and Tim Gutierrez, KTSM's news director approached Plaintiff and instructed her to ask Attorney General Paxton a list of questions prepared by Ms. Litton which had not been either submitted to or approved by Mr. Paxton in advance. Ms. Litton and Mr. Gutierrez provided this instruction to Plaintiff, according to Mr. Gutierrez, at the insistence of Escobar or a member of her staff. While pre-approval of questions by political figures such as Attorney General Paxton is normal and customary in the television reporting industry. Ms. Litton and Mr. Gutierrez

instructed Plaintiff to "blindside" Mr. Paxton and apologize for asking unapproved questions afterwards. Plaintiff refused this unethical instruction because complying with their demand would not only be detrimental to Plaintiff's reputation as a journalist, but, also, Attorney General Paxton had never previously agreed to an interview with a local station in El Paso and "blind siding" Mr. Paxton could deter him from conducting any other news interviews in El Paso. Accordingly, Plaintiff did not want to jeopardize her commitment regarding questions she provided to Mr. Paxton prior to the interview. Plaintiff reasonably suspects Ms. Litton prepared the list of unapproved questions because Ms. Litton worked on the election campaign for Escobar and is a close friend of Escobar's Communications and Special Projects Director, Elizabeth Lopez-Sandoval, and both Escobar and Ms. Lopez-Sandoval had political differences with Attorney General Paxton.

8.      On October 28, 2021, KTSM aired Plaintiff's interview with Attorney General Paxton on the Sunday night news show. The next day, October 29, 2021, Ms. Litton and Chris Babcock, KTSM's website director, removed Plaintiff's interview with Mr. Paxton from its website based, on information and belief, on the insistence of Escobar or a member of her staff. Ms. Litton and Mr. Babcock told Plaintiff that KTSM's Mr. Gutierrez and KTSM's general manager David Candelaria instructed Ms. Litton and Mr. Babcock to remove the Ken Paxton interview. Since Mr. Candelaria had approved airing the Ken Paxton interview in advance, Plaintiff went to his office to verify the truth of their claim that he had approved of the removal of the story from KTSM's website. Plaintiff determined Mr. Candelaria did not find anything objectionable either about Plaintiff's interview of Attorney General Paxton or KTSM's decision to air that story. Mr. Candelaria then instructed Ms. Litton and Mr. Babcock to put the story back on the station's website.

SECOND AMENDED COMPLAINT - Page  4

9.       Subsequently, Mr. Candelaria told Plaintiff that Escobar called Mr. Candelaria about the Ken Paxton story and complained about Plaintiff and the story, based on Escobar's political views contrary to those of Attorney General Paxton. Escobar told Mr. Candelaria that she was very angry that Plaintiff's interview and subsequent new story did not contain information regarding Mr. Paxton's legal troubles. Escobar requested that Mr. Candelaria remove Plaintiff from news broadcasting on the air, which meant that Escobar demanded KTSM no longer permit Plaintiff to report any news stories. After Mr. Candelaria received this complaining phone call from Escobar, Mr. Candelaria informed Plaintiff that her news reporting needed to be "more balanced," which under the circumstances, necessarily meant that Plaintiff should only report stories which satisfied Escobar's political views.

10.      The Paxton interview was the starting point of Escobar's campaign of complaining repeatedly to Mr. Candelaria about Plaintiff and repeatedly demanding KTSM remove Plaintiff from her news reporting duties. Subsequently, Mr. Candelaria read texts and emails from Escobar to Plaintiff that Mr. Candelaria received numerous times per week, containing complaints about Plaintiff and seeking her termination from employment with Nexstar.

