# EXHIBIT A

# PERFORMER EMPLOYMENT AGREEMENT

**THIS PERFORMER'S EMPLOYMENT AGREEMENT** (the "Agreement") is made as of July 28, 2021 by and between Christina Aguayo ("Performer"), and Nexstar Media Inc. (the "Company").

The Company desires to employ Performer as an on-the-air performer at its television broadcast station KTSM TV El Paso, TX (the "Station"), and Performer desires to be employed by the Company in such capacity on the terms and conditions set forth in this Agreement.

In consideration of the mutual promises set forth herein and the mutual benefits to be derived from this Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1. **Positions and Duties**. The Company will employ Performer as an on-the-air performer at the Station. In such position, Performer will perform such duties as are assigned to him from time to time by the Company. These duties include, but are not limited to, gathering and/or reporting on news matters, anchoring or co-anchoring newscasts, research, script preparation, and such other duties as management of the Station from time to time may determine. During Performer's employment under this Agreement, the Performer shall devote his or her full working time to the performance of duties for the Station. Performer shall also be reasonably available on a regular basis for general staff promotional activities, the production of promotional material, and participation in community events.

Performer grants to the Company the right to use, and license others to use, the Performer's name, stage name, recorded voice, biographical data, portrait, likeness and picture in or on any medium of communication now or in the future available, for advertising purposes or trade in connection with the Performer's on-the-air performances (whether live or by recording) and other activities for the Station and in connection with the Station's products and services and the products and services of any sponsor of any of the programs in which the Performer appears (but no such use shall constitute an endorsement or testimonial by the Performer of any such product or service). Performer acknowledges the Company's rights set forth herein shall survive the termination of this Agreement with no further compensation payable to Performer.

Except as otherwise specifically set forth herein, Performer's employment with the Company will be governed by the policies and procedures set forth in the Company's Employee Handbook, as may be amended from time to time, and the Performer agrees to comply with all such policies and procedures.

Performer agrees to promote the business goodwill of the Station at all times and shall not engage in any activity detrimental to the business goodwill of the Station or which portrays the Company or Station in a negative or unfavorable light.

2. **Term of Employment**. Unless terminated earlier as provided in Paragraph 3, the Company's employment of Performer under this Agreement will begin on September 7, 2021 and continue through September 6, 2024 (the "Initial Term"); provided, however, that the term of employment under this Agreement will be automatically renewed for successive one-year periods (the first of which will commence on September 7, 2024, unless, at least sixty (60) days prior to the end of the then current term of employment under this Agreement, Performer or the Company gives written notice to the other of the notifying party's intent not to renew the term of employment under this Agreement as of the end of the then current term.

3. **Termination**. The Company's employment of Performer under this Agreement will terminate prior to the end of the term specified in Paragraph 2 only under the following circumstances:

(a) **Death**. Performer's death; in which case Performer's employment will terminate on the date of death;

(b) **Termination by the Company for Cause**. The Company may terminate Performer's employment at any time for Cause; such termination to be effective as of the date stated in a written notice of termination. For purposes of this Agreement, "Cause" is defined to mean any of the following activities by Performer:

(i) the conviction of Performer of a felony or a crime involving moral turpitude or the commission of any act involving dishonesty, disloyalty or fraud with respect to the Company or any of its subsidiaries or affiliates;

(ii) failure to perform duties which are reasonably directed by Station management and which are consistent with the terms of this Agreement and the position specified in Paragraph 1;

(iii) any act(s) or failure(s) to act in any manner that threatens the qualification of the Company or its affiliates to maintain a broadcast license issued by the Federal Communications Commission ("FCC"), or which results in a violation of any rule or written policy of the FCC including but not limited to any utterance on the air that is obscene, indecent or profane;

(iv) gross negligence or willful misconduct with respect to the Company or any of its subsidiaries or affiliates;

(v) any material breach by Performer of a material provision of this Agreement;

(vi) willful violation of Company policies;

(vii) reporting to work under the influence of alcohol or illegal drugs;

(viii) insubordination;

(ix) excessive absenteeism;

(x) inappropriate on-air comments disparaging a competitor, advertiser, or other party unless specifically included within a story;

(xi) acting in a tortious manner towards a viewer;

(xii) conduct that tends to bring Performer, the Company, the Station, or the Station's sponsors into a negative public light, jeopardizes the reputation and success of the Company or otherwise reflects unfavorably on the Company; or,

(xiii) failure to improve performance as outlined in a written Performance Improvement Plan within the time frame set forth in the Plan.

(c) **Termination by the Company Other Than for Cause**. The Company may terminate Performer's employment for any reason or for no reason upon sixty (60) days' prior written notice to Performer, subject to payment of the termination payments specified in Paragraph 6. Such termination will be effective as of the date stated in a written notice of termination.

