IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

_____

CHRISTINA AGUAYO,

      Plaintiff,

v.

UNITED STATES OF AMERICA,

      Defendant.

Civil Action No. 3:23-CV-539-E

**DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S
SECOND AMENDED COMPLAINT**

LEIGHA SIMONTON
UNITED STATES ATTORNEY

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:  214-659-8626
Facsimile:   214-659-8807
brian.stoltz@usdoj.gov

Attorneys for the United States

**Table of Contents**

I. Introduction ................................................................................................ 1

II. Background ................................................................................................. 1

    A. Aguayo files suit alleging that a U.S. Congresswoman tortiously
        interfered with Aguayo's employment as a TV news reporter
        by complaining about politics-related stories aired by Aguayo
        on newscasts. ............................................................................................ 1

    B. After providing a Westfall Act certification stating that
        Congresswoman Escobar was acting within the scope of her
        federal employment with respect to Aguayo's claim, the government
        removes the suit to federal court with itself substituted as the
        defendant and moves to dismiss. ............................................................. 4

    C. Aguayo files a second amended complaint and argues that
        Congresswoman Escobar was not acting within the scope of
        her federal employment with respect to Aguayo's claims. ...................... 5

III. Argument and Authorities .......................................................................... 6

    A. Jurisdiction is lacking for Aguayo's suit because the government
        has not waived sovereign immunity. ........................................................ 6

    B. The government is the proper defendant in this case and
        Aguayo's arguments against the government's Westfall Act
        certification are unavailing. ..................................................................... 9

        1. Congresswoman Escobar's alleged actions easily fallwithin
            the scope of her employment as a Member of Congress. ................. 9

        2. Aguayo's contrary arguments are unavailing. ................................ 19

IV. Conclusion ............................................................................................... 24

# Table of Authorities

## Cases

*Baker v. McHugh*,
    672 F. App'x 357 (5th Cir. 2016)............................................................... 8

*Chapman v. Rahall*,
    399 F. Supp. 2d 711 (W.D. Va. 2005)............................................... 14, 19

*Counts v. Guevara*,
    328 F.3d 212 (5th Cir. 2003).............................................................. 9, 10

*Davis v. United States*,
    961 F.2d 53 (5th Cir. 1991) .................................................................... 7

*Doe v. McMillan*,
    412 U.S. 306 (1973) ............................................................................. 21

*Does 1–10 v. Haaland*,
    973 F.3d 591 (6th Cir. 2020).................................... 11, 15, 16, 18, 21, 23

*F.D.I.C. v. Meyer*,
    510 U.S. 471 (1994) ............................................................................... 7

*Garcia v. United States*,
    62 F.3d 126 (5th Cir. 1995) (en banc).................................................. 10

*Gulf Restoration Network v. McCarthy*,
    783 F.3d 227 (5th Cir. 2015)................................................................. 7

*Hernandez v. United States*,
    757 F.3d 249 (5th Cir. 2014).............................................................. 6–7

*Home Builders Ass'n of Miss., Inc. v. City of Madison*,
    143 F.3d 1006 (5th Cir. 1998) .............................................................. 6

*Laverie v. Wetherbe*,
    517 S.W.3d 748 (Tex. 2017) .......................................................... 10, 12

*Lynch v. Potter*,
    No. 3:05-0871, 2006 WL 8439180 (S.D. W. Va. Dec. 5, 2006)............. 8

*Mattison v. United States*,
    No. 4:20-CV-111, 2021 WL 3861597 (E.D. Va. Aug. 30, 2021)........... 8

*McKinney v. United States*,
    No. 16-cv-01033-RBJ, 2016 WL 6893269 (D. Colo. Nov. 23, 2016) .................... 8

*Osborn v. Haley*,
    549 U.S. 225 (2007) ..................................................................................... 9

*Painter v. Amerimex Drilling I, Ltd.*,
    561 S.W.3d 125 (Tex. 2018) .......................................................... 19, 20

*Ramming v. United States*,
    281 F.3d 158 (5th Cir. 2001) ............................................................... 6

*Rodriguez v. Sarabyn*,
    129 F.3d 760 (5th Cir. 1997) ............................................................. 20

*Truman v. United States*,
    26 F.3d 592 (5th Cir. 1994) ................................................................ 7

*United States v. Rostenkowski*,
    59 F.3d 1291 (D.C. Cir. 1995) ........................................................... 10

*United States v. Rostenkowski*,
    68 F.3d 489 (D.C. Cir. 1995) ...................................................... 10, 22

*White v. United States*,
    419 F. App'x 439 (5th Cir. 2011) .................................................... 8, 10

*Williams v. United States*,
    71 F.3d 502 (5th Cir. 1995) ..................................... 9, 10, 11, 15, 16, 18, 19, 20

*Zakiya v. United States*,
    No. 1:04-CV-38, 2005 WL 4860326 (N.D. W. Va. Mar. 18, 2005) ........................ 8

Statutes, Rules, and Other Authorities

28 U.S.C. § 1346(b)(1) ...................................................................... 7

28 U.S.C. § 2671 ......................................................................... 9, 20

28 U.S.C. § 2679(b)(1) ...................................................................... 21

28 U.S.C. § 2679(d) ....................................................................... 5, 9

28 U.S.C. § 2680 ......................................................................... 7, 21

28 U.S.C. § 2680(h) .................................................................................................. 1, 7

Federal Employees Liability Reform and Tort Compensation Act of 1988,
    Pub. L. 100-694, 102 Stat. 4563 (Nov. 18, 1988) ..................................................... 5

