UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHRISTINA AGUAYO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 3:23-CV-539-E |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS
<u>PLAINTIFF'S SECOND AMENDED COMPLAINT</u>

Respectfully submitted,

KILGORE & KILGORE, PLLC

<u>/s/ *Robert E. Goodman, Jr.*</u>
Robert E. Goodman, Jr.
State Bar No. 08158100
reg@kilgorelaw.com
John S. Morgan
State Bar No. 14447475
jsm@kilgorelaw.com
3141 Hood Street, Suite 500
Dallas, Texas 75219
(214) 969-9099 - Telephone
(214) 379-0840 - Fax

ATTORNEYS FOR PLAINTIFF

## TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………………………………ii

TABLE OF AUTHORITIES………………………………………………………………..iii

I.      Introduction…………………………………………………………………..1

II.     Pertinent Facts………………………………………………………………..2

III.    Argument………………………………………………………………………3

        A.      The Exception Under the Federal Tort Claim Act for
                Defamation and Interference Claims is Not Applicable…………………..3

IV.     Legal Argument………………………………………………………………...4

        A.      The Conduct of Escobar Supporting Claims Against
                Her Was Not Within the Scope of Her
                Employment as a Member of Congress………………………………...4

                1.      Definition of the Issue…………………………………………4

                2.      Plaintiff's Burden on Issue……………………………………...5

                3.      Analysis of the Issue……………………………………………7

                4.      Application of Case Law to this Action…………………………13

        B.      Defendant's Scope of Employment Arguments Are Not Valid………….14

        C.      Defendant's Rebuttals of Plaintiff's Arguments Are Not Valid…………18

V.      Conclusion……………………………………………………………………22

CERTIFICATE OF SERVICE………………………………………………………..23

TABLE OF AUTHORITIES

Cases                                                                                          Page(s)

Carroll v. Trump,
    49 F.3d 759 (2nd Cir. 2022).................................................................... *passim*

Carroll v. Trump,
    498 F. Supp. 3d 422 (S.D.N.Y. 2020)....................................................... *passim*

Clinton v. Jones,
    520 U.S. 681 (1997)..............................................................................7, 11

Council on American Islamic Relations v. Ballenger,
    444 F. 3d 659 (D.C. Cir. 2006)................................................................ *passim*

Does 1-10 v. Haaland,
    973 F. 3d 591 (6th Cir. 2020) ................................................................. *passim*

Laverie v. Wetherbe,
    517 S.W.3d 748 (Tex. 2017)......................................................................15

Operation Reserve National v. U.S.,
    147 F.3d 68 (1st Cir. 1998).........................................................................7

Osborn v. Haley,
    549 U.S. 225 (2007)............................................................................4, 5, 6

Osborn v. Haley,
    549 U.S. 355 (2007).....................................................................................6

Painter v. Amerimex Drilling I, Ltd.,
    561 S.W.3d 125 (Tex. 2018)..................................................................18, 19

Williams v. U.S.,
    71 F.3d 502 (5th Cir. 1995) ..................................................................... *passim*

Wuterich v. Murtha,
    562 F. 3d 375 (D.C. Cir. 2009)..........................................................7, 11, 14

Statutes

Federal Tort Claim Act .............................................................................. *passim*

Westfall Act .............................................................................................. *passim*

Plaintiff Christina Aguayo ("Plaintiff") hereby responds to the motion of Defendant United States of America, on behalf of the Member of the United States Congress for the 16th District of Texas, Veronica Escobar ("Escobar"), to dismiss Plaintiff's second amended complaint (the "Motion"):

I.

Introduction

Plaintiff is a former television reporter in El Paso, Texas whose employment was terminated by her employer, a television station in El Paso, Texas, KTSM-TV, after Escobar repeatedly defamed Plaintiff to KTSM representatives and interfered in Plaintiff's employment by demanding that KTSM terminate such employment. Defendant insists that Escobar defaming Plaintiff and demanding that she be fired was within the scope of her employment as a Member of Congress and that she is therefore immune from liability to Plaintiff for defamation and interference.

Defendant's argument in this action is as confounding of common sense and as otherwise troubling as Defendant's argument for immunity from defamation of former President Trump in Carroll v. Trump, 498 F. Supp. 3d 422, 428-457 (S.D.N.Y. 2020) ("Trump I"). It should be similarly rejected.

II.

Pertinent Facts

Plaintiff's second amended complaint alleges numerous facts reflecting repeated defamation by Escobar, or defamation by others aided and abetted by her, or conspired in by her, and interference by Escobar in Plaintiff's employment with KTSM. Defendant does not question the adequacy of the facts alleged to support Plaintiff's defamation and interference claims[1] but only the immunity of Escobar from Plaintiff's claims of defamation and interference.

