IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

_____

CHRISTINA AGUAYO,

     Plaintiff,

v.

UNITED STATES OF AMERICA,

     Defendant.

Civil Action No. 3:23-CV-539-E

**REPLY IN SUPPORT OF DEFENDANT'S MOTION
TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

LEIGHA SIMONTON
UNITED STATES ATTORNEY

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:  214-659-8626
Facsimile:   214-659-8807
brian.stoltz@usdoj.gov

Attorneys for the United States

In her response to the government's motion to dismiss, plaintiff Christina Aguayo

fails to show that Congresswoman Veronica Escobar's activities were not within the

scope of employment, and Aguayo does not otherwise offer any arguments against

dismissal.  The Court should grant the government's motion and dismiss this case.

## I.     Argument and Authorities

**A.     That Aguayo claims that tortious activity occurred does not remove the alleged conduct from the scope of Congresswoman Escobar's employment; nor does the ongoing *Carroll v. Trump* litigation support Aguayo's case.**

Aguayo begins the argument section of her response by asserting that it is

"counterintuitive and even repulsive" for the government to assert that Congresswoman

Escobar was within the scope of her employment as a Member of Congress, given that

Aguayo is claiming that the Congresswoman defamed her and interfered with her

employment.  (Doc. 19 at 4.)  But as the very existence of the Federal Tort Claims Act

(and the Westfall Act) shows, simply because some government employee's actions are

alleged to have been tortious does not mean that the actions were outside the scope of

employment.  If that were the case, the Federal Tort Claims Act and Westfall Act would

each be a dead letter within the U.S. Code—under Aguayo's view, it would never be

within the scope of federal employment for a federal employee to commit an (alleged)

tort.  But that is simply not the law.  *See, e.g.*, *Williams v. United States*, 71 F.3d 502,

506–07 (5th Cir. 1995) (explaining that a Congressman's allegedly defamatory remarks

were within the scope of employment—and specifically noting that this was true "even

assuming [the] remarks *are* defamatory" (emphasis added)); *see also Smith v. Clinton*,

886 F.3d 122, 126 (D.C. Cir. 2018) ("Extensive precedent makes clear that alleging a

federal employee violated policy or even laws in the course of her employment—

including specific allegations of defamation or of potentially criminal activities—does

not take the conduct outside the scope of employment.").  It is precisely *because*

government employees can engage in allegedly tortious activities in the scope of their

employment that Congress has passed laws that partially waive the government's

immunity for some tort claims but preserve immunity as to other claims (including

Aguayo's[1]) and simultaneously immunize the employees themselves from liability as to

all such claims.

Relatedly on the scope issue, Aguayo relies on the fact that she verified the

allegations of the second amended complaint, asserting that "if Plaintiff attests to facts

raising an issue of fact whether an alleged federal employee's conduct was outside the

scope of his employment," the government's motion to dismiss should be denied.  (Doc.

19 at 6.)  But this is question-begging.  Aguayo is (incorrectly) assuming that the facts

pleaded in the second amended complaint do show conduct outside the scope of

employment, and then suggesting that because she verified her pleading, this somehow

"establishes" that the conduct at issue was indeed outside the scope of employment.

(Doc. 19 at 6.)  But again, this is not the law.  Aguayo cites no precedent in support of her

verification theory.  (*See* Doc. 19 at 6.)  And the Fifth Circuit has made clear that after

the government files a Westfall Act certification, the burden is on the plaintiff to "show

that the defendant's conduct *was not within the scope of his or her employment*"—not

---

[1] Aguayo does not dispute that exceptions to the Federal Tort Claims Act preserve the government's immunity as to claims for defamation and interference with contract.

merely that the alleged conduct occurred.  *Williams*, 71 F.3d at 506 (emphasis added).

Thus, even if the Court were to treat Aguayo's verification as summary-judgment-type

"proof" from Aguayo that the events alleged in the second amended complaint did in fact

occur, that does not mean that those events were outside the scope of Congresswoman

Escobar's employment.  Instead, for all the reasons previously given in the government's

motion to dismiss, the actions at issue are within the scope of employment of a Member

of Congress—even if they are assumed to have occurred in the manner Aguayo recounts.

