UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| CHRISTINA AGUAYO, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | |
| § CIVIL ACTION NO. 3:23-CV-539-E | |
| UNITED STATES OF AMERICA, § | |
| § | |
| Defendant. § | |

PLAINTIFF'S SURREPLY TO RESPONSE
TO DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff Christina Aguayo ("Plaintiff") hereby files her surreply to her response to the motion of Defendant United States of America ("United States"), on behalf of the Member of the United States Congress for the 16th District of Texas, Veronica Escobar ("Escobar"), to dismiss Plaintiff's second amended complaint (the "Motion") based on the unopposed motion for leave to file surreply contemporaneously filed with this surreply:

This surreply simply highlights pertinent relevant authority not available when Plaintiff filed her response to the United States of America's motion to dismiss or the relevance of which was not readily apparent at the time.

1. The first authority is the correspondence of the United States Department of Justice dated July 11, 2023, addressed to the Honorable Lewis A. Kaplan, United States District Judge, Southern District of New York, 500 Pearl Street, New York, NY 10007 (copy attached as Exhibit "1"). This correspondence withdraws the United States' Westfall Act defense for former President Trump ("Trump") in Carroll v. Trump, Cause No. 20-CV-07311 (S.D.N.Y.) by

PLAINTIFF'S SURREPLY TO RESPONSE
TO DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED COMPLAINT – Page 1

"declining to certify . . . that [he] was acting within the scope of his office and employment as President of the United States when he made the statements that form the basis of the defamation claims in plaintiff's Amended Complaint in this action." Id. at 1.

Plaintiff believes this Court should take into consideration in this action multiple aspects of the correspondence as follows:

a.     The correspondence explains the decision of the District of Columbia Court of Appeals in Carroll v. Trump, 292 A. 3d 233-234 (D.C. App. 2023) in detail, emphasizing that the purpose of conduct, for vicarious liability purposes, must subjectively be to pursue the interest of an employer, and that that purpose must not be slight, whether or not predominant. Here, there was no obvious interest on the part of Escobar to serve any public purpose, much less to serve her constituents (of which Plaintiff was one) (and much less the purpose of an employer, even assuming she could be regarded as having an employer as a Congresswoman) in her defamatory comments, and those which she aided and abetted and in which she conspired, directed at Plaintiff, and in her communications with Plaintiff's private employer to bring about the termination of Plaintiff's private employment.

b.     The correspondence remarks upon the decision of the District of Columbia Circuit Court of Appeals in Council on American-Islamic Relations v. Ballenger, 444 F.3d 659 (D.C. Cir. 2006) and reiterates that Ballenger did not adopt a categorical rule holding that "the conduct of elected officials speaking to the press is always within the scope of that official's employment," and that the District of Columbia Court of Appeals likewise declined to itself adopt such a categorical rule. Carroll, 292 A.3d at 239-240 ("We have never adopted a rule that has detemined that a certain type of conduct is per se within (or outside of) the scope of

PLAINTIFF'S SURREPLY TO RESPONSE
TO DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED COMPLAINT – Page 1

employment, and we decline to do so now."). This is so even while the United States, in its motion and reply in this action, emphasized that consideration as the paramount, if not exclusive, basis for its Westfall certification. The correspondence to Judge Kaplan likewise notes that the District of Columbia Court of Appeals noted that the Ballenger court's holding "rested on undisputed, affirmative evidence in the record that [Ballenger's] purpose behind making the allegedly defamatory statements was to serve his constituents and otherwise carry out his legislative responsibilities," id. at 239, and suggested that in this respect, the record before the Ballenger court was distinct from the record in this case, "which is disputed by the parties." Id. at 239 n.23. The facts of this action also similarly distinguish themselves from Ballenger for reasons made apparent in Plaintiff's response to the motion to dismiss of the United States.

   c. In its analysis within the correspondence to Judge Kaplan, the United States concluded, that under the applicable standard, the evidence of the state of mind of President Trump "does not establish that he made the statements at issue with a "more than insignificant" purpose to serve the United States Government," further reiterating the contrast to Ballenger and other considerations pertinent to this action:

> No direct evidence of the former President's state of mind in making these statements is available. As the D.C. Court of Appeals noted, this case stands in contrast to Ballenger, in which the Congressman offered "undisputed, affirmative evidence," id. at 239, by way of his affidavit, on which the district court relied in finding that he was acting, at least in part, "for the purpose of preserving his effectiveness as a congressman." Ballenger, 444 F.3d at 663 (quotation marks and citation omitted).
>
> Moreover, the circumstantial evidence of Mr. Trump's subjective intent in making the allegedly defamatory statements does not support a determination in this case that he was sufficiently motivated by a desire to serve the United States Government. There is some evidence that could, in some circumstances, support a certification. The former President was responding to allegations that could have called into question his fitness to hold the office of the Presidency. In addition, the statements at issue were drafted or made at the

PLAINTIFF'S SURREPLY TO RESPONSE
TO DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED COMPLAINT – Page 1

White House, in response to inquiries made to or at the White House, through official channels that Presidents often use to communicate with the media: a statement issued by the press office to a daily press pool, a press "gaggle" on the White House lawn, and an interview in the Oval Office. See, e.g., Does 1-10 v. Haaland, 973 F.3d 591,602 (6th Cir. 2020) ("Congressmembers routinely broadcast their views on pending legislation and related current events through press releases, televised speeches, interviews, and, as in the present case, through social media postings.").