11.      Also subsequently, Plaintiff learned that multiple defamatory statements about her were published on various social media platforms regarding her reporting on Attorney General Paxton. One false statement was instigated by an employee of Escobar's office, whom Plaintiff reasonably believes was Ms. Lopez-Sandoval, based on false information Ms. Lopez-Sandoval provided to the Democratic Party of El Paso, which itself then published defamatory statements about Plaintiff on its own Facebook social media site. Defamatory statements were also made on the social media websites of KissFM 93.1, Lionstar Blog, the Democratic Party of El Paso and

FTVLive.com. These social media sites published defamatory statements regarding Plaintiff's interview of Ken Paxton and her employment at KTSM beginning October 28, 2021, continuing until the termination of Plaintiff's employment on February 8, 2022, and also continuing thereafter. These defamatory statements included that Plaintiff's reporting of her interview of Ken Paxton was "unbalanced," "inaccurate," "right leaning", "did not question Mr. Paxton's facts," was a "five-minute campaign ad [for Mr. Paxton]," and that numerous KTSM news staff had complained about Plaintiff's biased and inaccurate reporting. Such continuing defamatory statements of Plaintiff occurred based on Escobar herself, and others at her urging, making, conspiring in or assisting and encouraging or assisting and participating in such statements.

12.     Mr. Gutierrez subsequently admitted to Plaintiff that Escobar, Ms. Lopez-Sandoval and the Chairwoman of the El Paso Democratic Party, Dora Oaxaca, actively encouraged and assisted in, or encouraged and participated in, the publication of defamatory statements about Plaintiff by the social media sites identified in paragraph 11 to convince KTSM to terminate the employment of Plaintiff in violation of the agreement, notwithstanding that Plaintiff's news report about Mr. Paxton was honest, unbiased and approved in advance. Escobar told Mr. Candelaria that Escobar had made defamatory statements regarding Plaintiff to Ms. Lopez-Sandoval subsequently and that Ms. Lopez-Sandoval repeated the statements to to the Democratic Party of El Paso, which published a post defaming Plaintiff on Facebook.

13.     On or about November 9, 2021, Plaintiff interviewed Tony Gonzales, a Member of the United States Congress for the 23rd District of Texas. After this interview, Plaintiff reached out to Escobar by email, asking to interview Escobar if she wanted to respond to statements made by Congressman Gonzales. Escobar did not respond to Plaintiff's email inquiry. When KTSM reported Plaintiff's interview of Congressman Gonzales on television, Plaintiff

accurately stated she had reached out to Escobar but she had not responded to Plaintiff's email by the time of the broadcast.

14.     After the broadcast about Congressman Gonzales referred to in paragraph 13, Escobar called Mr. Candelaria and stated that she was very upset about Plaintiff's reporting of the interview of Congressman Gonzales. Escobar demanded that KTSM force Plaintiff to apologize for reporting that Escobar did not respond to Plaintiff's request for an interview even though Escobar knew Plaintiff had contacted her and that she did not respond. To appease Escobar, Mr. Candelaria responded by reprimanding Plaintiff by text message. Mr. Candelaria then asked Plaintiff to prove that she had emailed Escobar for a comment. Plaintiff then provided to Mr. Candelaria her email to Escobar. Even though Mr. Candelaria received proof of Plaintiff's email to Escobar, Mr. Candelaria and Mr. Gutierrez wrote an apology for Plaintiff and forced Plaintiff to read the apology on television regarding her prior statement that Escobar did not respond to Plaintiff's request for a comment. Forcing Plaintiff to lie on television was outrageous and was done to appease Escobar.

15.     On or about November 19, 2021, Plaintiff came to KTSM's offices on a day off to conduct an exclusive interview with Texas Governor Greg Abbott. Prior to this interview, Governor Abbott had not consented to any local interviews in El Paso. Mr. Gutierrez was in the control booth during Plaintiff's interview of Governor Abbott. After the interview, Mr. Gutierrez praised Plaintiff for it.

16.     On or about November 20, 2021, KTSM broadcasted Plaintiff's interview of Governor Abbott. Mr. Candelaria again praised Plaintiff's work after KTSM. Escobar again complained to Mr. Candelaria about Plaintiff, and complained about her news story about Governor Abbott, in both emails and text messages. Mr. Candelaria called Plaintiff into his

office, and he informed Plaintiff that Escobar was "blowing up" his phone and email with her anger regarding the news story. Escobar again demanded KTSM fire Plaintiff from her job as an on-screen news reporter, and asked KTSM to remove the story about Governor Abbott from its website. Due to Escobar's vociferous complaints about Plaintiff, Mr. Candelaria began telling that her news reporting had to be "more balanced" to appease Escobar.