(d) **Termination by Company During Probationary Period**. The first 90 days of employment under this Agreement are considered a Probationary Period. If necessary, the Station will provide Performer with feedback regarding improvements to be made and Performer is expected to improve performance to an acceptable level by the end of the Probationary Period. If Performer fails to improve to an acceptable level as determined within the discretion of the Station by the end of the Probationary Period, Performer's employment under this Agreement will be terminated.

4. **Compensation**. The Company will pay Performer a Base Salary as follows:

| | |
|---|---|
| During the first year of employment under this Agreement | $58,000.00 |
| During the second year of employment under this Agreement | $60,000.00 |
| During the third year of employment under this Agreement | $62,000.00 |

Plus cell phone $90 per month allowance

Performer's Base Salary will be paid in accordance with the Company's regular payroll practices. Performer acknowledges that Performer's position is a professional position in which Performer is required to perform varied and non-routine intellectual work that is original and creative in character and depends primarily on Performer's invention, imagination and talent and that Performer must consistently exercise discretion and independent judgment in the performance of Performer's duties hereunder. Accordingly, for all purposes, including, but not

limited to, wage and hour laws, Performer shall be deemed an "employee employed in a bona fide professional capacity" and exempt from all overtime reporting and compensation requirements.

5. **Fringe Benefits**.

(a) Performer will be eligible to participate in Company employee benefits plans and programs generally offered to Company employees under the terms and conditions of each such plan or program and subject to the eligibility and cost sharing provisions thereof.

(b) During the term of this Agreement, the Company will reimburse Performer for all approved business expenses which Performer incurs on the Company's behalf, upon presentation of appropriate documentation. Performer must comply with the Company's policies regarding obtaining approval for expenses prior to incurring them.

(c) In consideration for Performer agreeing to remain employed by the Company for the full Initial Term of this Agreement, the Company agrees to incur certain expenses on the Performer's behalf, including but not limited to expenses for coaching, production, advertising and promoting the Performer's image, and/or education ("Advance Items"). Performer acknowledges these payments by the Company will be in excess of $_____. Performer further acknowledges that the Company would not incur the expenses for these Advance Items without Performer's commitment to remain employed at the Station for full Initial Term. In addition to the value of the Advance Items, the Station will invest time and effort into developing its programming to improve the performance of the Station by giving viewers consistency in the on-air performers. Performer also acknowledges that the Initial Term protects the Station from another station hiring away its on-air performers during the term.

6. **Termination Payments**. Performer will be entitled to receive the following payments upon termination of Performer's employment hereunder:

(a) In the event of the termination of Performer's employment pursuant to any of the following provisions:

| | |
|---|---|
| Paragraph 3(a) | [Death] |
| Paragraph 3(b) | [By the Company for Cause] |
| Paragraph 3(d) | [Probationary Period] |

the Company will pay to Performer (or Performer's estate if pursuant to 3(a)) as soon as practical following such termination, all accrued and unpaid Base Salary as of the date of termination as provided in Paragraph 4 and an amount (calculated at the rate of the Base Salary in effect on such date) in respect of all accrued but unutilized vacation time as of such date. Termination under any of these provisions will not require Performer to reimburse the Company for the Advance Items under paragraph 5(c) of this Agreement.

(b)     In the event of termination of Performer's employment pursuant to Paragraph 3(c) [Termination by the Company Other Than For Cause] the Company will pay Performer the amounts described in Paragraph 6(a) and will pay Performer two weeks additional Base Salary contingent upon Performer signing a separation agreement re-affirming Performer's obligations under paragraph 7 of this Agreement and containing a Release.

(c)     In the event Performer breaches this Agreement or otherwise fails to perform under this Agreement by resigning prior to the end of the Initial Term, or if Performer engages in intentional misconduct in an attempt to cause the Station to terminate Performer's employment For Cause, Performer agrees to repay to the Company a portion of the value of the Advance Items set forth in Paragraph 5(c) of this Agreement according to the following formula:

> [# of months in the Initial Term - # months employed under Agreement] divided by # of months in the Initial Term] multiplied by the Total Stipulated Value of Advance Items

Payment must be made within 10 days after Performer's employment with the Company ends.

7.     **Covenant Not to Compete and Non-Disclosure**.  In consideration for Performer's employment with the Company and the Company's provision of confidential information and/or specialized training to Performer, Performer hereby covenants and agrees that:

(a)     The Company is providing Performer with access to certain confidential information of the Company, including, but not limited to, research, news sources, financial and other Company information.  In addition, the Station is making a substantial commitment to developing the Performer as a unique and recognizable personality, including but not limited to the promotion of Performer and investment and continuing education and further development of the Performer.  Performer acknowledges that such unique services and abilities enable Performer to seek and obtain similar employment inside the designated market area in which the Station operates (the "Station's Market").  Performer further recognizes that the value of the Company's business would be injured if Performer obtained comparable employment within the Station's Market.