U.S. Const. art. 1, § 6, cl. 1 ......................................................................................... 20, 21

## I.     Introduction

In this case, plaintiff Christina Aguayo, a TV news reporter, claims that a U.S. Congresswoman tortiously interfered with Aguayo's employment relationship with the TV station where she worked and defamed her, primarily by complaining or making allegedly false statements about her to station management.  But as explained herein, no jurisdiction exists for Aguayo's suit because the federal government has not waived its sovereign immunity for claims "arising out of . . . libel, slander, misrepresentation, [or] interference with contract rights."  28 U.S.C. § 2680(h).  Aguayo's lawsuit is such a case, and thus the Court should dismiss it for lack of subject-matter jurisdiction.  Additionally, to the extent Aguayo challenges the Westfall Act certification by which the government was substituted as the defendant in the case in place of the Congresswoman, that argument also fails because Aguayo fails to show that the Congresswoman was not acting within the scope of her employment as a Member of Congress in connection with the events in question.

## II.     Background

**A.     Aguayo files suit alleging that a U.S. Congresswoman tortiously interfered with Aguayo's employment as a TV news reporter by complaining about politics-related stories aired by Aguayo on newscasts.**

Aguayo filed this suit in Texas state court alleging that U.S. Congresswoman Veronica Escobar tortiously interfered with Aguayo's employment relationship with her (now-former) employer.  (*See* Doc. 1-6 (original petition); Doc. 1-8 (first amended petition); Doc. 11 (second amended complaint).)  Congresswoman Escobar represents Texas's 16th Congressional District, which covers portions of El Paso and surrounding

areas.[1]

According to her filings in this suit, Aguayo worked as a reporter at an El Paso-area TV station, but was terminated from that job in February 2022.  (*See* Doc. 1-8, ¶¶ 9–10; Doc. 11, ¶ 5.)  Aguayo blames Congresswoman Escobar for having been fired, asserting that the Congresswoman made "defamatory statements . . . regarding [Aguayo's] reporting of certain new stories which [the TV station] had approved."  (Doc. 11, ¶ 6.)  According to Aguayo's original petition and first amended petition, "[Congresswoman Escobar's] torts occurred while [the Congresswoman] was located either in her Congressional office in Washington, D.C., or in her local district office in El Paso, Texas."[2]  (Doc. 1-6, ¶ 11; Doc. 1-8, ¶ 12.)

Although she named only Congresswoman Escobar as a defendant, Aguayo did not rely solely on alleged acts of the Congresswoman herself—instead, Aguayo has contended that members of the Congresswoman's staff (described in the first amended petition as "agents in her El Paso District Office") made tortious statements to station management in the run-up to Aguayo's firing.  (Doc. 1-8, ¶ 17.)  Aguayo specifically identified Congresswoman Escobar's "Communications and Special Projects Director in

---

[1] *See* Congresswoman Veronica Escobar, https://escobar.house.gov/ (accessed April 24, 2023).

[2] Aguayo's second amended complaint no longer states that Congresswoman Escobar committed the alleged torts in her "Congressional office" or "local district office"—presumably because Aguayo is now attempting to argue that the alleged torts were outside the scope of her employment.  As discussed below, that argument is not correct.  Regardless, while it would not take Aguayo's claims outside the scope of the Congresswoman's employment if by chance the Congresswoman had been somewhere other than her Washington or district office (since a Member of Congress's work is not limited to in-office work), it is telling that Aguayo originally pleaded this fact about the Congresswoman's location but then felt the need to remove it from the second amended complaint once she realized that she would not be able to maintain any claim based on actions of the Congresswoman within the scope of her employment.

**Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint – Page 2**

her El Paso district office, Elizabeth Lopez-Sandoval," as someone who in her view tortiously interfered with Aguayo's employment relationship, allegedly via communications with someone Lopez-Sandoval knew at the TV station.  (Doc. 1-8, ¶ 19.)

As an example of the types of interactions between the Congresswoman (or her staff) and Aguayo's employer that are alleged to be tortious, Aguayo describes in her pleadings an incident growing out of Aguayo's interview of Congressman Tony Gonzales, who "represent[ed] a Congressional district adjacent to that represented by [Congresswoman Escobar]."  (Doc. 1-8, ¶ 23; *see also* Doc. 11, ¶ 13.)  After conducting this interview (but apparently before it aired), Aguayo "reached out to Escobar by email, asking to interview Escobar if she wanted to respond to statements made by Congressman Gonzales."  (Doc 11, ¶ 13; *see also* Doc. 1-8, ¶ 23.)  Aguayo alleges that Congresswoman Escobar "did not respond to [Aguayo's] email inquiry," and therefore when the interview with Congressman Gonzales ran on TV, Aguayo informed viewers that Congresswoman Escobar had not responded to a request for comment.  (Doc. 11, ¶ 13; *see also* Doc. 1-8, ¶ 23.)  According to Aguayo, Congresswoman Escobar thereafter contacted the TV station to complain that she had not in fact been asked to comment on the story.  (Doc. 11, ¶ 14; *see also* Doc. 1-8, ¶ 24.)  Station management required Aguayo to apologize on a later newscast for saying that Congresswoman Escobar had not responded to a request for comment (in Aguayo's telling, she was required to "lie on television" in making this retraction).  (Doc. 11, ¶ 14; Doc. 1-8, ¶ 24.)  This incident apparently (at least in Aguayo's view) contributed to the breakdown of her relationship with her employer.

**Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint – Page 3**

Aguayo similarly alleges that Congresswoman Escobar and/or her staffers made other unspecified complaints to station management about stories or interviews that Aguayo ran, including an interview with Texas Governor Greg Abbott, an interview with a person identified as a "political opponent" of the Congresswoman, a story about Texas Attorney General Ken Paxton, a story about the "morale of the Border Patrol" which included an interview with a former Border Patrol agent, and a story about an event held by then-President Trump in Texas.  (Doc. 11, ¶¶ 7–12, 15–22.)

Aguayo also takes issue with how Congresswoman Escobar's communications director (Lopez-Sandoval) responded to an interview request that Aguayo had submitted seeking to interview the Congresswoman.  (Doc. 11, ¶ 20.)  After Aguayo requested the interview, Lopez-Sandoval sent an email to Aguayo and others within station management stating, "Good afternoon, Christina.  Thank you for reaching out.  I'm so sorry if KTSM didn't inform you, but months ago your supervisors and my office agreed that given your track record of dishonest reporting, Congresswoman Escobar will not be granting you any interviews.  My best, Elizabeth."  (Doc. 11, ¶ 20.)

**B.      After providing a Westfall Act certification stating that Congresswoman Escobar was acting within the scope of her federal employment with respect to Aguayo's claim, the government removes the suit to federal court with itself substituted as the defendant and moves to dismiss.**

As noted above, Aguayo initially named Congresswoman Escobar as the defendant in this case when it was first filed in state court.  However, a federal statute known as the Westfall Act (which was enacted as an amendment to the Federal Tort Claims Act) provides that when a government employee is named as a defendant in a tort

suit based on matters occurring within the scope of the person's federal employment, the government is to be substituted as the defendant if a statutory certification is given (the so-called Westfall Act certification).  *See* 28 U.S.C. § 2679(d).[3]

In this particular case, such a certification was given by the U.S. Attorney (who has been delegated authority to do so from the Attorney General), certifying that "Congresswoman Veronica Escobar was acting within the scope of her office or employment with the United States" in connection with the incidents alleged by Aguayo. (Doc. 1-1.)  Pursuant to the Westfall Act certification, the government was substituted as the defendant and the case was removed to this Court.  (*See* Doc. 1 (notice of removal).) The government then moved to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1), because sovereign immunity had not been waived for Aguayo's claim.  (Doc. 5.)

**C.     Aguayo files a second amended complaint and argues that Congresswoman Escobar was not acting within the scope of her federal employment with respect to Aguayo's claims.**

In response to the motion to dismiss, Aguayo filed a second amended complaint against the government.[4]  (Doc. 11.)  This pleading is based on essentially the same factual allegations as Aguayo's previous pleading (the first amended petition), but in addition to asserting a claim for tortious interference as in Aguayo's prior pleadings, it

---

[3] The Westfall Act is formally titled the Federal Employees Liability Reform and Tort Compensation Act of 1988 but is commonly referred to as the Westfall Act in reference to a Supreme Court decision that prompted passage of the law.  *See* Pub. L. 100-694, 102 Stat. 4563 (Nov. 18, 1988).

[4] Aguayo had already amended her pleading once while in state court, so the new amendment was the second amended version of her pleading and is thus the "second amended complaint."

sets forth a claim for defamation as well.  (Doc. 11, ¶ 23.)  The second amended complaint also contains several paragraphs of argument against the government's Westfall Act certification—according to Aguayo, "Congresswoman Escobar did not act in the scope of her office or employment when she perpetrated tortious interference or defamation against Plaintiff."  (Doc. 11, ¶ 29.)  Aguayo therefore asks that the government be dismissed from the case and Congresswoman Escobar re-substituted as the defendant.  (Doc. 11, ¶ 35.)

The government now moves to dismiss in response to the second amended complaint and also explains why Aguayo's attempt to have Congresswoman Escobar re-substituted into the case should be denied.

### III.    Argument and Authorities

#### A.    Jurisdiction is lacking for Aguayo's suit because the government has not waived sovereign immunity.

The government moves to dismiss this action under Rule 12(b)(1) because no waiver of sovereign immunity applies and therefore jurisdiction is lacking.  Under Rule 12(b)(1), a case is properly dismissed when the court "lacks the statutory or constitutional power to adjudicate the case."  *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citation omitted).  "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction."  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citation omitted).  "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist."  *Id.* (citation omitted).  The government's sovereign immunity is jurisdictional.  *Hernandez v. United*

*States*, 757 F.3d 249, 259 (5th Cir. 2014).  "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."  *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994).  The party seeking relief has "the burden of proving that Congress has consented to suit by affirmatively waiving sovereign immunity in the specific context at issue."  *Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 232 (5th Cir. 2015).

The Federal Tort Claims Act waives the government's sovereign immunity for certain tort claims, including claims for "injury or loss of property" caused by the allegedly "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment" under circumstances where state law would allow recovery against a private person.  28 U.S.C. § 1346(b)(1); *see also Davis v. United States*, 961 F.2d 53, 56 (5th Cir. 1991).  But the statute also contains express exceptions that remove certain types of claims from this general waiver of sovereign immunity, such that the government retains its immunity as to these claims. *See* 28 U.S.C. § 2680; *see also Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994) (explaining that "the exceptions to the FTCA's waiver of sovereign immunity that appear in 28 U.S.C. § 2680 limit the federal courts'[] jurisdiction to hear FTCA claims and, if applicable, bar a suit brought against the government").

Aguayo brings claims for tortious interference with contract (based on her "employment contract" with the TV station (Doc. 11, ¶ 4)) as well as for defamation. (*See* Doc. 11, ¶ 23.)  Pertinent here, though, is the provision at 28 U.S.C. § 2680(h), by which the government has retained sovereign immunity against (among other things) "[a]ny claim arising out of . . . libel, slander, misrepresentation, [or] interference with

contract rights."