---

[1]      In Section II of the Motion, Defendant refers to the fact that Plaintiff alleged that Escobar engaged in tortious conduct in Texas and the District of Columbia, directly and through others. Motion at 3. Plaintiff in fact did so, alleging Escobar's commission of torts as principal, aider and abettor and conspirator, to some extent by herself and to another extent in concert with others, and alleging that she so engaged in such tortious conduct in both of her Congressional offices, in Washington, D.C. and El Paso. The former set of allegations does not, by referring to Escobar participating with one or more staff members in the commission of torts, render the torts any less tortious, or any more within the scope of her employment, as further addressed in the text in Section IV(B) of Plaintiff's Argument, then if otherwise committed. For reasons addressed in Section IV in the text, the significance of the location of tortious comments is not, as Defendant claims in footnote 2 of the Motion, that Escobar speaking or writing or emailing from one of her offices renders her conduct automatically within the scope of her employment; indeed, it simply calls attention to the fact that not only Texas law, but District of Columbia law, may dictate that Escobar's statements on which Plaintiff's defamation and interference claims are based were not within the scope of her employment for purposes of the FTCA. Plaintiff did not by her second amended complaint, as Defendant suggests (Motion at 2 n. 2), seek to in any way obscure the location of commission by Escobar of torts. Beyond its reference to Escobar's involvement of others in her torts and her commission of those torts in two locations, Defendant, in purporting to describe the important allegations of Plaintiff's second amended complaint (Motion at 3-4), studiously avoids the critical statements defaming Plaintiff to representatives of KTSM and making demands to KTSM representatives that Plaintiff be terminated. As described in the text in detail in Section IV(B), the allegations highlighted by Defendant are simply not the defamatory statements and demands for Plaintiff's termination which serve as the basis for her defamation and interference claims. In finally summarizing, within the Motion, Plaintiff's second amended complaint, Defendant properly notes that fact that it asserts not only a defamation claim but an interference claim. Motion at 5-6. However, as indicated in subsection IV(B), (C) and (D), Defendant ignores the interference claim in arguing for dismissal of Plaintiff's claims. For reasons indicated in Section IV(D) in particular, Defendant may not do so.

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED COMPLAINT - Page 2

III.

Argument

A.     The Exception Under the Federal Tort Claim Act for
       Defamation and Interference Claims is Not Applicable

As a basis for contesting the subject matter jurisdiction of this Court over this action,

Defendant invokes the provisions of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, et

seq., and specifically, its exception, for claims of defamation and interference, to the partial

waiver it provides of Defendant's sovereign immunity. However, Defendant admits that

immunity does not exist—making both the waiver and exception inapplicable—if the claims

against a federal employee claiming the benefit of the FTCA are based on conduct not in the

scope of the employment of such federal employee.

Plaintiff alleges in her second amended complaint that, assuming Escobar is properly

treated, while a Member of Congress, as an employee of Defendant,[2] she was not acting in the

scope of her employment in the conduct alleged by Plaintiff to constitute defamation of her to

KTSM and interference with her employment with KTSM.

Accordingly, the provisions of the FTCA, including that preserving sovereign immunity

for claims of defamation and interference, relied upon by Defendant, do not properly govern this

_____

[2]        In footnote 5 of the Motion, Defendant addresses the issue whether Escobar is an employee for
purposes of the FTCA, just as the Trump I court examined the same question as to former President Trump, 498 F.
Supp. 3d at 433-443. Defendant suggests the answer is an easy one on the basis that an employee or officer of any
federal agency qualifies and that the legislative branch, like the executive branch is an agency. Motion at 9 n. 5. But
there are, potentially, arguments that Escobar is not an employee of Defendant under Section 2671 of the FTCA, just
as there was such a question in Trump I whether former President Trump was an employee (498 F.Supp. 3d at 435-
444). Even so, Plaintiff agrees, only for purposes of Defendant's motion, that she may be treated as an employee.

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED COMPLAINT - Page 3

action. This Court may therefore not properly dismiss this action for a lack of waiver by Defendant of sovereign immunity under the FTCA but should substitute Escobar as defendant for Defendant and proceed to adjudicate Plaintiff's claim against Escobar.[3]

IV.

Legal Argument

A.   The Conduct of Escobar Supporting Claims Against
     Her Was Not Within the Scope of Her
     Employment as a Member of Congress

     1.   Definition of the Issue

Defendant does not acknowledge the counterintuitive and even repulsive quality of Defendant's contention supporting its motion that it is within the scope of employment of a Member of Congress to defame, and interfere in the employment, of a constituent of the very Member of Congress at issue, as a resident in the Member's district. Defendant actually argues that Escobar's conduct "falls easily" within the scope of her employment as a Member of Congress.

As a preliminary matter, it is helpful to frame the issue posed by Defendant's argument. In Trump I, the district court, with a nearly identical question before it, stating:

> The government's motion to substitute turns on whether the Attorney General's certification that President Trump was an employee of the government acting within the scope of his employment was correct. As noted at the outset of this opinion, that question raises two subsidiary issues: (1) whether the President of the United States is an "employee of the Government" and, if the answer to this question is "yes," (2) whether President Trump was acting within the scope of his employment when he made the allegedly defamatory statements.

---

[3]      Under Osborn v. Haley, 549 U.S. 225, 242 (2007), this Court retains jurisdiction even in the event it finds the FTCA inapplicable.