*See Williams*, 701 F.3d at 507 (explaining that a Congressman's remarks were within the

scope of employment "even assuming such remarks are defamatory").  As one court has

explained, the plaintiff seeking to overturn the government's Westfall Act certification

bears the burden of presenting "specific evidence or the forecast of specific evidence that

contradicts the Attorney General's certification decision, not mere conclusory allegations

and speculation."  *Gutierrez de Martinez v. DEA*, 111 F.3d 1148, 1155 (4th Cir. 1997).

Aguayo has not done so.

Aguayo also devotes several pages of her response to the ongoing *Carroll v.*

*Trump* litigation, in which the plaintiff is alleging that then-President Trump defamed her

when discussing the plaintiff's claim that Trump had sexually assaulted her in the 1990s.[2]

(*See* Doc. 19 at 1, 5–12 (citing *Carroll v. Trump*, 498 F. Supp. 3d 422 (S.D.N.Y. 2020),

---

[2] This *Carroll v. Trump* litigation is different from a second lawsuit by the same plaintiff in which she sued Trump directly for the alleged sexual assault, and recently obtained a jury verdict and judgment in her favor.  That second lawsuit was made possible after New York passed a law in 2022 that temporarily revived the window for filing lawsuits over sexual assaults against adults that otherwise would be time-barred (which law was patterned after a similar law that had been enacted in 2019 to allow child victims to sue), and also included a defamation claim but only for statements made by Trump after he left office.

and subsequent decisions from the same litigation).)  But the *Carroll v. Trump* litigation

does not help Aguayo's case and does not show that Congresswoman Escobar's alleged

actions were outside the scope of her congressional employment.

For one, a key disputed threshold issue in *Carroll v. Trump* has been whether the

President of the United States is considered an "employee" of the government for

purposes of the Federal Tort Claims Act and the Westfall Act.[3]  (*See* Doc. 19 at 12

(discussing this issue).)  But with respect to Aguayo's claims based on the allegedly

tortious conduct of Congresswoman Escobar, the "employee" question is not an issue.

Binding precedent from the Fifth Circuit expressly provides that Members of Congress

are considered "employees" of the government for purposes of the relevant statutes.  *See*

*Williams*, 71 F.3d at 504–05; *see also id.* at 505 ("Therefore, we find that as an employee

of the government as defined under the FTCA, [Congressman] Brooks is eligible for

coverage if his conduct at issue was within the scope of his employment.").

Further, in light of the initial skirmishing over the "employee" issue in the *Carroll*

*v. Trump* litigation, which by this point has occurred in multiple forums including in two

separate appellate courts, the issue now pending before this Court in connection with

Aguayo's suit—whether a government employee's actions were within the scope of

employment—has not yet been definitively resolved in *Carroll v. Trump*.  Indeed, that

issue probably will not be resolved in *Carroll v. Trump* for some time, given the seeming

likelihood of additional appellate proceedings similar to those that have already occurred

---

[3] The Second Circuit ultimately made clear that the answer is yes.  *See Carroll v. Trump*, 49 F.4th 759,
772 (2d Cir. 2022).

in the case no matter which way the district court eventually rules on the scope issue.

Meanwhile, though, existing caselaw makes clear that conduct of the type at issue here—

a Member of Congress's statements to the press and public about matters of public

note—does fall within the scope of congressional employment.  *See, e.g.*, *Williams*, 701

F.3d at 507; *Does 1–10 v. Haaland*, 973 F.3d 591, 600–02 (6th Cir. 2020); *Council on*

*Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 664–66 (D.C. Cir. 2006); *Chapman v.*

*Rahall*, 399 F. Supp. 2d 711, 714–15 (W.D. Va. 2005); *Operation Rescue Nat'l v. United*

*States*, 975 F. Supp. 92, 106–09 (D. Mass. 1997).

**B.      Aguayo has not shown that Congresswoman Escobar's alleged conduct was outside the scope of her employment as a Member of Congress.**

Aguayo next offers a series of arguments against the notion that Congresswoman

Escobar's activities occurred in the scope of her employment.  (*See* Doc. 19 at 13–21.)

But as discussed below, none of these arguments has merit.