The D.C. Court of Appeals, however, has now made clear that D.C. law does not hold that any statement, whatever its actual purpose, is by definition made for official purposes simply because it is made using official channels of communication. See Carroll, 292 A.3d at 232 ("The employment must have created more than the mere opportunity to commit the tort; there must still be some relationship or nexus between the tortious conduct and the employee's responsibilities for it to be an outgrowth of a job-related controversy."). Additionally, the Court of Appeals' clarification that Ballenger did not establish a "categorical" rule "that would hold that the conduct of elected officials speaking to the press is always within the scope of that official's employment," id. at 239, confirms that the context in which the former President made these statements does not end our inquiry even if it would, on its own, give rise to an inference that he was acting for an official purpose.

Instead, the Department must also consider whether the allegedly tortious action arose out of a work-related incident. See id. at 232 (explaining that "the District of Columbia case precedents have focused on whether the conduct was an 'outgrowth of a job-related controversy,'" which has been "framed as an inquiry into whether the conduct was the 'outgrowth of the employees' instructions or job assignments'" (citation omitted)).. . . . As a general matter, an elected official's ability to retain the trust of his constituents- including by addressing their concerns and informing them of his views on issues that they care about, or by discussing personal matters that may pertain to the public's confidence in him-is an important part of his ability to effectively perform his job. But that background principle cannot overcome countervailing evidence that an official who made defamatory statements was insufficiently actuated by a public purpose, to justify a finding that he was acting within the scope of his employment. See, e.g., Lyons v. Brown, 158 F.3d 605, 610 (1st Cir. 1998) (noting that "whatever justification [the defendant] might have for his actions could be overcome if his actual purpose was to retaliate").

d.      The correspondence finally to Judge Kaplan observed, as relevant to this action:

The Department must "take a holistic approach to discerning an employee's purpose in engaging in the tortious conduct, considering any inferences from the circumstances of the relationship between the parties and the conduct," as is "appropriate under the facts presented," Carroll, 292 A.3d at 235.

PLAINTIFF'S SURREPLY TO RESPONSE
TO DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED COMPLAINT – Page 1

2. The second authority is the opinion of the District of Columbia Court of Appeals in <u>Trump v. Carroll</u>, 292 A. 3d 220 (D.C. 2023) referred to in the (copy attached as Exhibit "2").

3. The third authority is the opinion of the Ninth Circuit Court of Appeals in <u>Spletstoser v. Hyten</u>, No. 20-56180 (9th Cir. 2022) (attached as Exhibit "3"). In <u>Hyten</u>, the Ninth Circuit Court of Appeals ruled that the plaintiff's allegations of sexual assault by General Hyten did not fall within the scope of immunity under the Federal Tort Claims Act or the <u>Feres</u> doctrine under <u>Feres v. United States</u>, 340 U.S. 135 (1950), because General Hyten's sexual assault of Lt. Col. Spletstoser was not within the course and scope of the General's job duties as a soldier, and the plaintiff's injuries were not within the scope of injuries that can reasonably be expected to arise out of military service. The <u>Hyten</u> decision is instructive to this instant suit, because Escobar's desire to defame and tortiously interfere with the employment of a private citizen and constituent of the Congresswoman, are not with the normal scope of a Congressperson's job duties, and Plaintiff's damages did not occur as a result of Escobar's service to the United States.

Respectfully submitted,

KILGORE & KILGORE, PLLC

/s/ *Robert E. Goodman, Jr.*
Robert E. Goodman, Jr.
State Bar No. 08158100
reg@kilgorelaw.com
John S. Morgan
State Bar No. 14447475
jsm@kilgorelaw.com
3141 Hood Street, Suite 500
Dallas, Texas 75219
(214) 969-9099 - Telephone
(214) 379-0840 - Fax

ATTORNEYS FOR PLAINTIFF

CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing was forwarded to counsel of record via the Court's electronic filing system and/or via email on the 17th day of July 2023.

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:      214-659-8626
Facsimile:       214-659-8807
brian.stoltz@usdoj.gov

/s/ *Robert E. Goodman, Jr.*
Robert E. Goodman, Jr.