17.     In November 2021, Plaintiff interviewed Irene Armendariz–Jackson, who was Escobar's political opponent in the election that Escobar won to become Congresswoman. KTSM approved Plaintiff's interview in writing for on-screen news broadcast. After KTSM aired the story, Escobar became infuriated and she complained about Plaintiff again to Mr. Candelaria, who told Plaintiff that Escobar had been continually complaining about Plaintiff and continually demanding that KTSM terminate Plaintiff's employment. Mr. Gutierrez also received complaints from Escobar. Approximately one week later, Mr. Gutierrez spoke to Plaintiff. Mr. Gutierrez admitted that he was exhausted with constantly dealing with Escobar's complaints regarding Plaintiff and the news stories which Plaintiff presented on-screen even though all had received prior approval from KTSM management. Mr. Gutierrez nevertheless reprimanded Plaintiff and told her KTSM would extend Plaintiff's 90-day probation another 30 days solely based on the constant angry communications by Escobar in response to news stories presented by Plaintiff even though all had been approved in advance by KTSM. Neither Mr. Gutierrez nor Mr. Candelaria, however, accused Plaintiff of providing either improper or biased content in her interview of Ms. Armendariz-Jackson.

18.     During her additional 30 days of probationary employment, Plaintiff refrained from reporting any news stories containing relevant current events. This caused Plaintiff to lose followers on social media and to lose her popularity and respect in the local community.

19.     On or about February 1, 2022, Plaintiff interviewed a former United States Border

Patrol agent regarding the morale of the Border Patrol and what was occurring behind the scenes

regarding the border situation. This Border Patrol veteran is the husband of Ms. Armendariz–

Jackson. Plaintiff's story was approved for a KTSM television broadcast in advance by Mr.

Gutierrez. After the story aired, Mr. Gutierrez praised the story and Plaintiff's handling of the

interview. Escobar, however, was upset about the story and she sent numerous emails and text

messages complaining about Plaintiff to Mr. Candelaria, including asking Mr. Candelaria to

terminate Plaintiff's employment.

20.     On February 2, 2022, Plaintiff sent an email to Escobar requesting an interview.

Escobar refused Plaintiff's request for an interview. Ms. Lopez-Sandoval replied to Plaintiff's

request to interview Escobar by an email to Plaintiff, dated February 3, 2022, at 2:50 p.m., with a

copy to Mr. Gutierrez, Mr. Candelaria and others. Ms. Lopez-Sandoval wrote: "Good afternoon,

Christina. Thank you for reaching out. I'm so sorry if KTSM didn't inform you, but months ago

your supervisors and my office agreed that given your track record of dishonest reporting,

Congresswoman Escobar will not be granting you any interviews. My best, Elizabeth."

21.     On or about February 5 or 6, 2022, Plaintiff ran a 20-second story about a Donald

Trump rally in Texas. Due to Plaintiff's concerns regarding the station's hostile criticism,

Plaintiff limited the story to informing the public that the Trump rally occurred in Texas, that

Governor Abbott was present at the rally and the Governor appeared on the stage at the rally and

made some public statements. Plaintiff ran a five second sound bite from the Governor while he

was speaking on the stage. This story was approved in writing by Mr. Gutierrez prior to KTSM

airing the story. After KTSM aired the story, Escobar and her staff sent several emails and made

several phone calls complaining about Plaintiff and the Trump rally story to Mr. Candelaria.

Both Mr. Candelaria and Mr. Gutierrez informed Plaintiff that they were spending an inordinate amount of time dealing with Escobar's complaints regarding Plaintiff and the pre-approved news stories which she reported.