(b)     During the term of Performer's employment with the Company, the Performer shall not, without the prior written consent of the General Manager of the Station: (1) perform any services for any radio or commercial television station, including cable, closed circuit or pay television or any other broadcast, print or electronic (i.e. Internet) media; (2) permit or authorize the use by anyone other than the Station of Performer's real or stage name, portrait, picture or license or the use of any endorsement or testimonial in advertising or publicizing any product, service, cause or institution; or (3) engage in any activity relating to the sale, advertising or promotion of any articles or materials used in any programs broadcast on the Station.

(c)     For a period of one (1) year after Performer's employment at the Station ends for any reason, Performer will not accept employment involving the rendering of

any on-air services, making any on-air appearances, or making any appearances in any media (including electronic media) whether or not for compensation, live or recorded, over the facilities of any radio or commercial television station, including cable, closed circuit or pay television which broadcasts or transmits to any place within the Station's Market unless: (i) such appearance is on a commercial spot announcement prepared by or for a national (but not local) advertiser and broadcast by such advertiser in multiple markets; (ii) such appearance is on a national network program delivered by the network to its local affiliated station; or (iii) such appearance is a syndicated program broadcast in multiple markets.

(d)   For a period of one (1) year after Performer's employment with the Company terminates, Performer will not hire, solicit, employ or contract with respect to employment any officer or other Performer of the Station.

(e)   Performer agrees to disclose promptly to the Company and does assign and agree to assign to the Company, free from any obligation to Performer, all Performer's right, title and interest in and to any and all ideas, concepts, processes, improvements and inventions made, conceived, written, acquired, disclosed or developed by Performer, solely or in concert with others, during the term of Performer's employment by the Company, which relate to the business, activities or facilities of the Company, or resulting from or suggested by any work Performer may do for the Company or at its request. Performer further agrees to deliver to the Company any and all drawings, notes, photographs, copies, outlines, specifications, memoranda and data relating to such ideas, concepts, processes, improvements and inventions, to cooperate fully during Performer's employment and thereafter in the securing of copyright, trademark or patent protection or other similar rights in the United States and foreign countries, and to give evidence and testimony and to execute and deliver to the Company all documents requested by it in connection therewith.

(f)   Except as expressly set forth below, Performer agrees, whether during Performer's employment pursuant to this Agreement or thereafter, except as authorized or directed by the Company in writing or pursuant to the normal exercise of Performer's responsibilities hereunder, not to disclose to others, use for Performer's or any other Person's benefit, copy or make notes of any confidential information or trade secrets or any other knowledge or information of or relating to the business, activities or facilities of the Company learned while working for the Company. Performer will not be bound by this obligation of confidentiality and nondisclosure if:

(i)   the knowledge or information in question has become part of the public domain by publication or otherwise through no fault of Performer;

(ii)   the knowledge or information in question is disclosed to the recipient by a third party and Performer reasonably believes such third party is in lawful possession of the knowledge or information and has the lawful right to make disclosure thereof; or

(iii)   Performer is required to disclose the information in question pursuant to applicable law or by a court of competent jurisdiction with actual or apparent jurisdiction to order Performer to disclose or make accessible such information.

(g)  Upon termination of employment pursuant to this Agreement, Performer will deliver to the Company all records, notes, data, memoranda, photographs, models and equipment of any nature which are in Performer's possession or control and which are the property of the Company.

(h)  The parties understand and agree that the remedies at law for breach of the covenants in this Paragraph 7 would be inadequate and that the Company will be entitled to injunctive or such other equitable relief as a court may deem appropriate for any breach of these covenants. Notwithstanding the provisions set forth in Paragraph 15 below, the Company shall have the right to pursue such injunctive or other equitable relief in a court of law and without posting of any bond. If any of these covenants will at any time be adjudged invalid to any extent by any court of competent jurisdiction, such covenant will be deemed modified to the extent necessary to render it enforceable.

8.  **Notices**.  All notices and other communications which may or are required to be given hereunder or with respect hereto shall be in writing, shall be delivered personally or sent by nationally recognized overnight delivery service, charges prepaid, or by registered or certified mail, return-receipt requested, and shall be deemed to have been given or made when personally delivered, the next business day after delivery to such overnight delivery service, three (3) days after deposited certified mail postage prepaid, as the case may be, addressed as follows:

If to Performer:  To Performer's address on file with the Company's Payroll Department.

If to the Company: *[insert station address]* Attention:  General Manager with a copy (which shall not constitute notice) to Human Resources Department, Nexstar Media Group, Inc., 545 E. John Carpenter Freeway, Suite 700, Irving, Texas, 75062.