It is well established that tortious-interference-with-employment claims fall within section 2680(h)'s retention of sovereign immunity. *See, e.g.*, *Mattison v. United States*, No. 4:20-CV-111, 2021 WL 3861597, at *9–*10 (E.D. Va. Aug. 30, 2021) (explaining that a plaintiff's interference-with-employment-relationship claim against the government was barred by section 2680(h)); *McKinney v. United States*, No. 16-cv-01033-RBJ, 2016 WL 6893269, at *5 (D. Colo. Nov. 23, 2016) (explaining that section 2680(h) "covers allegations of tortious interference with employment"); *Lynch v. Potter*, No. 3:05-0871, 2006 WL 8439180, at *6 (S.D. W. Va. Dec. 5, 2006) (explaining that a claim for tortious interference with employment was "excluded from [] FTCA coverage" by operation of section 2680(h), and therefore subject to dismissal); *Zakiya v. United States*, No. 1:04-CV-38, 2005 WL 4860326, at *4 (N.D. W. Va. Mar. 18, 2005) (explaining that section 2680(h) barred a claim based on "lost . . . employment opportunities").

Likewise, defamation claims fall within the reach of section 2680(h) and are therefore barred. *See Baker v. McHugh*, 672 F. App'x 357, 362 (5th Cir. 2016) (explaining that, per section 2680(h), "the United States has not waived sovereign immunity for" a defamation claim); *White v. United States*, 419 F. App'x 439, 441 (5th Cir. 2011) ("There is no dispute that White may not sue the Government for defamation.").

In short, by operation of section 2680(h), sovereign immunity has not been waived for Aguayo's claims against the government, and this suit must be dismissed.

**B.      The government is the proper defendant in this case and Aguayo's arguments against the government's Westfall Act certification are unavailing.**

Aguayo challenges the government's Westfall Act certification by arguing that Congresswoman Escobar was not acting with the scope of her employment with respect to the matters alleged in this suit.  (*See* Doc. 11, ¶¶ 29–35.)  The Westfall Act provides that, upon certification by the Attorney General or his designated representative that a government employee[5] was acting within the scope of her employment at the time of an allegedly tortious act, the government may substitute itself as the proper defendant in an action against the employee (and also remove the case to federal court if it was not initially filed there).  28 U.S.C. § 2679(d); *Counts v. Guevara*, 328 F.3d 212, 214 (5th Cir. 2003).  A plaintiff who challenges the government's Westfall Act certification bears the burden of showing that the employee's conduct was not within the scope of her employment.  *Williams v. United States*, 71 F.3d 502, 506 (5th Cir. 1995).  The Westfall Act certification should be upheld unless "the District Court determines that the employee, *in fact*, and not simply as alleged by the plaintiff, engaged in conduct beyond the scope of his employment."  *Osborn v. Haley*, 549 U.S. 225, 231 (2007).

**1.      Congresswoman Escobar's alleged actions easily fall within the scope of her employment as a Member of Congress.**

**a.      A Member of Congress's job duties include interacting with the press and weighing in on issues of public note.**

"Whether a federal employee acted within the scope of his employment is

---

[5] There is no dispute that, for purposes of the Federal Tort Claims Act and the Westfall Act, a Member of Congress is considered an "employee" of the government.  *See* 28 U.S.C. § 2671 (stating that an "Employee of the government" includes any officer or employee of any "federal agency," which term is defined to "include[] . . . the judicial and legislative branches").

**Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint – Page 9**

determined by the law of the state in which the negligent or wrongful conduct occurred."
*White*, 419 F. App'x at 442 (citing *Garcia v. United States*, 62 F.3d 126, 127 (5th Cir.
1995) (en banc)).  Aguayo relies on Texas law, stating that the "torts at issue occurred in
Texas."  (Doc. 11, ¶ 31.)  Under Texas law, "an employee's conduct is considered to fall
within the scope of his employment if his actions were (1) within the general authority
given him; (2) in furtherance of the employer's business; and (3) for the accomplishment
of the object for which the employee was employed."  *Counts*, 328 F.3d at 214 (internal
quotation marks and citation omitted).  As the Texas Supreme Court has explained, the
"scope-of-employment analysis . . . remains fundamentally objective:  Is there a
connection between the employee's job duties and the alleged tortious conduct?"  *Laverie
v. Wetherbe*, 517 S.W.3d 748, 753 (Tex. 2017).  "The answer may be yes even if the
employee performs negligently or is motivated by ulterior motives or personal animus so
long as the conduct itself was pursuant to her job responsibilities."  *Id.*

　　　　To determine whether Congresswoman Escobar's actions were within the scope of
her employment, it is of course necessary to consider what the "job" of a Member of
Congress consists of.  "[S]ervice in the United States Congress is not a job like any other,
it is a constitutional role to be played upon a constitutional stage."  *United States v.
Rostenkowski*, 59 F.3d 1291, 1312 (D.C. Cir. 1995), *opinion supplemented on denial of
reh'g*, 68 F.3d 489 (D.C. Cir. 1995).  The "duties of Members of Congress are not
confined to those directly mentioned by statute or the Constitution."  *Williams*, 71 F.3d at
507.  "Besides participating in debates and voting on the Congressional floor, a primary
obligation of a Member of Congress in a representative democracy is to serve and

respond to his or her constituents." *Id.* "Such service necessarily includes informing constituents and the public at large of issues being considered by Congress." *Id.*