498 F. Supp. 3d at 432-433. In this action, the only difference is that Plaintiff's claims are against a Member of Congress, not a former President, and not limited to defamation, but include interference.

    2.    <u>Plaintiff's Burden on Issue</u>

Defendant attempts to confuse the burden imposed upon Plaintiff by the Motion by suggesting that a so-called "Westfall Act certification" provided to this Court by the United States attorney for the benefit of Escobar is effective to dictate dismissal. Motion at 9. But the certification is conclusive only <u>for purposes of removal</u>. <u>Osborn v. Haley</u>, 549 U.S. 225, 242 (2007). As stated in <u>Trump</u>:

> The Attorney General's certification is conclusive only "for purposes of removal" – that is to say, only for purposes of whether the action shall continue in federal rather than state court. As the Supreme Court has held, such a certification "does not conclusively establish as correct the substitution of the United States as defendant in place of the employee." "The statute is fairly construed to allow petitioners to present to the District Court their objections to the Attorney General's scope-of-employment certification ...." Hence, the federal court to which the action has been removed must determine for itself whether the individual defendant is covered by the statute and, if so, whether the actions of which that defendant is accused or committed were within the scope of the defendant's federal employment. If those conditions both are met, the United States is made the defendant and the individual defendant is dismissed from the case. If either condition is not met, the case proceeds against the individual defendant in his or her personal capacity.

<u>Trump</u>, 498 F. Supp. 2d at 430.

Defendant does admit that Plaintiff may overcome the certification of the U.S. Attorney as to Escobar (Motion at 9), but offers a misleading characterization of the burden imposed upon a plaintiff in that regard, insisting, on the one hand, that the burden is to allege "that the employee's conduct was not within the scope of her employment," but on the other, that the certification of the U.S. Attorney should be "upheld unless the District Court determines that the

employee, in fact, and not simply as alleged by the plaintiff, engaged in conduct beyond the scope of his employment." <u>Osborn v. Haley</u>, 549 U.S. 355, 231 (2007). Motion at 9. But <u>Osborn</u> does not dictate the conclusion that, on a motion to dismiss, Plaintiff must establish, as a matter of law, as by a summary judgment, that an alleged federal employee "engaged in conduct beyond the scope of his employment." Rather, if Plaintiff attests to facts raising an issue of fact whether an alleged federal employee's conduct was outside the scope of his employment, the Motion, like any motion to dismiss, should be denied. Plaintiff has done so by a declaration attached to this response verifying the factual allegations in paragraph 4 and paragraphs 6 through 27 of her second amended complaint. <u>That verification of the factual allegations of the second amended complaint by Plaintiff is not necessarily sufficient to avoid dismissal of Plaintiff's claims supported by such allegations when as is this action, the U.S. attorney's Westfall Act certification is devoid of facts or reasoning, instead purely conclusory, and actually not even purporting to attest to a fact or facts, but solely an "opinion."</u> <u>See</u> Westfall Act certification of Leigha Simonton attached to Defendant's notice of removal. And, of course, the lack of any factual basis for Defendant's motion is not curable by any reply which Defendant may make to this response to the Motion. Taking into account the legal considerations highlighted by Plaintiff in Section I(A)(3) of this response, Plaintiff's declaration in support of this response verifying the factual allegations of her second amended complaint accordingly establishes, for purposes of the Motion, that the conduct of Escobar underlying Plaintiff's claims was outside the scope of her employment and thus dictates denial of the Motion.

3.    <u>Analysis of the Issue</u>

To understand the propriety of the conclusion that the allegations of Plaintiff's second amended complaint, in light of their verification by Plaintiff, satisfy Plaintiff's burden to make allegations contravening the certification of the U.S. Attorney, it is necessary to consider the limited number of decisions which address the FTCA issue of scope of employment in a comparable context. While, pursuant to a Second Circuit decision certifying the issue of scope of employment to the District of Columbia Court of Appeals, the holding of <u>Trump I</u> on the issue of scope of employment in <u>Trump I</u> was vacated, the Second Circuit Court of Appeals itself discussed the issue in a manner favorable to Plaintiff's position in this action. <u>Carroll v. Trump</u>, 49 F.3d 759 (2nd Cir. 2022) ("Trump II"). Together, an analysis of <u>Trump I</u> and <u>Trump II</u> afford ample basis for this Court's decision of the Motion. Other decisions, examined in <u>Trump I</u> and <u>Trump II</u>, also bear scrutiny, even if only by contrast, as described further below. <u>Council on American Islamic Relations v. Ballenger, 444 F. 3d 659 (D.C. Cir. 2006)</u>; <u>Wuterich v. Murtha</u>, 562 F. 3d 375 (D.C. Cir. 2009); <u>Clinton v. Jones</u>, 520 U.S. 681 (1997); <u>Williams v. U.S.</u>, 71 F.3d 502 (5th Cir. 1995); <u>Operation Reserve National v. U.S.</u>, 147 F.3d 68, 69 (1st Cir. 1998); <u>Does 1-10 v. Haaland</u>, 973 F. 3d 591 (6th Cir. 2020).

a.    In <u>Trump I</u>, the district court, having framed the scope of employment issue as it did, analyzed applicable law and the general standard for determining scope of employment under such law and then applied it to the conduct alleged. <u>Id</u>. at 443-451. The court first noted that the applicable law is the respondeat superior law of the jurisdiction where the tort occurred. <u>Id</u>. at 444. The court then noted that the respondeat superior law it was considering as potentially applicable —that of New York and the District of Columbia—both require that an employer exercises, or has the ability to exercise, control over an employees' relevant actions. <u>Id</u>. at 446.