Aguayo first focuses on the issue of who the "master" of a Member of Congress is,

and asserts that "no one controls the actions of a Member of Congress," including when

"speaking to the press."  (Doc. 19 at 13.)  Aguayo appears to be suggesting that unless it

is shown that a Member was acting at the specific direction of some higher employer-

type authority, the Member's activities cannot be considered to have occurred within the

scope of employment.  But this approach is flatly inconsistent with the Fifth Circuit's

decision in *Williams*, in which the court was "not hesitant to find that as a matter of law"

the Congressman's statements were within the scope of employment, even if assumed to

be defamatory.  *See Williams*, 71 F.3d at 507.  In reaching this result, the Fifth Circuit

noted that the Texas scope-of-employment inquiry focuses on whether the actions in question were within the employee's general authority and in furtherance of the employer's business. *Id.* at 506. But the court did not find it necessary to identify some "master" who had directed or even merely authorized the Congressman to make the remarks at issue. *See id.* at 506–07. Instead it considered whether the activities in question were among the type of things traditionally done by Members of Congress. *See id.* They were, and therefore scope of employment was established.

The same analysis applies here and dictates the same result. As discussed in the motion to dismiss, a Member of Congress's job-related duties are wide-ranging and easily encompass a Member's attempts to make her own views known with respect to "'pending legislation and related current events through press releases, televised speeches, interviews, and . . . through social media postings.'" (Doc. 13 at 11 (quoting *Does 1–10*, 973 F.3d at 602).) Congresswoman Escobar's alleged activities in interacting with Aguayo and Aguayo's management (i.e., the press), and also communicating her views to the public on matters of current political interest (either directly or through staffers), all fall within the sphere of traditional activities of a Member of Congress.

Aguayo next asserts that because she (apparently) was a constituent of Congresswoman Escobar's, the Congresswoman's actions cannot have been within the scope of employment because they allegedly harmed a constituent (Aguayo) rather than helped her. (Doc. 19 at 15.) As an initial matter, the second amended complaint does not appear to actually allege that Aguayo lives or lived in the district represented by Congresswoman Escobar, so it is unclear on what basis the Court can conclude that she

was, in fact, a constituent.  But even if she were, that would not change anything.  The

motion to dismiss discussed constituents in the context of explaining that "[i]n asking

whether Congresswoman Escobar was authorized to engage in the type of activities at

issue and whether those were in the general furtherance of her employment (i.e., to the

'benefit' of her employer), the Congresswoman's employer can be thought of as her

constituents, and she serves them simply by making *her views* known and working to

advance whatever policies and positions *she thinks* would benefit them."  (Doc. 13 at 22–

23 (citing *Does 1–10*, 973 F.3d at 600) (emphasis added).)  Obviously, though, not every

constituent will be completely satisfied at all times with the views and actions of the

constituent's Member of Congress.  The Member's job duties are wide enough to permit

the Member to do what she thinks would be most beneficial to the district and its

constituents at large and as a whole, even if certain specific constituents might disagree.

*See Does 1–10*, 973 F.3d at 600 (explaining that a Senator's job involved serving

constituents "by fully informing them of his views and working to pass legislation he

believed would benefit them").)  So the fact that Aguayo, personally, takes issue with

Congresswoman Escobar's actions does not mean that it was not within the scope of the

Congresswoman's employment to, e.g., push back against perceived errors in Aguayo's

reporting on matters of public note.  These matters were relevant to all of the district's

constituents as a whole and Aguayo's disagreement with the Congresswoman's positions

or statements does not control the scope question.

Aguayo next discusses the specific incident in which Congresswoman Escobar

contacted TV station management to complain that Aguayo had made an erroneous

statement in a new report about whether the Congresswoman had been contacted with a request for comment about a story. (*See* Doc. 19 at 17.) On this occasion, Aguayo said during a newscast that the Congresswoman had been contacted for comment about an issue but never responded; upon hearing this, the Congresswoman contacted station management to dispute Aguayo's statement because according to the Congresswoman, Aguayo had not actually made any request for comment. (*See* Doc. 13 at 3–4.) The culmination of these events was that Aguayo's management apparently sided with the Congresswoman's account of what had happened and required Aguayo to make an on-air apology/retraction of her prior statement—which Aguayo obviously took great exception to and calls being forced to "lie on television." (Doc. 11, ¶ 14.)