22.     On February 8, 2022, Nexstar terminated Plaintiff's employment with Nexstar, claiming the reason for her termination was Plaintiff's broadcasting of the two news stories regarding the Border Patrol veteran and the Trump rally. Nexstar falsely claimed that the publication of these news stories, although approved in advance by KTSM's management, was "conduct detrimental" to Nexstar through KTSM. Nexstar's termination of Plaintiff's employment would not have occurred but for Defendant's repetitive acts and tortious interference and defamation intended to force Nexstar to fire Plaintiff.

## IV.

## PLAINTIFF'S CLAIMS

23.     Escobar repeatedly committed tortious interference with Plaintiff's employment relationship with Nexstar and defamation of Plaintiff, in the case of defamation as a principal, conspirator and aider and abettor. Escobar knew that her acts of tortious interference and defamation were specifically intended to disrupt and cause the termination of the contractually-based employment between Plaintiff and Nexstar. Escobar perpetrated these torts against Plaintiff with actual knowledge that all the defamatory statements made against Plaintiff by Escobar and others at the request, instigation or encouragement of Escobar were part of the means by which Escobar tortiously interfered with Plaintiff's employment relationship with Nexstar. Escobar knew her pattern of interference and defamation, occurring through her own phone calls, emails and the continuing defamation of Plaintiff which she orchestrated, would severely damage, if not destroy, Plaintiff's career as a journalist and a television reporter, and

cause Plaintiff substantial mental or emotional distress. Escobar, and at Escobar's request, instigation or encouragement, multiple other persons, defamed Plaintiff by accusing her of dishonesty in her reporting, political bias, publishing intentionally false information, being a fake journalist, carrying out a "far-right agenda" as well as other similar false statements of fact. Escobar's tortious interference and defamation toward Plaintiff proximately caused Plaintiff to sustain damages, consisting of both pecuniary losses and non-pecuniary losses in the past, present and in all reasonable probability into the future and probably for the remainder of the Plaintiff's life, and loss of reputation. It also caused Plaintiff mental anguish. Plaintiff seeks to recover all such actual damages from Escobar in this action. Plaintiff is also entitled to punitive damages based on the nature of Escobar's conduct.

## V.

## PLAINTIFF'S DAMAGES

24.     Plaintiff's claim for actual damages against Escobar includes Plaintiff's past pecuniary losses consisting of her past lost wages and benefits from the date of her wrongful termination to the date of the conclusion of this suit. These damages can be calculated based on her salary set forth in the agreement, plus the value of her dental and vision insurance coverage and her cell phone allowance. Such damages also include lost rental income, because Plaintiff remains unemployed and cannot afford to rent an apartment or purchase a home and therefore Plaintiff is residing in a home that she had previously rented to tenants and had previously derived income.

25.     Plaintiff has been unable to obtain new employment as a journalist or a news reporter due to the negative job reference from Nexstar resulting from her termination of employment under the circumstances it occurred, and the defamatory statements about her, all of

which occurred due to Escobar's interference in her employment with Nexstar, Escobar's defamation of Plaintiff and Escobar's facilitation of defamation by others. Plaintiff reasonably estimates that her pecuniary damages in nature of lost wages and benefits in the past, continuing in all reasonable probability into the future and for the remainder of Plaintiff's work life, will exceed $2,000.000.

26.     Plaintiff has also sustained substantial non-pecuniary damages consisting of loss of her personal and professional reputation in the past, continuing in all reasonable probability into the future and for the remainder of Plaintiff's life, as well as substantial mental anguish, with physical and bodily manifestations in the past, continuing into the future and probably for the remainder of her life. These damages include Plaintiff suffering from depression, self-doubt, feelings of hopelessness, persistent crying, loss of self-esteem, constant anxiety, stress and fear over her finances, loss of sleep, worries about her reputation and career, flashbacks, nightmares, heartbreak and social isolation due to fear of facing more unjustified accusations of impropriety. These damages were all proximately caused by Escobar's tortious interference and defamation, and these damages severely and adversely impact Plaintiff's daily life routine and activities. Plaintiff seeks to recover non-pecuniary compensatory damages in the past, continuing in all reasonable probability into the future and for the remainder of Plaintiff's life.