9.  **Entire Agreement**.  This instrument embodies the entire agreement between the parties hereto with respect to Performer's employment with the Company, and there have been and are no other agreements, representations or warranties between the parties regarding such matters.

10.  **No Assignment**.  This Agreement may not be assigned by Performer without the prior written consent of the Company and any attempted assignment without such prior written consent will be null and void and without legal effect. This Agreement will not be assigned by the Company without the prior written consent of Performer except to any other person or entity which may acquire or conduct the business of the Station, the Company, its Parent and/or their respective subsidiaries, if any.

11.  **Amendment; Modification**.  This Agreement will not be amended, modified or supplemented other than in a writing signed by the parties hereto.

12.  **Severability**. The parties agree that if any provision of this Agreement is under any circumstances deemed invalid or inoperative, the Agreement will be construed with

the invalid or inoperative provision deleted, and the rights and obligations of the parties will be construed and enforced accordingly.

13. **Governing Law.** This Agreement will be governed by and construed in accordance with the internal law of the State of Texas without giving effect to any choice of law or conflict provision or rule that would cause the laws of any jurisdiction other than the State of Texas to be applied. Subject to the forum selection clause in the agreement to arbitrate contained in paragraph 15 of this Agreement, the parties agree that exclusive venue for any court proceeding will be in Dallas County, Texas.

14. **Representations.** Performer represents and warrants to the Company that Performer is not a party to or bound by any employment agreement, noncompete agreement or confidentiality agreement with any other person or entity.

15. **Strict Construction.** The parties to this Agreement have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

16. **Binding Arbitration.**

Excluding workers compensation, unemployment compensation and any other claims which by law must be resolved in other forums, Company and Performer agree to resolve any and all disputes or claims related in any manner whatsoever to this Agreement and/or to Performer's employment, including, but not limited to, all claims beginning from the period of Performer's application for employment with the Company through termination of employment at Company, by binding arbitration pursuant to the National Rules for the Resolution of Employment Disputes of the American Arbitration Association (hereinafter "AAA"). Disputes related to employment include, but are not limited to, claims or charges based upon federal or state statutes, including, but not limited to, the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, as amended, and any other civil rights statute, the Americans with Disabilities Act, the Family and Medical Leave Act, the Fair Labor Standards Act or other wage statutes, claims under this Agreement, and claims based upon tort or contract laws or common law or any other federal or state or local law affecting employment in any manner whatsoever. (the "Claims"). In the event that arbitration is brought pursuant to any law or statute which provides for allocation of attorneys' fees and costs, the arbitrator shall have the authority to allocate attorneys' fees and costs pursuant to the applicable law or statute. Except with respect to the enforcement of the Company's rights under Paragraph 7 herein, the Company agrees to be bound by the arbitration procedure set forth in this Agreement. In the event Performer is unable to pay the applicable filing fee for arbitration due to extreme hardship, Performer may apply to AAA for deferral or reduction of the fees. AAA shall determine whether the Performer qualifies for financial hardship. To invoke the arbitration process, Performer or Company must contact the American Arbitration Association at 2200 Century Parkway, Suite 300, Atlanta, Georgia 30345-3202, 404-325-0101, direct toll free: 1-800-925-0155, facsimile 404-325-8034, or American Arbitration Association, 13455 Noel Road, Suite

1750, Dallas, Texas 75240, 972-702-8222, facsimile 972-490-9008, or the nearest regional office of AAA.

Company and Performer expressly agree that the Federal Arbitration Act governs the enforceability of any and all of the arbitration provisions of this Agreement, and judgment upon the award rendered by the arbitrator(s) may be entered by any court having jurisdiction thereof. Questions of arbitrability (that is whether an issue is subject to arbitration under this agreement) shall be decided by the arbitrator. Likewise, procedural questions which arise out of the dispute and bear on its final disposition are matters for the arbitrator to decide.

This Agreement is an agreement as to choice of forum only and is not intended to extend or limit any applicable statute of limitation. Performer and Company understand and agree that any claim or demand for arbitration will be timely only if filed with AAA within the time in which an administrative charge or a complaint could have been filed if the claim or demand is one which could be filed with an administrative agency or court. If the arbitration claim raises an issue which could not have been timely filed with the appropriate administrative agency or court, then the claim must be treated as the administrative agency or court would have treated it. Claims must be filed within the time set by the appropriate statute of limitation.

By signing this Agreement, Performer waives his/her right to commence, be a party to, or class member in any court action against Company relating to employment issues. If any claim is found not to be subject to this Agreement and the arbitration procedure, exclusive venue for any court proceeding shall be in Dallas County, Texas.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

Christina Aguayo

Nexstar Media Inc.

By: _____

David Candelaria
VP/General Manager        KTSM

By: _____

Julie Pruett
Title: SVP/Regional Manager

PERFORMER EMPLOYMENT AGREEMENT        Page 9