Not surprisingly, the work of a Member of Congress regularly involves interacting with the press. "Congressmembers routinely broadcast their views on pending legislation and related current events through press releases, televised speeches, interviews, and . . . through social media postings." *Does 1–10 v. Haaland*, 973 F.3d 591, 602 (6th Cir. 2020). And in addition to the direct interaction that occurs between Members of Congress and the press and public at large, it is probably safe to say that every Member has at least one staffer, if not several, whose primary job duties include serving as a liaison to the press and managing the Member's relationships with various press outlets. The fact that these staffers—whether known by the title "communications director," "press secretary," "public affairs officer" or something else—are carried as official, taxpayer-paid employees within Members' offices is further reflective of the common-sense notion that dealing with the press is part of a Member's job. (*See also* Doc. 11, ¶ 7 (identifying Elizabeth Lopez-Sandoval as Congresswoman Escobar's "Communications and Special Projects Director"); *see also* Doc. 1-8, ¶ 19 (explaining that Lopez-Sandoval is "in [the Congresswoman's] El Paso district office").)

###   b.   Congresswoman Escobar's alleged actions were within the scope of her employment.

Against this backdrop and applying the above-described legal principles, it is clear that the alleged activities of Congresswoman Escobar upon which Aguayo has brought suit were well within the scope of the Congresswoman's employment as the Member of

Congress representing Texas's 16th Congressional District in the El Paso area.

First take the incident that Aguayo describes relating to Aguayo's alleged request to have Congresswoman Escobar comment on an interview that Aguayo had conducted with Congressman Gonzales (who represents the district adjoining Congresswoman Escobar's district).  (*See* Doc. 11, ¶¶ 13–14; *see also* Doc. 1-8, ¶¶ 23–24.)  Aguayo does not precisely lay out in her pleadings what specific statements of Congressman Gonzales she wanted Congresswoman Escobar to comment on, but it is obvious that these must have related to some issue of local or national political concern that were relevant to Congresswoman Escobar *as a Member of Congress*.  There are no facts alleged indicating that Aguayo, as a TV news reporter, was reaching out to some random private individual for comment on Congressman Gonzales's interview, and that this private individual just happened to be Congresswoman Escobar.  Instead, the Congresswoman was apparently approached for comment on the story because of her status as the Member of Congress for the district adjoining Congressman Gonzales's district.  (*See* Doc. 11, ¶ 13; Doc. 1-8, ¶ 23.)  Thus, Aguayo's pleadings make clear that the entire context for the disputed interactions with Congresswoman Escobar manifested a "connection between the employee's job duties and the alleged tortious conduct."  *Laverie*, 517 S.W.3d at 753.  Congresswoman Escobar's ongoing service as the Member of Congress for Texas's 16th District in El Paso was the reason that she and Aguayo (and Aguayo's management) even crossed paths on this occasion (as well as any others).

When the interview with Congressman Gonzalez then aired on TV, Aguayo told viewers that Congressman Escobar had been contacted for comment about Congressman

Gonzales's statements, but had not responded.  (Doc. 11, ¶ 13.)  Congresswoman Escobar allegedly took issue with this statement—which of course could tend to make her look uninvolved or uncaring about whatever issues were being discussed by Congressman Gonzales, which in turn could negatively affect her working relationship with her constituents and other stakeholders and thus detract from her ability to serve effectively as the Representative from Texas's 16th District—and she contacted station management to complain that Aguayo had not in fact asked her to comment.  (*See* Doc. 11, ¶ 14.)

Aguayo asserts that Congresswoman Escobar's complaint to station management was not true (and thus defamatory and constituting tortious interference) because Aguayo says that she *had* reached out to the Congresswoman for comment.  (Doc. 11, ¶ 14.) Station management apparently ended up agreeing with Congresswoman Escobar's account, because they required Aguayo to make an on-air apology about the matter. (Doc. 11, ¶ 14; *see also* Doc. 1-8, ¶ 24.)  But it is not necessary to decide who was right about this to resolve the scope-of-employment question.  Either way, Congresswoman Escobar's alleged steps taken in reaction to the interview of Congressman Gonzales and the accompanying statements made by Aguayo when the interview aired were taken in connection with Congresswoman Escobar's duties and status as a Member of Congress in dealing with the press on issues of political note, which as discussed above is something well within the normal course and scope of a Member of Congress's job.

Indeed, the only plausible reason that Congresswoman Escobar had (allegedly) been asked for comment by Aguayo at all, and then when the story ran had been referenced on air by name as someone who had not responded to a request for comment,

was due to her status as the Member of Congress representing the district next to Congressman Gonzalez's district.  (*See* Doc. 1-8, ¶ 23.)  As noted above, there is no indication that Aguayo had decided to ask some random private individual for his or her thoughts about whatever Congressman Gonzales had said, and then to also mention on air that this private individual had not responded to the request for comment.  Nobody would care, and there is no plausible allegation that that is what happened.  Instead, Congresswoman Escobar's dealings with Aguayo and Aguayo's TV station were all inextricably connected to and bound up in the Congresswoman's job duties as a Member of Congress.  Aguayo's own initial actions confirm as much, insofar as she apparently wanted the Congresswoman to engage with the press to comment on the story and interview that she was planning to run—showing that this sort of thing was something that even Aguayo views as within the bailiwick of a Member of Congress.  The fact that the Congresswoman later interacted with the press (including Aguayo's management) in a way that Aguayo did not like—by pushing back against or trying to correct some aspects of Aguayo's reporting that Congresswoman Escobar viewed as inaccurate—does not somehow mean her actions were no longer within the scope of her job as a Congresswoman.  To the contrary, such actions "made to the media to ensure [Congresswoman Escobar's] effectiveness as a legislator, can fairly and reasonably be deemed to be an ordinary and natural incident or attribute of [her] job" as a Member of Congress.  *See Chapman v. Rahall*, 399 F. Supp. 2d 711, 715 (W.D. Va. 2005) (internal quotation marks and citation omitted).