The court then noted that the law of both jurisdictions required analysis whether a master-servant relationship existed and whether an act in question was within the scope of the servant's employment. Id. at 447.

As the Trump court considered the application of the first, master-servant relationship, prong to President Trump, it highlighted the issue of control by a principal of the conduct of an agent, both in performance of work and the manner in which the work is to be done. Id. at 447-448. It then identified a five-factor test for the existence of a master-servant relationship involving "the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer." Id. at 448. Applying the test to President Trump, the court noted that only the fact of payment of a salary could even arguably be considered applicable. Id. But the most important consideration against considering the President a servant was the lack of any power of control over the President by any other person or entity. Id. at 449-450. The court also emphasized the President's actual control over others and his own choice to do or say as he wishes. Id. Finally, the court noted, apropos of the master-servant paradigm, that, the President not being a servant, his challenged defamatory statements were necessarily not "actuated, at least in part, by a purpose to further the master's business." Id. at 450. Thus, it held that "[h]e was not acting within the scope of his employment when he made [the statements], and the Attorney General's certification under the Westfall Act was erroneous." Id.

Addressing the issue of scope of employment issue on the assumption that President Trump could be treated as a "servant," the Trump I court then held that he was not "acting in the scope of employment because a purpose to serve the master was missing." Id. at 450-451. The court noted that the contrary argument of Defendant was based on the proposition that speaking

to reporters is part of the president's job. Id. at 451. But it dismissed that argument as unduly overbroad, as it amounts to contending that whenever the President speaks to reporters, he is acting within the scope of employment. Id. at 451.

The court then discussed Ballenger, a case involving a claim of defamation against a Member of Congress, in order to explain why it was not persuaded of the validity of an argument tied to communications with the press was sufficient to treat any statement to the press within the scope of duties as a Member of Congress. Id. at 451-452. As the Trump I court explained Ballenger, it involved Congressman Ballenger stating that his wife was uncomfortable living across from an Islamic institution, and that institution sued for defamation. Id. As the Trump I court further indicated, the district court in Ballenger did not question a Westfall Act certification made in that case and neither did the District of Columbia Court of Appeals, albeit in both cases, without addressing the FTCA "employee" issue or the FTCA scope of employment issue, in particular from the standpoint of control. Id. The courts in Ballenger instead, reasoned that merely speaking to the press during regular working hours was within the scope of "authorized duties." Id. As the Trump court noted:

> The court did not explain its use of the word "authorized" nor offer any theory as to who if anyone authorizes a Member of Congress to speak to reporters, much less to discuss his marital status with them. Nor, when it reached the question of whether speaking to reporters is conduct "actuated, even in part, to serve *the master*," did the court offer any theory as to who is the "master" of a Member of Congress or who controls a Member's discussions with the press. The D.C. Circuit appears to have overlooked these requirements by focusing only on whether the "conduct was motivated – at least in part – by a legitimate desire to discharge his duty as a congressman."

> Even on the issues it addressed, Ballenger's reasoning is wanting. Its explanation for why a Member of Congress acts within the scope of his employment is presented in the following paragraph:

"[The plaintiff] resists this conclusion on two grounds. First, it insists that Ballenger's statement was purely private, unrelated to any matter of public concern. The circumstances of the conversation belie this suggestion. The *Charlotte Observer* and at least some subset of Ballenger's constituents were interested in the separation. Given this level of public interest, we find CAIR's absolutist view at odds with reality. Moreover, it is telling that [the reporter] felt at liberty to ask [Ballenger's chief of staff] – rather than Ballenger himself – about the marital separation."

There are two problems with this passage. The first is that it is unpersuasive. Gossip about a congressperson's marriage may very well be interesting to the public. But that fact does not transform it into the official business of the United States Congress. The job description of a congressperson does not include transparency about one's personal life.

In addition, Ballenger misstates D.C. law – and not only in the manner described above. A plaintiff is not required, as the court asserted, to show that the defendant's "statement was *purely* private, unrelated to any matter of public concern." A real but insubstantial purpose to serve the master is insufficient. "'Conduct of a servant [that] is ... too little actuated by a purpose to serve the master' is not within the scope of employment."

The implications of Ballenger's holding also are troubling. The case stands for the proposition that, under D.C. law, virtually any remarks that Members of Congress make to the press are conduct within the scope of their employment. Setting aside the master-servant question that the court did not address, this means that Members of Congress, and perhaps all federal officials who speak to the press with any regularity, effectively are immune from defamation claims for comments made within the District of Columbia, no matter how personal or private in nature.