Oddly—especially given that the very gravamen of Aguayo's suit is the breakdown of the relationship with her TV station employer that ultimately led to her firing, and for which she blames the Congresswoman—Aguayo now disavows these allegations about the forced apology/retraction, suggesting that they form no part of her claims for defamation and tortious interference. (Doc. 19 at 17.) Instead, Aguayo says, these allegations provide only "background" such that there is "no need to subject the allegations in question to a scope of employment analysis." (Doc. 19 at 17.)

Aguayo's backtracking in this regard is telling, for several reasons. First, it is contrary to any reasonable reading of her pleadings. The second amended complaint expressly alleges that Congresswoman Escobar "defamed [Aguayo] by accusing her of dishonesty in her reporting." (Doc. 11, ¶ 23.) This quite clearly encompasses the incident in question, in which the Congresswoman contacted Aguayo's management to

say that Aguayo's statement about having contacted the Congresswoman for comment was not true.  For Aguayo to now say that this incident in fact forms no part of her claims is not a plausible reading of the second amended complaint and of her claims.

Second, the reason for Aguayo's about-face is apparent.  She presumably does not want the Court to consider the matters in question because she realizes that the activities were so obviously within the scope of a Member of Congress's employment.  As discussed in the motion to dismiss, among the traditional and customary activities of Members of Congress are interacting with the media and making known the Member's views about matters of public concern.  Responding to a TV news reporter's story about a political issue (in this instance a story relating to Congressional support for Fort Bliss, which is a major Army installation in El Paso), especially when Congresswoman Escobar was specifically referenced in that story, falls easily within the ambit of such activities.

Further, Congresswoman Escobar's other allegedly tortious activities, consisting of things like contacting TV station management on other occasions to complain about Aguayo's reporting or allegedly engineering defamatory comments about Aguayo's reporting on social media, are of the same general type as the interactions with station management in connection with the apology/retraction.  Aguayo tacitly concedes that the latter activities were within the scope of the Congresswoman's employment, by now asking the Court not to consider the scope-of-employment issue as to these matters and asserting that they form no part of her claims.  But the same is true of the other allegedly tortious acts of the Congresswoman—there is no meaningful distinction in the type of conduct at issue, and all the conduct was within the scope of employment.

**Reply in Support of Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint – Page 9**

Finally, Aguayo suggests that her claims are different from other cases in which allegedly defamatory remarks were held to be within the scope of employment because Congresswoman Escobar allegedly "only privately communicated to representatives of an organization, KTSM [the TV station], to attack the reputation of an employee of that organization and undermine her employment." (Doc. 19 at 21.)  But this argument fails for at least two reasons.  First, the second amended complaint does not merely allege that communications were made "privately" that allegedly defamed Aguayo.  Instead, Aguayo alleged that "defamatory statements about her were published on various social media platforms" and that these statements "occurred based on Escobar herself, and others at her urging, making, conspiring in or assisting and encouraging or assisting and participating in such statements." (Doc. 11, ¶ 11.)  And further, even with respect to private communications to station management, Aguayo has taken the position (incorrectly, in the government's view) that the Congresswoman's private communications to TV station management about the disputed request for comment do not form any part of her claims and that there is "no need to subject [these] allegations . . . to a scope of employment analysis." (Doc. 19 at 17.)  Aguayo cannot have it both ways.  And ultimately, she provides no authority showing that Congresswoman Escobar's communication of concerns about Aguayo's reporting directly to station management, in addition to in various public forums (e.g., social media), somehow removed these activities from the scope of the Congresswoman's employment.  It did not.

## II.      Conclusion

The motion to dismiss should be granted and this case dismissed.

**Reply in Support of Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint – Page 10**

Respectfully submitted,

LEIGHA SIMONTON
UNITED STATES ATTORNEY

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:   214-659-8626
Facsimile:    214-659-8807
brian.stoltz@usdoj.gov

Attorneys for the United States

Certificate of Service

On June 6, 2023, I electronically submitted the foregoing document with the clerk

of court for the U.S. District Court, Northern District of Texas, using the electronic case

filing system of the court.  I hereby certify that I have served all parties electronically or

by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney

**Reply in Support of Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint – Page 11**