27.     Plaintiff also seeks to recover from Escobar punitive or exemplary damages in an amount in the discretion of the fact-finder, to punish Escobar for her intentional and malicious misconduct and to deter Escobar from engaging in similar misconduct in the future. Plaintiff shall demonstrate by clear and convincing evidence the tortious misconduct of Escobar occurred deliberately, with malice and with specific knowledge that her misconduct would harm Plaintiff and posed a severe risk of serious harm or damage to Plaintiff.

28.     Plaintiff has satisfied all conditions precedent to asserting her claims against Escobar.

## VI.

## FACTS PRECLUDING IMMUNITY FOR ESCOBAR ON PLAINTIFF'S CLAIMS

29.     The United States removed Plaintiff's claim of tortious interference against Escobar, as originally asserted in a suit in the District Court of Dallas County, Texas, pursuant to the Westfall Act, 28 U.S.C. § 2679, which provides that a suit based on any wrongful act of an employee of the government "while acting within scope of her office or employment" is governed by 28 U.S.C. §1346(6) and 18 U.S.C. § 2672 and "is exclusive of any other civil action or proceeding for monetary damages." In support of its removal, a Westfall Act certification was submitted pursuant to 28 U.S.C. § 2679(d)(2), claiming that Escobar is a United States government employee or holding an office of the United States, and that Escobar was acting in the scope of her employment or office at the time she committed the torts at issue. Plaintiff contests that latter part of the Westfall Act's certification. Removal was improper because Congresswoman Escobar did not act in the scope of her office or employment when she perpetrated tortious interference or defamation against Plaintiff. Accordingly, the name of the Defendant in this case should be converted from the United States of America back to Escobar, even if pursuant to applicable case law under the Westfall Act, this action must remain pending in this Court. Osborn v. Haley, 549 U.S. 225, 242, 127 S.Ct. 881, 894-895 (2007).

30.     Under the Westfall Act, whether a federal employee committed a tort in the scope her office or employment is an issue that must be resolved by the vicarious liability of the state law where the tort or torts occurred. Carroll v. Trump, 49 F. 4th 759, 766-767 (2d Cir. 2022).

31.     Escobar's torts at issue occurred in Texas, making Texas law applicable. Texas law is clear that Escobar's conduct at issue in this case does not satisfy the Texas standard for vicarious liability, that Escobar was acting in the course-and-scope of her employment when she committed her tortious misconduct. In Painter v. Amerimex Drilling I, Ltd., 561 S.W. 3d 125 (Tex. 2018), the Texas Supreme Court, opining on the Texas standard of vicarious liability, holding that an employer is liable for an employee's torts if the employee's torts occur in the course and scope of his or her employment, ruled the "defining characteristic [of an employer/employee relationship] is the principal's 'right to control the agent's actions undertaken to further the principal's objectives.'" Id. at 132, citing FFP Operating Partners, L.P. v. Duenez, 327 S.W. 3d 680, 686 (Tex. 2007). The Painter court held: "Thus, a plaintiff must demonstrate such a right to control in order to satisfy the first element of a vicarious-liability claim against an employer for its employee's negligence: that the wrongdoer was an employee at the time of the negligent conduct. … As a general matter, this right to control extends to all the employee's acts within the course and scope of his employment, i.e., actions 'within the scope of the employee's general authority in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired.'" Id. citing Goodyear Tire and Rubber Co. v. Mayes, 236 S.W. 753, 757 (Tex. 2007). The Painter court concluded its analysis of whether an employee was acting in the course and scope of his or her employment by holding: "The course-and-scope inquiry under step two involves an objective analysis, hinging on whether the employee was performing tasks generally assigned to him in furtherance of the employer's business. That is, the employee must be acting with the employer's authority and for the employer's benefit." Id. at 138.

32.     While Painter involved a negligence claim, the Texas Supreme Court, in Laverie v. Wetherbe, 517 S.W. 3d 748 (Tex. 2017), held that the tortfeasor (a senior associate dean) was acting in the course-and-scope of his employment when he provided defamatory information regarding a professor who had applied for a deanship position to the university provost. The reason it held the senior associate dean's defamation occurred within the course-and-scope of his employment was that the dean defamed the professor as part of the dean's job duties of evaluating the professor's qualifications. Id. at 755.