The same conclusion holds with respect to Congresswoman Escobar's other

alleged actions or statements that Aguayo complains of.  These include the Congresswoman's responses to an interview of Governor Greg Abbott that Aguayo conducted, an interview with a person Aguayo describes as a "political opponent" of the Congresswoman, a story about Texas Attorney General Ken Paxton, and a story about the "border situation" and the "morale of the Border Patrol" in which a former Border Patrol agent was interviewed.  (*See* Doc. 11, ¶¶ 15–19.)  Aguayo does not detail with any specificity what Congresswoman Escobar allegedly said to station management (or anyone else) about these stories reported by Aguayo.  (*See* Doc. 11, ¶¶ 15–19.)  She alleges only that Congresswoman Escobar "complained about," "was upset about," or "became infuriated" about the stories, and then made "vociferous complaints" and "angry communications" to station management about them and about Aguayo generally.  (Doc. 11, ¶¶ 9, 16, 17, 19.)

Given the lack of any factual detail provided about what, specifically, Congresswoman Escobar is alleged to have said or done, Aguayo has not carried her burden to show that the Congresswoman's conduct was somehow outside the scope of her employment as a Member of Congress.  *See Williams*, 71 F.3d at 506.  In any event, though, it is clear from the context that all of the stories or interviews in question related to current political topics and events.  As noted above, "Congressmembers routinely broadcast their views on pending legislation and related current events through press releases, televised speeches, interviews, and . . . through social media postings."  *Does 1– 10*, 973 F.3d at 602.  If Congresswoman Escobar was apparently of the view that the reporting aired by Aguayo about various political figures, issues, and current events was

somehow inaccurate, or even if it was just a situation where the narrative being pushed by Aguayo did not align with the Congresswoman's own views and policy preferences, it was within the scope of the Congresswoman's job as a Member of Congress to engage with the media to make her own views about these matters known and to advocate for them. *See Williams*, 71 F.3d at 506–07 (rejecting the argument that a Congressman's allegedly defamatory remarks about a lobbyist were not within the scope of his official duties, where the remarks were made in the context of an interview addressing an appropriation of money for a project in Texas); *Does 1–10*, 973 F.3d at 600 (explaining that "unsolicited comments by elected officials on an event of widespread public interest" were within the scope of employment of a Senator and Congresswoman, even though the "unsolicited comments" (made on Twitter) were alleged to be libelous).

Aguayo's allegations about supposedly tortious activity by Congresswoman Escobar's communications director, Elizabeth Lopez-Sandoval, also do not operate to place this lawsuit outside the scope of the Congresswoman's job duties as a Member of Congress. (*See* Doc. 11, ¶¶ 7, 11–13, 20.)  At a most fundamental level, there is a disconnect between Aguayo's attempt to impute a congressional staffer's actions to the Member for whom the staffer works as a basis for liability, while now also arguing that the suit relates only to the Member's personal, non-work-related activities.  Aguayo's own allegations establish that Lopez-Sandoval is part of Congresswoman Escobar's official staff, as the communications director who works in the Congresswoman's "El

Paso district office."[6]  (Doc. 1-8, ¶ 20.)  Congresswoman Escobar does not employ her communications director, or any other official staffer, in a personal capacity, so the notion that activities of this or any other official congressional staffer should somehow be considered to be the personal-capacity activities of the Congresswoman herself does not make sense.

Regardless, Aguayo's allegations about staffer activities do not establish that any aspect of this lawsuit falls outside of Congresswoman Escobar's scope of employment. Aguayo complains of an email Lopez-Sandoval sent to decline Aguayo's request to interview the Congresswoman, as part of which Lopez-Sandoval stated that "months ago your supervisors and my office agreed that given your track record of dishonest reporting, Congresswoman Escobar will not be granting you any interviews."  (Doc. 11, ¶ 20.) (Notably, this email references that there was apparently some ongoing dialogue between the Congresswoman's "office" and the TV station—which again cuts against the notion of personal-capacity action by the Congresswoman.)  Aguayo also asserts that Lopez-Sandoval supplied "false information" that was published on various "social media websites" including those of a radio station, something called "Lionstar Blog," and the Democratic Party of El Paso.  (Doc. 11, ¶ 11.)  According to Aguayo, the false or defamatory information was that Lopez-Sandoval criticized Aguayo's reporting of a story about Texas Attorney General Ken Paxton as "unbalanced," "inaccurate," "right

_____

[6] Most Members of Congress have two offices—one office in Washington, D.C. in the Capitol complex, and then also a "district" office located in the Member's district in his or her home state.  The district office typically has a number of full-time staffers who deal with constituent matters and coordinate the Member's schedule and activities when in the district.

leaning," and in other similar ways.  (Doc. 11, ¶ 12.)  Aguayo also contends that Congresswoman Escobar, Lopez-Sandoval, and others "encouraged and assisted in" the publication of the allegedly defamatory statements to "convince" the TV station to terminate Aguayo.  (Doc. 11, ¶ 12.)