Ballenger acknowledged this concern. But it made no attempt to assuage it. It noted merely that the case was limited to its facts.

As explained above, the undisputed facts demonstrate that President Trump was not acting in furtherance of any duties owed to any arguable employer when he made the statements at issue. His comments concerned an alleged sexual assault that took place several decades before he took office, and the allegations have no relationship to the official business of the United States. To conclude otherwise would require the Court to adopt a view that virtually everything the president does is within the public interest by virtue of his office. The government has provided no support for that theory, and the Court rejects it as too expansive.

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED COMPLAINT - Page 10

498 F. Supp. 3d at 451-452. The <u>Trump I</u> court concluded that <u>Ballenger's</u> reasoning was not enough to support the argument that anything a Congressman says to the press is within the scope of his employment and that any such holding would lead to problematical implications. <u>Id</u>. at 451-452.

Separate and apart from its treatment of <u>Ballenger</u>, the <u>Trump I</u> court noted that a subsequent decision, <u>Wuterich</u>, by the same District of Columbia Court of Appeals which decided <u>Ballenger</u>, did not sweep as broadly as <u>Ballenger</u>. <u>Id</u>. at 453. Specifically, it noted that, in <u>Wuterich</u>, the court of appeals examined the relationship between a Member of Congress and contested remarks, holding that there was a relationship between his specific duties as a Member of Congress, including on the Defense subcommittee of the Appropriateness Committee, and legislation he had proposed, and his remarks. <u>Id</u> at 453. The <u>Trump I</u> court thus rejected <u>Ballenger</u> as permitting the conclusion that anything "[the President] says is within the scope of his employment." <u>Id</u>. The court also rejected an argument, not applicable here, that accusations which were the subject of the contested remarks might impact the President's ability to govern effectively. <u>Id</u>. at 453-454. Finally, the court also referred to <u>Clinton</u>, another defamation case, like <u>Trump I</u>, similarly focused on an allegation of pre-Presidential sexual misconduct. <u>Id</u>. at 454. The <u>Trump I</u> court finally distinguished what it referred to as other Westfall Act defamation cases. <u>Does</u> was distinguished based on the statements in question touching upon "an event of widespread public interest" and based on Kentucky law deemed distinguishable from that of the District of Columbia. <u>Id</u>. at 455. <u>Williams</u> was distinguished as dealing with statements related to a specific Congressional appropriations bill, and again, as governed by distinguishable state law, that of Texas. The <u>Trump I</u> court likewise distinguished <u>Operation Rescue</u> as involving a challenged statement dealing with a bill sponsored by the Senator at issue. <u>Id</u>. at 455.

After offering its analysis based on District of Columbia law, the <u>Trump</u> court held that the same conclusion was justified by New York law based on the consideration of the issues of control and furtherance of duties owed to an employer required by New York law, noting that conduct "committed for wholly personal motives, including sexual misconduct and related tortious behavior," is not in furtherance of duties owed to an employer. <u>Id</u>. at 456-457.

b. In <u>Trump II</u>, the Second Circuit reversed <u>Trump I</u> on the issue whether President Trump was an "employee" for purposes of the FTCA. 47 F. 4th at 769-772. As to the scope of employment issue, the Court of Appeals ultimately certified the issue to the District of Columbia Court of Appeals. <u>Id</u>. at 781. In the meantime, however, it addressed the issue in a manner consistent with the analysis of the issue in <u>Trump I</u>. <u>Id</u>. at 772-781. The court noted that the issue is ultimately one of employer liability for an employee's intentional torts, with the traditional view being that an employer must benefit from the conduct and the modern view that the purpose of serving a master is the critical consideration. <u>Id</u>. at 774-775. The Second Circuit reviewed the history of District of Columbia caselaw to determine where it stood on the issue and concluded that it could not decide on which basis the District of Columbia Court of Appeals would decide the issue. <u>Id</u>. at 777-779.The Court of Appeals also took note of <u>Ballenger</u> and <u>Does</u>, adverting to Defendant's view that they were decisive of the issue of scope of employment in <u>Trump</u> and <u>Trump II</u>, but critically, disagreed with that view. <u>Id</u>. at 779-780.

4.      <u>Application of Case Law to this Action</u>.

Here, a general analysis of the issue of scope of employment as to Escobar justifies the same conclusion reached in <u>Trump I</u> and the like conclusion suggested in <u>Trump II</u>. First, no one controls the actions of a Member of Congress, just as no one controls the President; including, as noted in <u>Trump</u>, in speaking to the press. Second, none of the alleged defamatory statements, as in <u>Trump</u>, or acts of interference, explicitly "had [any]thing to do with the official business of government," from the standpoint of Escobar, and so in furtherance of any duties of Escobar. 498 F. Supp. 3d at 448. Third, a Member of Congress not being beholden to another federal official or other person, no such statements or actions were even arguably "activated at least in part, by a purpose to serve the master's business, . . . [as opposed to] the servant's own purposes." <u>Id</u>. at 450. As noted in <u>Trump</u>, a "slight purpose to serve the master is not enough." <u>Id</u>.