33.     In Carroll v. Trump, 498 F. Supp. 3d 422 (S.D.N.Y. 2020), aff'd in part, vacating in part, Caroll v. Trump, 49 F. 4th 759 (2nd Cir. 2022) (certifying the question of course-and-scope of employment under District of Columbia law to the District of Columbia Court of Appeals), the federal district court found former President Trump's defamation against a woman who claimed President Trump raped her in a department store did not occur in the course and scope of President Trump's employment as president. The district court reasoned, both under District of Columbia law and also New York law, that the President's defamation did not "further the master's business [the Executive branch of the U.S. Government]" and was not "foreseeable to the employer, meaning that it is a direct outgrowth of the employee's instructions or job assignments." Id. at 450-51, 456.

34.     In this case none of Escobar's tortious interference or defamation occurred while she was in session in Congress or participating in Congressional business. As such, Escobar's misconduct is not immunized by the Speech and Debate Clause of the United States Constitution, Article 1, Section 6, Clause 1. Further, Escobar's tortious interference and defamation of Plaintiff did not further the business of the United States Congress, did not benefit Congress, and Congress did not have a right of control over Congresswoman Escobar's torts in

this case. Under controlling Texas law, therefore, Congresswoman Escobar was not acting in the course-and-scope of her office or employment as a Member of Congress when she tortiously interfered with Plaintiff's employment at Nexstar and defamed Plaintiff. Painter, 561 S.W. 3d at 132-133.

35.      Escobar's employment duties as a member of the U.S. House of Representatives are set forth in Roles and Duties of a Member of Congress; Brief Overview, Congressional Research Service, Updated February 15, 2022, which is attached as Exhibit "A". This publication identifies the job duties of a congressperson as: (1) Representation; (2) Legislation; (3) Constituency Service; (4) Oversight and Investigation; (5) Advice and Consent (Senators Only); (6) Congressional Leadership; (7) Personal Office Management; and (8) Electoral Activity. A review of each of these job duties confirm that they do not include tortiously interfering with the employment of a private citizen or defaming a private citizen. Escobar's defaming Plaintiff and tortiously interfering with Plaintiff's employment at Nexstar and defaming Plaintiff, causing Nexstar to fire Plaintiff, and probably ending Plaintiff's career in journalism, do not arguably fit within any of the stated duties. For these reasons, this Court should find that Plaintiff's allegations against Escobar defeat the defense by the United States of Escobar under the Westfall Act that Escobar is immune from liability because she was allegedly acting in the course-and-scope of her employment in defaming Plaintiff and interfering with her employment with Nexstar. This Court, therefore, should dismiss the United States as the defendant, substitute Escobar as the defendant in place of the United States, and set this action for a trial on the merits.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that upon final hearing, Plaintiff recover her actual, including compensatory, damages and punitive or exemplary damages against Escobar, prejudgment and post-judgment interest at the maximum legal rate, all costs of court, and such other and further relief at law or in equity to which Plaintiff may be justly entitled.

Respectfully submitted,

KILGORE & KILGORE, PLLC

By: /s/ *Robert E. Goodman, Jr.*
Robert E. Goodman, Jr.
State Bar No. 08158100
reg@kilgorelaw.com
John S. Morgan
State Bar No. 14447475
jsm@kilgorelaw.com
3141 Hood Street, Suite 500
Dallas, Texas 75219
(214) 969-9099 - Telephone
(214) 379-0840 - Fax

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing was forwarded to

counsel of record via the Court's electronic filing system and/or via email on the 11th day of

April 2023.

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:     214-659-8626
Facsimile:     214-659-8807
brian.stoltz@usdoj.gov

/s/ Robert E. Goodman, Jr.
Robert E. Goodman, Jr.

.

SECOND AMENDED COMPLAINT - Page  18