But for all the same reasons discussed above, this kind of discourse between a Member of Congress (or her staff) and the press and public at large about matters of political interest falls well within a Member's job duties.  The work of a Member of Congress "necessarily includes informing constituents and the public at large of issues" that are pending in the public sphere, *Williams*, 71 F.3d at 507, and as part of this process Members will naturally "broadcast *their views* on pending legislation and related current events through press releases, televised speeches, interviews, and . . . through social media postings," *Does 1–10*, 973 F.3d at 602 (emphasis added).  Aguayo may take issue with the fact that Congresswoman Escobar's views apparently did not align with the narrative that Aguayo was advancing in her various news stories, as well as the fact that the Congresswoman's staff informed station management that the Congresswoman did not want to be interviewed by Aguayo because of perceived disagreements with Aguayo's reporting, but it was within the prerogative of a Member of Congress to make her own views about these matters of political interest and public discourse known.  Even assuming that Congresswoman Escobar or others within her office cast aspersions on Aguayo's work as a reporter, that does not remove these matters from the scope of

official employment.[7]  *See, e.g.*, *Williams*, 71 F.3d at 507 (assuming that a Congressman's statements were defamatory but finding that they were nonetheless within the scope of his official employment); *Chapman*, 399 F. Supp. 2d at 713, 715 (finding that a Congressman's remarks that the plaintiff was a "bigoted, right wing, redneck, racist wacko," made in response to the plaintiff's commentary in a news story suggesting that the Council on American-Islamic Relations was linked to terrorism, were within the scope of congressional employment).

### 2.    Aguayo's contrary arguments are unavailing.

Aguayo asserts in the second amended complaint that Congresswoman Escobar's activities did not occur with the scope of her employment as a Member of Congress. (Doc. 11, ¶¶ 29–35.)  But as discussed below, she fails to carry her burden to rebut the government's Westfall Act certification.  *See Williams*, 71 F.3d at 506.

First, Aguayo discusses Texas vicarious-liability law including the concept of whether there is a "right to control" the alleged tortfeasor's actions.  (*See* Doc. 11, ¶ 31 (quoting *Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 132 (Tex. 2018)).)  But as

---

[7] Notably, in her arbitration demand against the TV station and certain station employees, Aguayo has claimed that allegedly libelous and slanderous statements by station employees *did* occur within the course and scope of their employment.  (*See* Doc. 1-6, Ex. C-2 at pp. 3, 10, 11, 13.)  The statements at issue appear to be of the same type as the statements that Aguayo alleges in this lawsuit were made by Congresswoman Aguayo (or her staff) but *outside* the scope of their employment.  (*See, e.g.*, Doc. 1-6, Ex. C-2 at p. 10 (complaining of alleged defamatory statements by TV station employees stating that Aguayo had a political bias or "far-right agenda").)  Indeed, it appears that Aguayo is actually claiming that many of these allegedly tortious statements were in effect jointly made or disseminated by (1) the Congresswoman or people on her staff (most notably communications director Lopez-Sandoval) in conjunction with (2) TV station employees, as part of some alleged conspiracy.  (*See* Doc. 1-6, Ex. C-2 at p. 6.)  Aguayo can provide no principled explanation for how it was somehow simultaneously *within* the scope of the TV station employees' employment to engage in this alleged conspiracy, but nonetheless *outside* the scope of employment of the Congresswoman and her communications director.

the Texas Supreme Court's *Painter* decision that Aguayo quotes makes clear, this concept has no applicability here.  Per *Painter*, the significance of the right to control is that a plaintiff must demonstrate "such a right to control in order to satisfy the first element of a vicarious-liability claim against an employer . . . that the wrongdoer was an employee at the time of the [tortious] conduct."  *Painter*, 561 S.W.3d at 132.  In this case, though, Congresswoman Escobar's status as an "employee" of the government is undisputed and is established as a matter of federal law.  *See* 28 U.S.C. § 2671; *Williams*, 71 F.3d at 504–05; *see also Rodriguez v. Sarabyn*, 129 F.3d 760, 765 (5th Cir. 1997) (whether a person was a federal employee for purposes of the Federal Tort Claims Act and Westfall Act is a question of federal law).  And even under Texas law, the question of whether there is a "right to control" so as to establish an employment relationship is a separate inquiry from the question posed by Aguayo's challenge to the government's Westfall Act certification, which is whether the acts in question were within the scope of employment.  *See Painter*, 561 S.W.3d at 132 (the Texas Supreme Court's explanation that it "disagree[d] with those courts of appeals that have tied the right-to-control analysis to the course-and-scope element").  Accordingly, the "right to control" is irrelevant.

Aguayo next argues that Congresswoman Escobar's actions were outside the scope of employment because "none of Escobar's tortious interference or defamation occurred while she was in session in Congress or participating in Congressional business," and thus it "is not immunized by the Speech and Debate Clause[8] of the

---

[8] It is actually the Speech *or* Debate Clause.  *See* U.S. Const. art. 1, § 6, cl. 1.

United States Constitution."  (Doc. 11, ¶ 34 (footnote added).)  The Speech or Debate

Clause provides that Members of Congress "shall not be questioned in any other Place"

based on "any Speech or Debate in either House," U.S. Const. art. I, § 6, cl. 1, and is

generally understood to confer immunity on Members for, among other things, "anything

generally done in a session of the House by one of its members in relation to the business

before it," *Doe v. McMillan*, 412 U.S. 306, 311 (1973) (internal quotation marks and

citation omitted).