As in <u>Trump</u>, and in <u>Ballenger</u>, the single premise of Defendant's argument that Escobar's conduct was within the scope of her employment as a Member of Congress is the regularity (even if not the necessity as such) of dealing with the press by a Member of Congress. This rationale was understandably rejected by the <u>Trump I</u> court and also disapproved by the <u>Trump II</u> court in its rejection of <u>Ballenger</u> as controlling. 498 F. Supp. 3d at 450-454. The <u>Trump I</u> court rejected it even while recognizing it was relied upon in <u>Ballenger</u>. <u>Id</u>., 49 F. 4th 779-780. As the <u>Trump I</u> court viewed the district and appellate court decisions in <u>Ballenger</u>, their scope of employment analysis was utterly flawed. <u>Id</u>. at 451-452. As the <u>Trump I</u> court also noted, the notion of defamation of a private person being within the scope of the duties of a Member of Congress is extremely troubling. It stated:

> The implications of <u>Ballenger</u>'s holding also are troubling. The case stands for the proposition that, under D.C. law, virtually any remarks that Members of Congress make to the press are conduct within the scope of their employment. Setting aside

the master-servant question that the court did not address, this means that Members of Congress, and perhaps all federal officials who speak to the press with any regularity, effectively are immune from defamation claims for comments made within the District of Columbia, no matter how personal or private in nature.

Id.

The Trump I court also noted that Ballinger was succeeded by Wuterich, 562 F.3d, which engaged in a more persuasive analysis on the facts at issue, tying an alleged defamatory statement to topics of legislative activity by a Member. Id. at 453. Thus, the Trump court rejected the logic of Ballenger on the ground that it would otherwise be concluding that anything an employee "says is within the scope of his employment." Id. at 453. It distinguished a "comment about government action, public policy or even an election," and so similarly distinguished other decisions involving defamation claims against Members of Congress, including Does, Williams and Operation Rescue, as involving statements directed to Congressional responsibilities. Id. at 454-456. As further addressed below, none of the statements and actions by Escobar alleged to be actionable as defamation and interference fit the same bill as those decisions or even Ballenger.

      B.      Defendant's Scope of Employment Arguments Are Not Valid

In the Motion, Defendant makes certain arguments specific to Plaintiff's allegations that Escobar's defamation and interference was within the scope of her employment. None are valid.

First, while acknowledging that Texas law may be applicable to determine the issue of scope of employment (Motion at 10), and recognizing that Texas law requires that any act by an employee acting within the scope of employment be within general authority given him furtherance of the employer's business for the accomplishment of the object for which the employee is employed, Defendant nevertheless suggests that the test is one which is independent

of motive. Defendant offers <u>Laverie v. Wetherbe</u>, 517 S.W.3d 748, 753 (Tex. 2017) as support for that conclusion. But <u>Laverie</u> simply holds that the issue of scope of employment is properly decided on the basis of an objective assessment whether an employee is doing her job when she committed the alleged tort, not her state of mind when doing it." 517 S.W. 3d at 752-753. That is precisely the analysis offered by Defendant and what makes so critical the fact that Escobar's statements involved harm to a constituent purposely served by her.

Second, referencing in the most general possible terms the duties of a Member of Congress, Defendant recognizes that the "primary obligation of a Member of Congress in a representative democracy is to serve and respond to his or her constituents," including "informing constituents and the public at large of issues being considered by Congress," citing <u>U.S. v. Rostenkowski</u>, 59 F.3d 1291, 1312 (D.C. Cir. 1995), <u>opinion supplemented on denial of reh'g</u>, 68 F.3d 489 (D.C. Cir. 1995). Motion at 10-11. Defendant, again, however, fails to square that truism with the fact that Plaintiff's claim involves intentional harm by Escobar to a constituent, not serving a constituent, responding to a constituent or informing a constituent of any issues being considered by Congress. That is to say, none of the defamatory statements alleged to have been made by Escobar to KTSM representatives involved "furtherance of duties" of a Member of Congress, as such duties are characterized by Defendant itself, since defaming a constituent and putting the constituent out of a job, the opposite of benefitting constituents, the "primary obligation" of a Member according to Defendant, is necessarily not part of the duties of a Member of Congress.

Third, Defendant suggests that simply because a Member of Congress inevitably interacts with the press, communicating with the press is thereby necessarily within the scope of employment. Motion at 11. The same argument that dealings with the press are sufficient, used

in <u>Ballenger</u> and <u>Trump I</u>, was rejected in <u>Trump II</u> and disapproved in <u>Trump II</u>. Defendant's only example of dealings with the press offered in the Motion actually demonstrates the ridiculousness of any argument by Escobar that her conduct, relative to Plaintiff, was within the scope of her employment simply because it was based on interaction with the press. That example is "views on pending legislation." Motion at 11. But no aspect of the allegation of defamation or interference Plaintiff's claims had anything to with Escobar's expression of views on pending legislation.

Fourth, wrongly assuming the validity of an argument for Escobar tied to interactions with the press, Defendant offers that the designation by a Member of Congress of a staff member as a press liaison or press secretary or other similar term carries weight. Motion at 11. But whether or not a Member of Congress employs a delegate for dealing with the press cannot logically dignify action involving communication with the press otherwise outside the scope of employment.

Fifth, as suggested by Plaintiff's description of the characterization by Defendant of Plaintiff's second amended complaint, Defendant addresses only in a highly selective and misleading manner, Plaintiff's allegations in her second amended complaint (Motion at 11-19). Defendant's observations about such allegations actually makes Plaintiff's point that the allegations of her second amended complaint, in identifying the defamatory statements and demands for Plaintiff's termination underlying her claim, do not involve conduct to be expected of a Member of Congress, but rather, intentional destruction of a constituent's reputation and of a constituent's employment.

Defendant focuses first upon allegations in paragraphs 13 and 14 of Plaintiff's second amended complaint, relating to Escobar's refusal to comment on an interview with another

Member of Congress, Tony Gonzales. Motion at 12-14. But the limited allegations in that regard are not either the basis of Plaintiff's claim of defamation nor her claim of interference; which are contained in paragraphs 10, 11, 12, 16, 17, 18, 19 and 21 of her second amended complaint; the first set of allegations simply describe one aspect of the background of the conduct claimed to be actionable. There is, accordingly, no need to subject the allegations in question to a scope of employment analysis.

Beyond the subject of Plaintiff's interview of another Member of Congress addressed in paragraphs 13 and 14 of the second amended complaint, Defendant seizes upon statements of Escobar about interviews by Plaintiff of other politicians referred to in paragraphs 8-11 and 15-16 of the second amended complaint. Motion at 14-16. These allegations again provide context for Plaintiff's claim of defamation and interference of Plaintiff; they are not the allegations of actionable conduct of defamation of Plaintiff to KTSM and demands that KTSM terminate her employment supporting her claims. Moreover, the mere fact that they related to politicians does not mean that they were per se within the scope of Escobar's employment. Williams and Does, cited by Defendant, do not dictate the contrary position but actually undermine Defendant since they involve a connection between statements challenged as defamatory with the specific duties and specific acts of a specific Member of Congress. Defendant does not attempt to make such a connection between any of Escobar's alleged statements and demands to KTSM and any aspect of Escobar's performance as a legislator or Congressional committee member or other specific aspects of Escobar's performance as a Member of Congress.

Next, Defendant focuses upon allegations of Plaintiff's second amended complaint, in paragraphs 7, 11, 12 and 20, relating to Escobar's communication director. Motion at 16-18. Such allegations actually do relate to Escobar's insinuation of that director into her campaign

defamation of Plaintiff which serves as part of the basis of Plaintiff's claims. As indicated by Plaintiff in footnote 1, however, Defendant's argument that use of a staff member to engage in conduct outside her scope of employment is logically impossible (Motion at 16-19) deserves to be turned on its head when the issue is, as here, intentional harm to a constituent's reputation and employment facilitated by a staff member. Indeed, Plaintiff identifies precisely the statements by Escobar's communication director contributing to the destruction of her reputation and employment, but Defendant does not address the allegations concerning such statements. This fact distinguishes this action from Chapman, cited by Defendant, in which the subject of the alleged defamation itself concerned a public issue and the Member made the statements subsequently challenged as defamatory "to ensure his effectiveness as a legislator and maintain the support of his constituents." 399 F. Supp. 2d at 714-715. There was no such effort to Escobar, in any of her challenged statements to KTSM, to appeal to constituents.

C.    Defendant's Rebuttals of Plaintiff's Arguments Are Not Valid

Defendant not only offers its own arguments to conclude Escobar's conduct was within the scope of her employment, but responds to Plaintiff's factual and legal arguments supporting the conclusion that Escobar's defamation and interference were outside the scope of her employment as a Member of Congress. Motion at 19-24. Its responses to Plaintiff's arguments are inadequate.

Defendant first insists upon the applicability of Painter v. Amerimex Drilling I, Ltd., 561 S.W.3d 125, 132 (Tex. 2018). It argues that the "right to control" aspect of Painter has no applicability (Motion at 19-20) to consideration of Escobar's conduct, but relies for that purpose solely on its argument that Escobar was an employee of Defendant as a Member of Congress. Id. But, as reflected in Trump I and Trump II, the questions of employee status and scope of

employment are separate. 498 F. Supp. 3d at 447. Defendant ultimately admits this while still maintaining the right to control under Texas law is irrelevant. Motion at 19-20. But it is not irrelevant under <u>Painter</u> for the reasons indicated in Plaintiff's second amended complaint by its references to <u>Painter</u>. Second amended complaint at 14.

Indeed, as suggested in footnote 1, District of Columbia law could also be argued to govern this action to the extent Escobar made statements sued on from her Capitol office. But, as reflected in Trump I, District of Columbia law is as constraining as Texas law in its focus on a master's right to control a servant and furtherance of a master's business.

Defendant also addresses Plaintiff's reference in her second amended complaint to Escobar's conduct not being immune pursuant to the Speech and Debate Clause of the Constitution. Motion at 20-22. Plaintiff was merely making the point that Escobar's defamatory statements were not absolutely immune. Defendant's elaborate discussion of the point in the Motion was therefore unnecessary.

Defendant further addresses Plaintiff's argument, based on applicable case law, tied to a lack of benefit to Defendant of Escobar's conduct, relevant to the scope of employment analysis. Motion at 22-23. Defendant would prefer to ignore not only the right of control element of Texas law under <u>Painter</u>, but also the benefit element of the Texas law test of vicarious liability under <u>Painter</u>. Motion at 22-23. Defendant admits, however, that Escobar has no master who may receive the benefit of her action. <u>Id</u>. Defendant thereby admits a factual basis for vicarious liability under Texas law (and, as discussed, also District of Columbia law) is missing. It cites <u>Does</u> for the proposition that it is a Member's constituents who benefit but that is not what <u>Does</u> stated in connection with the holding cited by Defendant. 973 F.3d at 599-601. <u>Does</u> adopts a master-servant analysis under Kentucky law but addresses the critical issue of scope of

employment as one of whether statements on issues of widespread public interest—access to abortion clinics—are within the scope of duties of a Member of Congress. Id. at 599-600. The Does court ultimately relied, however, not on the mere fact of a Member communicating with the press but on the basis of serving constituents by "fully informing them of his views." Id. The Does court otherwise analyzed Williams and Operation Rescue in a manner focused upon alleged defamatory statements of Members of Congress likewise involving informing constituents. Id. at 600-601. The Does court sought to tie Ballenger to the same rationale although the statement in contest in Ballenger dealt with an issue of the Member's private life and thereby not an issue of obvious public import or, as in Chapman, in response to an attack on the Member. Id. In all events, neither any of the cases cited in Does, nor Does itself, offers or warrants, the conclusion that conduct harming a constituent is within the scope of employment of a Member of Congress. Moreover, even if such decisions allow statements to the press germane to the duties and roles of a specific Member of Congress to be considered within the scope of employment, they do not address any issue of interference. In fact, none of the decisions relied upon by Defendant address either the issue of either defamation of a constituent or the issue of interference with employment of a constituent. Accordingly, in all events, Defendant cannot use any of the cases it cites to justify a conclusion that Escobar's defamation of Plaintiff, a constituent, and interference in the employment of Plaintiff, a constituent, was within the scope of employment.

Finally, Defendant dismisses the significance of its own definition of the duties of Members of Congress in a summary of such duties by the Congressional Research Service. Motion at 23-24. Defendant insists that the list is not definitive and refers to expectations or responsibilities of Members of Congress beyond those specified by the Congressional Research

Service. Motion at 23-24. But it does not begin to suggest that other such expectations and responsibilities include defaming constituents and getting them fired from positions of private employment.

Indeed, Defendant ignores the fundamental distinction between <u>all of the extant case law and Plaintiff's allegations against Escobar</u>. Escobar did not make statements to the press qua press, but only privately communicated to representatives of an organization, KTSM, to attack the reputation of an employee of that organization and undermine her employment with that organization. None of the cased relied upon by Defendant remotely involve comparable circumstances.

Moreover, the employment of Plaintiff was not a matter of public interest or concern. If it had been, Escobar would have made public, not merely left private, her attacks on Plaintiff's reputation and demands for termination of the employment of Plaintiff. She is not alleged to have made a public statement to the press, as opposed to KTSM representatives, by press release or public statement, defaming Plaintiff to KSTM representatives or demanding that KTSM representatives terminate her employment. She cannot, therefore, invoke the same protection afforded to other Members of Congress who did so in the cited cases and escaped liability for defamation. Even less justifiably can Escobar invoke protection against her demands for action by KTSM bringing about KTSM's termination of Plaintiff's employment.

V.

Conclusion

This Court should not tolerate an argument that conduct rendering an individual liable for defamation and interference should be immune from remedy when engaged in by a Member of Congress.

Respectfully submitted,

KILGORE & KILGORE, PLLC

/s/ *Robert E. Goodman, Jr.*
Robert E. Goodman, Jr.
State Bar No. 08158100
reg@kilgorelaw.com
John S. Morgan
State Bar No. 14447475
jsm@kilgorelaw.com
3141 Hood Street, Suite 500
Dallas, Texas 75219
(214) 969-9099 - Telephone
(214) 379-0840 - Fax

ATTORNEYS FOR PLAINTIFF

CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing was forwarded to

counsel of record via the Court's electronic filing system and/or via email on the 23rd day of

May 2023.

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:     214-659-8626
Facsimile:      214-659-8807
brian.stoltz@usdoj.gov

/s/ Robert E. Goodman, Jr.
Robert E. Goodman, Jr.