But here, whether Congresswoman Escobar's alleged acts might fall within the

scope of the Speech or Debate Clause is irrelevant because the government is not relying

on that clause for its Westfall Act certification or for the government's immunity defense

in this case.  Instead, the applicable provisions are 28 U.S.C. § 2679, which applies to any

claim "for injury or loss of property . . . resulting from the negligent or wrongful act or

omission of any employee of the Government while acting within the scope of his office

or employment" and confers immunity on federal employees by making a claim against

the government under the Federal Tort Claims Act the exclusive means by which a

plaintiff can pursue a recovery for such a claim (if at all), and 28 U.S.C. § 2680, which

retains the government's immunity as to certain claims.  The immunity that section 2679

(i.e., the Westfall Act) confers on all federal employees—including Members of

Congress—is thereby different from and in many respects broader than the scope of the

Speech or Debate Clause.  Accordingly, the Speech or Debate Clause is not relevant to

the issues before this Court and does not support any argument by Aguayo against the

government's Westfall Act certification. *See Does 1–10*, 973 F.3d at 596 (explaining that

the plaintiffs' arguments about the Speech or Debate Clause were "irrelevant" in a suit alleging that a Senator and Congresswoman libeled the plaintiffs in a series of tweets; instead, the Westfall Act was the relevant provision).

Last, Aguayo offers a brief argument that Congresswoman Escobar's activities were outside the scope of her employment because they purportedly did not "benefit Congress" and "Congress did not have a right of control over Congresswoman Escobar's torts in this case," and also because the activities allegedly do not fall within those outlined in a February 15, 2022 Congressional Research Service paper entitled "Roles and Duties of a Member of Congress; Brief Overview."  (Doc. 11, ¶¶ 34, 35.)  But in both respects, Aguayo's argument is incorrect.

As an initial manner, Aguayo misperceives the role and relationship of a Member of Congress vis-à-vis "Congress" as a whole.  Contrary to Aguayo's suggestion, the entity or thing that Aguayo refers to as "Congress" (presumably referring to the group of all Representatives as a body, or perhaps all Representatives and Senators together) is not Congresswoman Escobar's "boss" in the sense that "Congress" dictates on a day-to-day basis what specific actions the Congresswoman may take as the Representative of Texas's 16th District and must somehow receive the "benefit" of those actions.  The job of a Member of Congress "is not a job like any other, it is a constitutional role to be played upon a constitutional stage." *Rostenkowski*, 59 F.3d at 1312.  In asking whether Congresswoman Escobar was authorized to engage in the type of activities at issue and whether those were in the general furtherance of her employment (i.e., to the "benefit" of her employer), the Congresswoman's employer can be thought of as her constituents, and

she serves them simply by making her views known and working to advance whatever policies and positions she thinks would benefit them. *See Does 1–10*, 973 F.3d at 600 (explaining in the context of discussion of a claim about a Senator's allegedly defamatory comments that "the Senator's employer was his constituents and he served them by fully informing them of his views and working to pass legislation he believed would benefit them").

Aguayo's reliance on the Congressional Research Service article is also unavailing. (*See* Doc. 11, ¶ 35.[9]) The article does not purport to serve as a definitive cataloging of what activities a Member of Congress can or cannot do as part of her job—and of course there would be no constitutional basis for such an article from a support entity that works *for* Members of Congress to somehow dictate the scope of their employment.[10] Even so, the article itself states that "there is no formal set of expectations or official explanation of what roles or duties are required, or what different Members might emphasize as they carry out their work," and that "[i]n the absence of such formal authorities, many of the responsibilities that Members of Congress have assumed over the years have evolved from the expectations or preferences of Members

---

[9] Aguayo states that the article is attached as Exhibit A to her second amended complaint, but no such document was attached—instead, Exhibit A is a copy of Aguayo's contract with the TV station. The Congressional Research Service article is available online at https://crsreports.congress.gov/product/pdf/ RL/RL33686/13#:~:text=Roles%20of%20Members%20of%20Congress,-The%20roles%20and&text=Rol es%20include%20representation%2C%20legislation%2C%20constituency,office%20management%2C% 20and%20electoral%20activity (accessed April 24, 2023).

[10] The Congressional Research Service is an agency within the Library of Congress that provides nonpartisan research assistance to Members of Congress. *See* https://crsreports.congress.gov/ Home/About (accessed Apr. 24, 2023).

and of their constituencies."[11]  "[E]ach Member is free to define his or her own job and set his or her own priorities,"[12] the article explains, before going on to note that "[i]n current practice, the roles and duties of a Member of Congress are understood to include" a number of various things, including "interact[ing] with the news media," and that Members typically have staffers who "handle media relations."[13]  Far from supporting Aguayo's arguments, then, the Congressional Research Service article makes clear that—as already shown herein—interactions with the press fall squarely within the types of duties and activities that Members of Congress (and their official staff) routinely engage in within the scope of their federal employment.

## IV.    Conclusion

The Court should deny Aguayo's challenge to the government's Westfall Act certification and this case should be dismissed for lack of subject-matter jurisdiction.

---

[11] *See* Role and Duties of a Member of Congress: Brief Overview, at Summary page (prior to Table of Contents).

[12] *Id.*

[13] *Id.* at 1–2, 4.

**Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint – Page 24**

Respectfully submitted,

LEIGHA SIMONTON
UNITED STATES ATTORNEY

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:   214-659-8626
Facsimile:    214-659-8807
brian.stoltz@usdoj.gov

Attorneys for the United States

Certificate of Service

On April 25, 2023, I electronically submitted the foregoing document with the

clerk of court for the U.S. District Court, Northern District of Texas, using the electronic

case filing system of the court.  I hereby certify that I have served all parties

electronically or by another manner authorized by Federal Rule of Civil Procedure

5(b)(2).

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney